# EXHIBIT

# A

Case: 1:20-cv-02582-SO  Doc #: 1-1  Filed: 11/17/20 2 of 133. PageID #: 8

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV20938826 | D1 CM | 42783459 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

| | |
|---|---|
| WRB PARTNERS, LLC | **PLAINTIFF** |
| **VS** | |
| RGN-CLEVELAND II, LLC | **DEFENDANT** |

## SUMMONS

RGN-CLEVELAND II, LLC
C/O: REGUS CORPORATION
ATTN: LEGAL DEPARTMENT
3000 KELLWAY DRIVE
STE. 140
CARROLTON TX 75006

You have been named defendant in a sums
complaint (copy attached hereto) filed in Cuyahoga
County Court of Common Pleas, Cuyahoga County
Justice Center, Cleveland, Ohio 44113, by the
plaintiff named herein.

You are hereby summoned and required to answer
the complaint within 28 days after service of this
summons upon you, exclusive of the day of service.

**Said answer is required to be served on:**



Said answer is required to be served on Plaintiff's
Attorney (Address denoted by arrow at left.)

**Plaintiff's Attorney**

AARON S EVENCHIK
200 PUBLIC SQUARE, SUITE 2800

CLEVELAND, OH 44114-0000

Your answer must also be filed with the court
within 3 days after service of said answer on
plaintiff's attorney.

If you fail to do so, judgment by default will be
rendered against you for the relief demanded in the
complaint.

**Case has been assigned to Judge:**

CASSANDRA COLLIER-WILLIAMS
**Do not contact judge. Judge's name is given for
attorney's reference only.**

**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

| DATE SENT |
|---|
| Oct 14, 2020 |

By _____
Deputy

COMPLAINT FILED   10/13/2020

CMSN130

Date Produced: 10/26/2020

CERTIFIED MAIL SOLUTIONS INC.:

The following is the delivery information for Certified Mail™/RRE item number 9314 8001 1300 3540 7929 94. Our records indicate that this item was delivered on 10/21/2020 at 02:47 p.m. in CARROLLTON, TX 75006. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: COMPLAINT**
**October 13, 2020 11:01**

By: DANIEL A. DEMARCO 0038920

Confirmation Nbr. 2093116

WRB PARTNERS, LLC                                CV 20 938826

vs.

RGN-CLEVELAND II, LLC                            **Judge:**  CASSANDRA COLLIER-WILLIAMS

**Pages Filed:**  128

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| WRB PARTNERS, LLC, | ) | |
| 10020 Aurora Hudson Rd. | ) | CASE NO.: |
| Streetsboro, OH 44241 | ) | |
| | ) | JUDGE: |
| Plaintiff, | ) | |
| | ) | **COMPLAINT FOR DECLARATORY** |
| v. | ) | **JUDGMENT AND INJUNCTIVE** |
| | ) | **RELIEF** |
| RGN-Cleveland II, LLC, | ) | |
| Notice Address: c/o Regus Corporation | ) | (JURY DEMAND ENDORSED |
| 3000 Kellway Dr., Ste. 140 | ) | HEREON) |
| Carrolton, TX 75006 | ) | |
| Attn: Legal Department | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff WRB Partners, LLC ("WRB") for its Complaint for Declaratory Judgment and
Injunctive Relief against Defendant RGN-Cleveland II, LLC ("RGN"), states as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff WRB is an Ohio limited liability company and the owner of commercial
real estate located in downtown Cleveland, Ohio at the address of 1468 West Ninth Street,
Cleveland, Ohio 44113 (the "Premises").

2.      Defendant RGN is a Delaware limited liability company ultimately owned and
controlled by Regus Corporation ("Regus"). Regus is in the business of providing office and co-
working spaces to paying customers and members under the "Regus" brand. RGN is one of
hundreds of special purpose entities ("SPEs") formed by Regus to serve as the named tenant for a
Regus co-working space, this one to be located in Cleveland at the Premises.

3.     This Court has personal jurisdiction over RGN pursuant to R.C. § 2307.382(A) because, among other things, RGN has a leasehold interest in the Premises.

4.     This Court has subject matter jurisdiction over this matter because it is a court of general jurisdiction and the amount in controversy exceeds $15,000.

5.     Venue is proper in this Court pursuant to Civil Rule 3(C) because, among other things, the property that is the subject of this action (the Premises) is located in Cuyahoga County.

## NATURE OF THE CASE

6.     This dispute arises as a result of RGN's failure to provide WRB with adequate assurances that it will perform its obligations as tenant under the lease agreement between the parties. RGN is just one of many Regus SPEs created to serve as a nominal tenant for a Regus co-working space. To date, more than 100 of RGN's affiliate SPEs have declared bankruptcy, and RGN appears poised to do the same. RGN's bankrupt affiliates have already used their bankruptcies to demand costly lease modifications from their respective landlords. WRB files this declaratory judgment action to ensure that it does not become the next landlord forced into a harsh and costly lease modification with a Regus SPE.

7.     RGN is now lobbying WRB to pour more than $1.6 million into improvements for the leased Premises—improvements that will make the Premises unmarketable to potential tenants other than RGN. But RGN's ability to perform under the lease has been, and remains, in serious doubt given the very public financial struggles of its affiliate companies, its failure to perform certain existing obligations under the lease, and its affiliates' bankruptcy strategy of maximizing leverage against landlords in order to extract costly lease modifications.

8.     WRB therefore demanded adequate assurances from RGN: primarily financial information that would demonstrate RGN's ability to perform the lease. RGN refused to provide

these adequate assurances, and by doing so repudiated and anticipatorily breached the lease. WRB therefore brings this action seeking a declaration that RGN has repudiated the lease and that WRB has no further obligation to perform.

## FACTS

### A.     WRB and RGN Enter into the Lease.

9.      On or about December 13, 2019, WRB as landlord and RGN as tenant executed a Lease Agreement (the "Lease") under which WRB would lease the Premises to RGN for a term of 12 years. Attached hereto as **Exhibit 1** is a true and correct copy of the Lease.

10.     Tenant's obligations under the Lease were guaranteed by IWG Global Investments SARL ("IWG"), a Luxemburg-based multinational company that directly or indirectly owns Regus. *See* Lease Art. 21. A true and correct copy of IWG's Guaranty Agreement in relation to the Lease is attached hereto as **Exhibit 2**.

11.     As contemplated by the Lease, RGN was to operate the Premises as a co-working space under the Regus brand. At the time the Lease was executed, the Premises was not built out to operate as a co-working space. As such, the Lease included terms contemplating a build-out of the Premises. The improvements to be made to the Premises to turn it into a functional co-working space were deemed "Tenant's Initial Improvements."

12.     Under Article 17 of the Lease, WRB was to perform certain initial work on the Premises ("Landlord's Initial Work"), including the installation of ceiling lighting and the renovation of the elevator lobby and restrooms located on the second floor. *See* Ex. 1, Lease § 17.1 & Ex. E thereto. For its part, RGN was to submit construction plans for Tenant's Initial Improvements to WRB for WRB's approval. *See id.* § 17.3(i). The Lease also obligated RGN to deliver a variety of specific items to WRB "[p]rior to beginning Tenant's Initial Improvements,"

including a builder's risk insurance policy naming WRB and its mortgagee as additional insureds, plans for the construction of the Tenant's Initial Improvements, certificates of insurance evidencing insurance coverages required by the Lease, and the names of RGN's proposed contractor, subcontractors and architect, for WRB's approval. *See id.*

13.     The Lease granted RGN a Tenant Improvement Allowance of $1,611,780.00. Ex. 1, Lease § 1.1, at 6. As contemplated by the Lease, RGN was to have responsibility for planning and carrying out Tenant's Initial Improvements (subject to WRB's review and approval), and the Tenant Improvement Allowance was to be paid by WRB toward Tenant's Initial Improvements as they were completed, pursuant to Section 17.3(iii) of the Lease.

14.     Under the Lease, RGN was to begin paying rent to WRB after the build-out of the Premises was completed or after it opened for business in the Premises, whichever occurred earlier (i.e., on the "Rent Commencement Date"). *See* Ex. 1, Lease § 1.1, at 4–5.

**B.      RGN Fails to Provide Items Required by the Lease and Fails to Work Toward Completing Tenant's Initial Improvements While Dozens of Its Affiliates File for Bankruptcy.**

15.     WRB substantially and timely completed Landlord's Initial Work and delivered the Premises to RGN in March 2020. This work was significant, and involved, among other things, WRB's expenditure of approximately $250,000 to renovate an exclusive elevator for RGN's use, and its additional expenditure of hundreds of thousands of dollars to relocate other tenants in order to accommodate RGN's use and occupancy of the Premises.

16.     RGN was then supposed to begin work on Tenant's Initial Improvements, but instead it did almost nothing throughout the spring and summer of 2020. By August 2020, RGN had not provided WRB with construction plans, had not begun substantial work on Tenant's Initial Improvements, and indeed had not even obtained a permit from the City of Cleveland to begin

work on Tenant's Initial Improvements. In addition, RGN had failed to perform several Lease obligations, specifically:

a) RGN had failed to procure insurance coverage, as required by Section 6.1 of the Lease;

b) RGN had failed to provide WRB with certificates of insurance evidencing that it had obtained the necessary insurance coverage, as required by Section 6.2 of the Lease;

c) RGN had failed to deliver to WRB a builder's risk insurance policy naming WRB and its mortgagee as additional insureds, as required by Section 17.3(i) of the Lease;

d) RGN had failed to provide WRB with the names of its proposed contractor, subcontractors and architect, for WRB's approval, as required by Section 17.3(i) of the Lease; and

e) RGN had failed to provide WRB with a W-9 Form and Contact Information Form that WRB had previously requested, which were required to enable WRB to prepare for billing on the Rent Commencement Date.

17. Further, RGN unreasonably refused to accept WRB's tender of the Premises to it after the completion of Landlord's Initial Work, in an effort to delay the commencement of construction on Tenant's Initial Improvements and to delay the Rent Commencement Date.

18. RGN's inaction was particularly alarming because, by August 2020, dozens of its affiliates from around the country had already declared bankruptcy, and the CEO of IWG PLC, an entity related to RGN's parent company and guarantor, IWG, had announced "plans to close around 100 [more] locations in the second half of the year." *See* **Exhibit 3**, Konrad Putzier, *Co-Working Companies Expanded Rapidly. Now They're Retreating Fast.*, Property Report, Aug. 11,

2020. IWG PLC's CEO also publicly announced plans to shepherd SPEs like RGN into strategic bankruptcies to "get out of long-term lease obligations." *Id.* at 4.

19.     The fact that RGN was not working toward the planning or completion of Tenant's Initial Improvements and had not performed several requirements of the Lease, coupled with the fact that RGN's affiliates from around the country were declaring bankruptcy in droves, reasonably caused WRB to be concerned that RGN would not be able to continue performing the Lease by, for example, paying rent on and after the Rent Commencement Date.

**C.     WRB Demands that RGN Provide It with Adequate Assurances but RGN Fails to Do So.**

20.     Because of its reasonable concern that RGN would be unable to perform the Lease, on August 21, 2020, WRB sent RGN a formal request for adequate assurances (the "First Request for Adequate Assurances"). The First Request for Adequate Assurances demanded that RGN demonstrate its continuing willingness and ability to perform its obligations under the Lease by providing WRB with the deliverables required of it under the Lease, which it had theretofore failed to provide, as set forth above. *See supra* ¶ 16. It granted RGN until August 28, 2020 to provide these items, and advised RGN, "If you fail to [provide the requested materials], we will consider that failure to constitute a repudiation of [RGN's] obligations under the Lease . . . ." Attached hereto as **Exhibit 4** is a true and correct copy of the First Request for Adequate Assurances.

21.     The August 28 deadline came and went, but by September 2020, RGN still had not provided WRB with all of the items requested in its First Request for Adequate Assurances. For instance, RGN had not provided WRB with a builder's risk insurance policy, the identities of its subcontractors, or detailed construction plans for Tenant's Initial Improvements—all of which were required by Section 17.3(i) of the Lease.

**D.      RGN Abruptly Begins Work on the Premises Without Having Provided Adequate Assurances, While Its Affiliates Continue to Declare Bankruptcy in Droves.**

22.     Despite having failed to provide items required by the Lease and demanded by WRB as adequate assurances, RGN retained a contractor and began demolition work on the Premises in September 2020. When it began work, RGN still had not obtained a permit from the City of Cleveland authorizing it to begin work on Tenant's Initial Improvements. This was a breach of Section 7.4 of the Lease, which obligated RGN to comply with all applicable governmental requirements in connection with work on the Premises.

23.     RGN's retention of a contractor was abrupt and unexpected given its months of inactivity over the spring and summer. It appeared to be part of a new whirlwind approach to the Lease under which RGN would seek to perform Tenant's Initial Improvements as quickly as possible in order to force WRB to fund the Tenant Improvement Allowance. To ensure that RGN would receive a reasonable bid for the work to be performed, WRB had offered to leverage the bid from RGN's contractor against that of another contractor with whom WRB had worked in the past. RGN initially agreed, but then failed to follow through on WRB's offer. RGN ultimately executed a contract with its contractor without obtaining a competing bid from WRB's suggested contractor.

24.     Meanwhile, RGN's affiliates continued to file bankruptcies en masse. By late September 2020, more than 100 of RGN's affiliates had declared bankruptcy. *See* **Exhibit 5**, Jonathan Randles, *Regus Affiliates to Tap Bankruptcy Loan to Pay Rent on Co-Working Spaces*, Wall Street Journal, Sept. 29, 2020. In their bankruptcy proceedings, those affiliates made clear that they are highly integrated with each other (legally, financially and operationally), that they function under a business model involving myriad intercompany transfers, transactions and obligations, and that through the bankruptcies or otherwise they intend to seek "forbearances, temporary accommodations and where possible, permanent modifications" from their landlords.

*See* **Exhibit 6**, Declaration of James S. Feltman in Support of Chapter 11 Petitions and First Day Relief, ¶ 27.

25.     These developments again raised reasonable concerns within WRB that RGN would be unable to perform under the Lease. RGN's newfound urgency to construct Tenant's Initial Improvements without first providing the requested adequate assurances was particularly worrying because the improvements contemplated by RGN would render the Premises unmarketable to most prospective tenants other than, possibly, some co-working companies. If RGN were to order its contractor to make the improvements, pay the contractor with the Tenant Improvement Allowance funded by WRB, and then declare bankruptcy, it would all but force WRB to renegotiate the Lease on far less favorable terms.

### E.     WRB Again Requests Adequate Assurances from RGN, Which Again Fails to Provide Them.

26.     In light of its continuing reasonable concerns about RGN's ability to perform, on October 3, 2020, WRB sent a Second Request for Adequate Assurances to RGN. The Second Request for Adequate Assurances sought a variety of financial information from RGN that would give WRB confidence that RGN was able to perform, including its most recent monthly financial statements, financial projections, and capital expenditure budgets, and those of its guarantor, IWG. The Second Request for Adequate Assurances demanded that RGN provide this information no later than October 12, 2020. A true and correct copy of the Second Request for Adequate Assurances is attached hereto as **Exhibit 7**.

27.     The October 12, 2020 deadline came and went without RGN providing the materials requested in the Second Request for Adequate Assurances. As of the date of this Complaint, RGN still has not provided WRB with the requested materials, including its most

recent monthly financial statements, financial projections, and capital expenditure budgets, as well as those of its guarantor, IWG.

28.     In addition, RGN still has not provided WRB with many of the items that the Lease expressly requires it to provide, including a builder's risk insurance policy and construction plans sufficiently detailed for WRB to review and approve, as required by Lease Section 17.3(iii).

29.     Further, RGN still has not obtained a permit from the City of Cleveland for Tenant's Initial Improvements. Without this permit, work cannot legally be performed on the Premises.

30.     RGN having breached the Lease, the Lease is terminated. WRB informed RGN of the termination of the Lease by letter of October 13, 2020. A true and correct copy of this letter is attached hereto as **Exhibit 8**.

**F.     WRB Requires a Declaration that RGN Has Repudiated the Lease, that the Lease Is Terminated, and that WRB Is No Longer Obligated to Perform.**

31.     Because RGN has not obtained the necessary permits, WRB demanded on October 9, 2020 that RGN immediately cease all work on the Premises. Attached hereto as **Exhibit 9** is a true and correct copy of the email WRB's property manager transmitted to RGN's parent company demanding that RGN cease work unless and until it obtains the proper permits.

32.     However, even if RGN obtains the necessary permits, it still has not provided the adequate assurances WRB reasonably requested of it. RGN's failure and refusal to provide adequate assurances amounts to a repudiation and anticipatory breach of the Lease.

33.     In light of RGN's repudiation and anticipatory breach of the Lease, WRB is unwilling to continue performing the Lease by, among other things, funding Tenant's Initial Improvements. It appears that RGN is setting itself up to gain maximum leverage over WRB by forcing WRB to fund Tenant's Initial Improvements—thereby converting the Premises into a

space that will be unsuitable to re-let to other parties—then declaring bankruptcy to force WRB into a punishingly disadvantageous renegotiation of the Lease.

34.     WRB therefore requires a declaration from this Court providing that RGN has repudiated its obligations under the Lease, that the Lease is terminated, and that WRB is relieved of its obligation to continue performing the Lease. Without such a declaration, the parties' rights and obligations under the Lease will remain in doubt, and they will be unable to conduct business with the resulting legal uncertainty concerning their rights and obligations.

**G.     WRB Requires an Injunction Prohibiting RGN from Continuing to Perform Work on the Premises.**

35.     Even though RGN failed to acquire a permit to construct Tenant's Initial Improvements at the Premises, and even though WRB ordered RGN to cease and desist any construction or demolition efforts without that permit (*see* Exs. 8, 9), and even though RGN has repudiated the Lease by failing to provide adequate assurances of performance, and WRB has resultantly terminated the Lease (*see* Ex. 8), RGN has not confirmed, as of the filing of this Complaint, that it will cease and desist from performing demolition and construction work on the Premises.

36.     If RGN's contractor is permitted to continue performing demolition and/or construction work on the Premises, WRB will be irreparably harmed. RGN's planned work will transform the Premises into a space unmarketable to most businesses other than co-working companies, drastically diminishing the value of RGN's real property. In addition, RGN transparently plans to force WRB to pay the Tenant Improvement Allowance of more than $1.6 million to finance Tenant's Initial Improvements, and then swiftly declare bankruptcy to force a renegotiation of the Lease. RGN's imminent insolvency will prevent WRB from collecting on any money judgment WRB obtains in this or any other litigation.

## COUNT I:
### Declaratory Judgment

37.　　WRB hereby incorporates and repeats the allegations set forth in paragraphs 1–36 of this Complaint as though fully set forth herein.

38.　　There exists an actual controversy and genuine dispute between WRB and RGN concerning whether WRB is obligated to continue performing the Lease in light of RGN's continuing failure and refusal to provide WRB with adequate assurances that it is willing and able to perform its own obligations under the Lease.

39.　　WRB is an interested party whose legal relations under the Lease have been cast into uncertainty by RGN's conduct, and it therefore has standing to seek a declaration concerning these matters pursuant to R.C. § 5311.23(B).

40.　　The matters on which WRB seeks declaratory relief are justiciable in character.

41.　　WRB requires speedy relief to preserve its rights under the Lease.

## COUNT II:
### Injunctive Relief

42.　　WRB hereby incorporates and repeats the allegations set forth in paragraphs 1–41 of this Complaint as though fully set forth herein.

43.　　WRB is entitled to prevail on the merits of this litigation.

44.　　WRB will suffer irreparable injury if an injunction is not granted enjoining RGN and its contractors—and anyone acting for them or on their behalf—from continuing to perform demolition or construction work on Premises, or any other work in connection with Tenant's Initial Improvements.

45.　　No third parties will be unjustifiably harmed if the requested injunction is granted.

46.　　The public interest will be served by the requested injunction.

## PRAYER FOR RELIEF

WHEREFORE, WRB Partners, LLC respectfully requests that the Court enter a judgment in its favor and against RGN, as follows:

a) Declaring that RGN has repudiated and/or materially breached the Lease;

b) Declaring that the Lease is terminated;

c) Declaring that WRB has no further obligation to perform under the Lease;

d) Ordering RGN to pay WRB's expenses and attorneys' fees pursuant to Sections 7.7 and 10.3 of the Lease;

e) Enjoining RGN and its contractor—and anyone acting for them or on their behalf— from continuing to perform demolition or construction work on the Premises, or any other work in connection with Tenant's Initial Improvements;

f) Enjoining RGN to vacate the Premises and cooperate with WRB's reasonable efforts to re-let the Premises to another tenant;

g) Granting any such other and further relief that the Court deems just and proper.

## JURY DEMANDED

WRB demands a jury trial on all issues so triable.

October 13, 2020

Respectfully submitted,

*/s/ Daniel A. DeMarco*
Daniel A. DeMarco (0038920)
Aaron S. Evenchik (0073809)
**HAHN LOESER & PARKS LLP**
200 Public Square, Suite 2800
Cleveland, OH 44114-2316
Phone: 216.621.0150
Fax:    216.241.2824
Email: dademarco@hahnlaw.com
        aevenchik@hahnlaw.com

*Counsel for Plaintiff WRB Partners, LLC*

# EXHIBIT 1

# LEASE AGREEMENT

**By and Between**

## WRB PARTNERS, LLC
**(Landlord)**

**and**

## RGN-CLEVELAND II, LLC
**(Tenant)**

**1468 West Ninth Street**
**Cleveland, Ohio 44113**

## TABLE OF CONTENTS

**ARTICLE 1 -**DEFINITIONS AND EXHIBITS .............................................................1
    1.1     Definitions......................................................................................1
    1.2     Effect of Reference to Definitions ......................................................7
    1.3     Exhibits .........................................................................................7

**ARTICLE 2 -** PREMISES. LEASE TERM AND COMMENCEMENT OF LEASE TERM.......7
    2.1     Premises .........................................................................................7
    2.2     Lease Term......................................................................................8
    2.3     Renewal Term .................................................................................8
    2.4     Intentionally Deleted........................................................................8
    2.5     Tenant's Early Termination Option ....................................................10

**ARTICLE 3 –** BASE RENT AND ADDITIONAL RENT..........................................11
    3.1     Base Rent ......................................................................................11
    3.2     Additional Rent..............................................................................12
    3.3     Rent.............................................................................................13
    3.4     Landlord's Right to Seek Abatement..................................................14
    3.5     Intentionally Deleted.......................................................................14
    3.6     Independent Covenants ....................................................................14
    3.7     Late Charge ...................................................................................14
    3.8     Rent Commencement Date Agreement ...............................................14
    3.9     Rent Abatement .............................................................................14

**ARTICLE 4 –** SECURITY DEPOSIT .................................................................14

**ARTICLE 5-** BUILDING SERVICES. ACCESS AND MAINTENANCE.....................15
    5.1     Utilities.........................................................................................15
    5.2     Tenant's Access .............................................................................15
    5.3     Building Services ...........................................................................15
    5.4     Maintenance ..................................................................................15

**ARTICLE 6 -** INSURANCE .............................................................................16
    6.1     Required Coverage..........................................................................16
    6.2     Writing and Disposition of Insurance Policies .....................................17
    6.3     Mutual Waiver of Subrogation .........................................................17
    6.4     Blanket Policies .............................................................................17
    6.5     Landlord's Insurance Covenants........................................................17

**ARTICLE 7 –**TENANT'S ADDITIONAL COVENANTS........................................18
    7.1     Performing Obligations....................................................................18
    7.2     Use ..............................................................................................18
    7.3     Compliance with Laws ....................................................................18
    7.4     Payment for Tenant's Work..............................................................19
    7.5     Indemnity .....................................................................................19

| | | |
|---|---|---|
| 7.6 | Personal Property at Tenant's Risk | 19 |
| 7.7 | Payment of Cost of Enforcement | 19 |
| 7.8 | Surrender | 20 |
| 7.9 | Rights of Mortgagees. | 20 |
| 7.10 | Estoppel Certificates | 21 |
| 7.11 | Nuisance | 21 |
| 7.12 | Changes and Alterations | 21 |
| 7.13 | Financial Statements | 22 |
| 7.14 | Holding Over | 22 |
| 7.15 | Landlord's Ownership | 23 |
| 7.16 | JO Program Requirements | 23 |

**ARTICLE 8 -** QUIET ENJOYMENT ....23

**ARTICLE 9 -** DAMAGE AND EMINENT DOMAIN ....23
| | | |
|---|---|---|
| 9.1 | Fire and Other Casualty | 23 |
| 9.2 | Eminent Domain | 24 |

**ARTICLE 10 -** DEFAULTS BY TENANT AND REMEDIES ....24
| | | |
|---|---|---|
| 10.1 | Tenant's Default | 24 |
| 10.2 | Landlord's Election | 25 |
| 10.3 | Reimbursement of Landlord's Expenses | 26 |
| 10.4 | Termination of Right of Possession | 26 |
| 10.5 | Mitigation | 26 |
| 10.6 | Claims in Bankruptcy | 26 |
| 10.7 | Landlord's Right to Cure Defaults | 26 |
| 10.8 | No Waiver | 27 |
| 10.9 | Default Interest | 27 |
| 10.10 | Landlord Default | 27 |
| 10.11 | Tenant Remedies | 28 |
| 10.12 | No Consequential Damages | 28 |

**ARTICLE 11 -** ASSIGNMENT AND SUBLETTING ....29
| | | |
|---|---|---|
| 11.1 | Prohibition | 29 |
| 11.2 | Conditions to Consent | 29 |
| 11.3 | Excess Rents | 29 |
| 11.4 | Assignment or Sublease to an Affiliate | 29 |
| 11.5 | No Waiver; Tenant to Remain Liable | 30 |
| 11.6 | Licensees Permitted | 30 |

**ARTICLE 12 -** NOTICES ....30

**ARTICLE 13 –** MEMORANDUM OF LEASE ....30

**ARTICLE 14 -** APPLICABLE LAW, SEVERABILITY, CONSTRUCTION ....31

ii

**ARTICLE 15 -** SUCCESSORS AND ASSIGNS. ETC. ................................................................31
    15.1    Covenants Run With the Land ...............................................................31
    15.2    Limitation on Landlord's Liability .......................................................31

**ARTICLE 16 -** LANDLORD'S ACCESS ....................................................................32

**ARTICLE 17 –** CONDITION OF PREMISES: LANDLORD'S WORK: TENANT'S WORK 32
    17.1    Condition of Premises...........................................................................32
    17.2    Landlord's Work....................................................................................32
    17.3    Tenant's Initial Improvements ..............................................................33
    17.4    Signage..................................................................................................34
    17.5    Tenant Delay .........................................................................................34
    17.6    Landlord Delay .....................................................................................34

**ARTICLE 18 -** WARRANTY REGARDING BROKER ............................................34

**ARTICLE 19 -** HAZARDOUS MATERIALS .............................................................35

**ARTICLE 20 –** FORCE MAJEURE ...........................................................................36

**ARTICLE 21-** GUARANTY……………………………………  …………………………………..36

**ARTICLE 22 –** EXCLUSIVE USE...............................................................................35

**ARTICLE 23-** GENERAL PROVISIONS
    23.1    Merger...................................................................................................36
    23.2    Invalidity of Particular Provision.........................................................36
    23.3    Waiver...................................................................................................37
    23.4    Obligations that Survive Lease Termination ........................................37
    23.5    Waiver of Jury Trial .............................................................................37
    23.6    Prevailing Party....................................................................................37
    23.7    Counterparts.........................................................................................37
    23.8    Originals................................................................................................37
    23.9    Consents and Approvals .......................................................................37
    23.10  Authorization of Pictures and Name.....................................................37

## LEASE AGREEMENT

THIS LEASE (the "Lease") is dated as of the 12ᵗʰ day of ~~November,~~ December 2019 (the "Effective Date"), and is entered into by and between Landlord and Tenant named below.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE 1
### DEFINITIONS AND EXHIBITS

1.1    Definitions.    Whenever used herein, the following terms shall have the following meanings:

Landlord:                          WRB Partners, LLC,
                                   an Ohio limited liability company.

Notice Address of Landlord:  10020 Aurora Hudson Road
                                   Streetsboro, Ohio 44241
                                   Attn: Property Manager

                                   Copy to:

                                   10020 Aurora Hudson Road
                                   Streetsboro, Ohio 44241
                                   Attn: General Counsel

Tenant:                            RGN-Cleveland II, LLC, a Delaware limited liability company

Notice Address of Tenant:    For notices of default only:

                                   RGN-Cleveland II, LLC
                                   c/o Regus Corporation
                                   3000 Kellway Dr., Suite 140
                                   Carrollton, TX 75006
                                   Attn: Legal Department

                                   and

                                   RGN-Cleveland II, LLC
                                   c/o Regus Corporation
                                   3000 Kellway Dr., Suite 140
                                   Carrollton, TX 75006
                                   Attn: Chief Financial Officer

1

All other notices:

RGN-Cleveland II, LLC
c/o Regus Corporation
3000 Kellway Dr., Suite 140
Carrollton, TX 75006
Attn: Lease Administrator

and

RGN-Cleveland II, LLC
c/o Regus Corporation
One Alliance Center, Suite 1500
3500 Lenox Road
Atlanta GA 30346
Attn: Michael Berretta

Guarantor:                      IWG Global Investments SARL, a company incorporated with
                                number B200.985 in Luxembourg at 26 Boulevard Royal,
                                Luxembourg L-2449 Luxembourg

Notice Address of Guarantor:
                                c/o Regus Corporation
                                3000 Kellway Dr., Suite 140
                                Carrollton, TX 75006
                                Attn: Legal Department

                                and

                                c/o Regus Corporation
                                3000 Kellway Dr., Suite 140
                                Carrollton, TX 75006
                                Attn: Chief Financial Officer

Broker:                         Steve Voinovich- CBRE (Tenant Representative)
                                Rico Pietro- Cresco Cushman Wakefield (Tenant Representative)

Lease
Commencement Date:              This Lease shall commence and be effective upon the Effective
                                Date.

Premises Delivery Date:         The "First Delivery Date" shall be the date that Landlord delivers
                                possession of Suite 105 and the second-floor portions of the
                                Premises to Tenant free and clear of any tenancies or occupants
                                thereunder, which date shall be thirty (30) days after the Effective

Date, but the First Delivery Date shall in no event be sooner than the date of completion of Landlord's Initial Work (as defined in Section 17.2) for Suite 105, and the second-floor portions of the Premises in accordance with the requirements of this Lease.

The "Second Delivery Date" shall be the date that Landlord delivers possession of Suite 100 of the Premises to Tenant free and clear of any tenancies or occupants thereunder and with the Landlord's Initial Work (as defined in Section 17.2) for Suite 100 completed in accordance with the requirements of this Lease, which is estimated to be approximately ninety (90) days after the Effective Date.

In the event both the First Delivery Date and Second Delivery Date have not occurred by the date that is one hundred sixty-five (165) days after the Effective Date (the "Outside Delivery Date"), Tenant shall have the right to terminate this Lease by providing at any time ten (10) days' written notice to Landlord ("Tenant's Termination Notice"), in which event Tenant will have no obligation to pay for any work performed hereunder, all improvements to the Premises will become and remain the property of Landlord, and neither Landlord nor Tenant shall have any further obligation to each other under the Lease except for such matters as expressly survive termination (by way of example and not limitation, the parties' respective indemnification obligations herein concerning brokerage commissions); provided, however, Tenant agrees it shall exercise its termination right hereunder no later than thirty (30) days following Tenant's receipt of written notice from Landlord (if given, at Landlord's option) in which Landlord acknowledges that the Outside Delivery Date has passed, that Landlord has failed to deliver the Premises to Tenant with all Landlord's Initial Work completed and that Tenant has the right under this Paragraph to terminate this Lease. No such termination of this Lease by Tenant shall be effective, and this Lease shall remain in full force and effect, if Landlord delivers possession of the Premises with all Landlord's Initial Work completed within thirty (30) days after Landlord's receipt of Tenant's Termination Notice. In the event this Lease is terminated in accordance with this Section, Landlord shall permit Tenant to remove any personal property, furniture or trade fixtures in the Premises or at the Building which Landlord permitted Tenant to theretofore install or store (and Tenant shall promptly repair any damage caused by such removal) during the thirty (30) day period following such termination.

Notwithstanding the foregoing to the contrary, the Outside Delivery Date may be extended and delayed day for day for each actual day of delay in performance of Landlord's Initial Work due to Force Majeure delays and Tenant Delay; provided, however, (i) Landlord shall have provided written notice of each such extension to Tenant (and each such written notice shall expressly set forth the calendar date to which the Outside Delivery Date is being extended pursuant to the terms hereof) and (ii) the Outside Delivery Date shall not be extended as a result of Force Majeure delays for more than one hundred sixty-five (165) days in the aggregate. Landlord shall promptly provide Tenant with written notice of any claimed event of Force Majeure delay and Tenant Delay together with a reasonably detailed description of the facts and circumstances giving rise to such claimed event of Force Majeure and Tenant Delay (Landlord shall, in each case, use reasonable efforts to notify Tenant of any claimed event of Force Majeure or Tenant Delay within 48 hours after discovering same)

Tenant Build-Out Period:

Tenant's build-out period (the "Build-Out Period") will commence on the First Delivery Date and end one hundred twenty (120) days following the Second Delivery Date; provided, however, in the event the Second Delivery Date is earlier than ninety (90) days after the Effective Date, then the Build-Out Period shall end one hundred eighty (180) days following the Second Delivery Date, subject to extension in all events for casualty and condemnation delays, Landlord Delays and Force Majeure delays in the performance of the build-out of Tenant's Initial Improvements (as defined in Section 17.3) or the issuance of the certificate of occupancy or its equivalent. By way of clarification, in no event will be Build-Out Period be deemed to have ended until all of the Landlord's Initial Work shall have been completed in accordance with the requirements of this Lease.

Lease Term:

Twelve (12) Lease Years from the Rent Commencement Date, unless the same is earlier terminated in accordance with the terms and conditions of this Lease, subject to Tenant's right to extend the term of this Lease in accordance with Section 2.4. If the Rent Commencement Date does not occur on the first (1st) day of a calendar month, the last Lease Year shall include any partial calendar month.

Rent Commencement
Date:

The earlier of: (i) the date Tenant opens for business in all of the Premises (it being understood that conducting space tours, installing cabling and performing other work to prepare the space for Tenant's business operations, and moving in/installing furniture

|   | and the like shall not be considered being open for business); provided that possession of the entirety of the Premises shall have been delivered to Tenant with all of the Landlord's Initial Work completed in accordance with the requirements of this Lease, or (ii) the first day following the Tenant Build-Out Period (as defined above). |
|---|---|
| Land: | Certain real property, having an address of 1468 West Ninth Street, Cleveland Ohio, containing approximately 0.466 acres of real property, on which the Building is located. A legal description of the Land is set forth in Exhibit A, which is attached hereto and incorporated herein by this reference. |
| Building: | The eight-story building located on the Land, containing approximately 145,000 rentable square feet. |
| Building Complex: | The Land and Building, together with any and all other structures and improvements located thereon (including, without limitation, driveways, landscaping and the like). |
| Premises: | Approximately 26,863 total rentable square feet ("RSF") of space demised as follows: Approximately 6,450 RSF located on the 1st floor of the Building in Suites 100 and 105; and approximately 20,413 RSF located on the 2nd floor of the Building in Suite 200; and as shown on the depiction attached hereto and incorporated herein by this reference as Exhibit B. |
| Temporary Sales Office: | Commencing on the Lease Commencement Date until up to thirty (30) days following the Rent Commencement Date, Tenant may occupy Suite #330 located on the 3rd floor of the Building for Tenant's use as a temporary sales office ("Temporary Sales Office" in connection with Tenant's suite business in the Premises. Tenant shall accept the space in as-is condition. Tenant shall have no obligation to pay Rent, OPEX Increase (as such terms are defined herein) or utilities for the Temporary Sales Office, but all other obligations of Tenant under this Lease shall be in effect. During the period that Tenant occupies the Temporary Sales Office, Landlord may enter the Temporary Sales Office at all reasonable times in order to show the space to prospective tenants, provided that Landlord shall not unreasonably interfere or disturb Tenant during such showings. In the event that Landlord leases the Temporary Sales Office to a third party, Tenant shall relocate the temporary sales office to another location within the Building identified by Landlord that reasonably meets the needs for Tenant's use as a temporary sales office. |

Permitted Use:

General office purposes, including the operation of a flexible workplace center with executive suites, shared workspace, open seating areas and co-working areas, together with refreshment, business supply and printing stations, and offering office- related services, such as meeting facilities, administrative and concierge services, telecommunications services and furniture. Tenant may have, within the Premises, a café and/or deli which will provide food and beverages, including alcohol, for sale to Tenant's office licensees and other clients, and their respective visitors, provided Tenant secures proper licenses and insurance as required by Article 6 herein, subject in all cases to the Legal Requirements (as hereinafter defined).

Base Rent:*

| Period | Per RSF Rental Rate | Annual Base Rent | Monthly Installment of Base Rent |
|--------|---------------------|------------------|----------------------------------|
| Years 1-12 | $    18.55 | $498,308.64 | $41,525.72 |

\* Subject to the terms of Section 3.9 hereof.

Tenant Improvement
Allowance:

Sixty Dollars and 00/100 ($60.00) per rentable square of the Premises foot for a total of One Million Six Hundred Eleven Thousand Seven Hundred Eighty and 00/100 Dollars ($1,611,780.00).

Operating Expenses:

Collectively, the Impositions (as defined below) and the aggregate expenses incurred by Landlord but invoiced to Tenant in the operation, maintenance, repair and management of the Building Complex, including, without limitation, the following: utilities supplied to the Building Complex (to the extent the same are not being paid directly by Tenant or other tenants of the Building); security services for the Common Areas (as hereinafter defined) of the Building Complex provided Landlord has contracted for such services; lighting, cleaning, repairing and maintaining, walkways, drives, service areas, landscaping, exterior Common Areas doors, and other installations used in common with other occupants in connection with the Building Complex; those certain services described in Section 5.3 herein (to the extent the same are not being paid directly by Tenant or other tenants of the Building), wages and "fringe" benefits for employees or contractors engaged on a full-time basis in connection with servicing the Building Complex up to the grade of building manager only, and payroll taxes, workmen's compensation insurance premiums and similar costs with respect thereto, and an appropriate portion of same with respect to employees or contractors on a part-time basis up to the

grade of building manager only; snow shoveling, walkways, drives and service areas, all insurance obtained by Landlord relating to or otherwise in connection with its ownership or operation, rental or management of, the foregoing to include without limitation any liability insurance, rent loss insurance, and any insurance required by Landlord's mortgagee; services obtained for the benefit of the Building Complex (including, without limitation, window cleaning, rubbish and recycling collection and removal, snow removal and grounds maintenance) at a reasonable cost therefor; repairs, replacement, repainting, maintenance, supplies and the like for the Building Complex; a management fee (not to exceed 4% of gross rents from the Building); depreciation (on a straight line basis) for capital replacements and improvements made by Landlord which will reduce ongoing expenses or which are required to comply with any Legal Requirements that are enacted, or first interpreted to apply to the Building Complex, after the Effective Date ("Permitted Capital Costs"), the cost of which shall be amortized over the useful life of the capital replacement or improvement for federal income tax purposes in accordance with generally accepted accounting principles ("GAAP"). The following items shall be excluded from "Operating Expenses": principal or interest payments or other costs on any mortgages or other financing arrangements; transaction costs incurred in connection with the sales, mortgaging, selling or change of ownership of the Land or Building Complex or any part thereof, including brokerage commissions, consultants', attorneys' and accountants' fees, closing costs, title insurance premiums, transfer taxes and interest charges; leasing commissions and depreciation for the Building Complex, except as specifically provided above; leasing commissions, attorneys' fees, costs and disbursements and other expenses incurred in connection with negotiations or disputes with tenants, other occupants, or prospective tenants or occupants; renovating or otherwise improving, decorating, painting or redecorating space for tenants or other occupants of the Building which is are not part of the Common Areas; Landlord's cost of electricity and other services which are separately metered or separately charged to tenants and for which Landlord is entitled to be reimbursed by tenants; expenses in connection with services or other benefits of a type which are not provided Tenant but which are provided to another tenant or occupant (other than an occupant of the Premises); damages and penalties incurred due to a violation by Landlord or any tenant of the terms and conditions of any lease; overhead and profit increment paid to subsidiaries or affiliates of Landlord for services, to the extent only that the costs of such services exceed competitive costs of such services were they not so rendered by a subsidiary or affiliate; costs, fines, interest, penalties,

legal fees or costs of litigation incurred due to the late payment of taxes, utility bills and other costs incurred by Landlord's failure to make such payments when due; any capital expenditures whatsoever or any cost of a capital nature, including the costs of any capital improvements, alterations or replacements, as determined in accordance with GAAP, consistently applied (other than the Permitted Capital Costs); costs incurred in correcting defects in the design, construction or components of the improvements comprising the Building Complex; reserves for maintenance, repairs and replacements or any other purpose; retail operating expenses if retail space is in the Building Complex; development fees, impact fees and similar charges; Landlord's general overhead and administrative expenses (except that Tenant hereby acknowledges that Operating Expenses shall include a management fee as set forth above); and advertising and promotional expenditures.

Impositions:  All taxes including real estate taxes (which term shall include payments in lieu of real estate taxes), assessments, levies, license and permit fees (except those for tenants or occupants of the Building) and other governmental charges, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever, which at any time during the Lease Term may be assessed, levied, confirmed, imposed upon, or may become due and payable out of or in respect of, or become a lien upon, the Building Complex (including all improvements thereto), other than: (i) municipal, state and federal income taxes (if any) assessed against Landlord; or (ii) municipal, state or federal capital levy, gift, estate, succession, inheritance or transfer taxes of Landlord; or (iii) corporation excess profits or franchise taxes imposed upon any corporate owner of the Building Complex; (iv) any income, profits or revenue tax, assessment or charge imposed upon the Rent payable by Tenant under this Lease, or (v) any interest or penalties for late payment of any taxes, or any development or impact fees or similar charges; provided, however, that if at any time during the Lease Term the methods of taxation prevailing at the commencement of the Lease Term shall be altered so that in lieu of or as a substitute for the whole or any part of the taxes, assessments, levies or charges now levied, assessed or imposed on real estate and the improvements thereon, there shall be levied, assessed and imposed a tax, assessment, levy, imposition or charge, wholly or partially as a capital levy or otherwise, on the rents received therefrom, or measured by or based in whole or in part upon the Building Complex and imposed upon Landlord, then all such taxes, assessments, levies, impositions or charges or the part thereof so measured or based, shall be deemed to be included

within the term "Impositions" for the purposes hereof.  In addition to the foregoing, the term "Impositions" shall include any new tax of a nature not presently in effect, but which may be hereafter levied, assessed, or imposed upon Landlord or the Building Complex, if such tax shall be based solely on or arise out of the ownership, use or occupation of the Building Complex.  Landlord shall elect to pay all betterments and special assessments of real estate taxes over the longest period permitted under applicable law and Impositions shall include only those installments which become due during the Lease Term plus any interest payments due during the same period. In the event the Impositions or any portion thereof are abated or reduced for any reason, then there shall be a readjustment in Tenant's Proportionate Share of such Impositions.

| | |
|---|---|
| Tenant's Proportionate Share: | Tenant's Proportionate Share shall be determined by dividing the rentable square footage of the Premises by the rentable square footage of the Building. Tenant's Proportionate Share shall be 18.53%. Notwithstanding anything to the contrary in this Lease, in no event shall the rentable square footage of the Premises be increased due to any modifications made by Landlord with respect to the Common Areas of the Building, nor shall Tenant's Proportionate Share be increased due to any reason other than an expansion of the Premises. |
| Lease Year: | The twelve (12) month period commencing on the Rent Commencement Date and each successive twelve (12) month period included in the Lease Term commencing on the anniversary of that day. |
| Landlord's Mortgagee: | Any party holding a mortgage on the Building Complex or any portion thereof, given as security for indebtedness owed by Landlord to the holder of the mortgage. |
| Building Service Hours: | Monday thru Friday from 8:00 AM EST to 6:00 PM EST and Saturday 9:00 AM to 1:00 PM EST excluding all nationally recognized national holidays. |

1.2    Effect of Reference to Definitions.  Any reference in this Lease to any of the terms defined above shall be deemed, to the extent possible, to mean and include all aspects of the definition set forth above for such term.

1.3    Exhibits.  The exhibits listed in this Section and attached to this Lease are incorporated by reference and are a part of this Lease.

Exhibit A:    Description of the Land

Exhibit B:     Depiction of the Premises
Exhibit C:     Commencement Date Agreement
Exhibit D:     Test-Fit
Exhibit E:     Landlord's Initial Work
Exhibit F:     Intentionally Deleted
Exhibit G:     Guaranty

## ARTICLE 2
## PREMISES, LEASE TERM AND COMMENCEMENT OF LEASE TERM

2.1     _Premises_.  Landlord hereby LEASES to Tenant the Premises, subject to and with the benefit of the terms, covenants, conditions and provisions of this Lease, together with all easements, rights or privileges necessary in connection with the use of the Premises for the Permitted Use.  Tenant shall have the use, in common with others entitled thereto, of the roadways, driveways, sidewalks and all other areas used in common with other occupants of the Building Complex and that serve the Building Complex, as the same may be adjusted by Landlord from time to time and all subject to reasonable rules and regulations promulgated by Landlord from time to time and provided in writing to Tenant, provided that such reasonable rules and regulations are uniformly enforced and applied to all occupants of the Building (the "Common Areas").

2.2     _Lease Term_. TO HAVE AND TO HOLD the Premises for the Lease Term commencing on the Rent Commencement Date, subject to the terms, covenants, agreements and conditions contained in this Lease. As used in this Lease, "Lease Term" shall refer to the initial twelve-year term of this Lease and the Renewal Terms (defined herein), if exercised by Tenant.

2.3     _Renewal Term_.

        a.     _Renewal Option_. Landlord hereby grants to Tenant the right and option to extend the term of this Lease for two (2) consecutive periods of five (5) years each (each a "Renewal Term", or collectively, the "Renewal Terms"). Each Renewal Term shall commence upon the day next following the last day of the expiring initial Lease Term or the first Renewal Term, as the case may be. Notwithstanding anything herein contained to the contrary, Tenant's right and option as aforesaid shall be conditioned upon: (i) the Lease remaining in full force and effect; and (ii) Tenant not being in default under this Lease beyond any applicable notice, grace and cure period. Tenant shall notify Landlord in writing of its election to extend this Lease for the Renewal Term not less than three hundred sixty-five (365) days prior to the expiration of the current Lease Term ("Tenant's Renewal Notice").  Within thirty (30) days following receipt of Tenant's Renewal Notice, Landlord shall provide Tenant with Landlord's proposed Fair Market Rental Rates ("FMRR") as hereinafter defined.  Following receipt of the Landlord's FMRR, Tenant shall have thirty (30) days to either: (i) accept in writing the proposed FMRR; or (ii) elect in writing to abandon the renewal option, in which case the Lease shall terminate at the end of the Lease Term in accordance with the provisions of this Lease; (iii) reach written agreement with Landlord on a different FMRR; or (iv) elect in writing to have the FMRR determined in

accordance with Section 2.3(b). Tenant shall be deemed to have abandoned the renewal option if Tenant fails to provide Landlord with timely written notice as described in this Section.

b.      Rental Rate for the Renewal Term. FMRR shall be determined based on recent comparable transactions involving comparable tenants and comparable space in comparable buildings in the warehouse district of the downtown Cleveland market. Adjustments shall be made to the rate to equalize the effects of differing lease structures (net, gross, etc.), lease terms, tenant improvement allowances, rent abatement, base years, and other market concessions.

The Renewal Term shall be upon all of the terms, covenants and conditions of this Lease except that the Base Rent payable during the Renewal Term shall be equal to 95% of the FMRR prevailing twelve (12) months prior to the commencement of such renewal term. If the parties are unable to agree on a mutually acceptable FMRR, Tenant and Landlord shall each appoint a qualified SIOR certified real estate broker practicing in the Cleveland Market with not less than five years' experience (the "Appraiser"). Each party shall notify the other as to the name and address of the Appraiser selected within ten (10) days after the arbitration election date. Each Appraiser shall, during the next fifteen (15) days, calculate the Market Rent and notify both parties of said determination of Market Rent. If the two Appraisers agree upon a FMRR, such determination shall be final and binding on the parties. If the difference between the rate calculated by each Appraiser is One Dollar ($1.00) per rentable square foot or less, the rates calculated by the two Appraisers will be averaged and the resulting figure will be the agreed upon FMRR. If the difference between the rates calculated by each Appraiser is more than One Dollar ($1.00) per rentable square foot, the two Appraisers shall select a third Appraiser, who shall satisfy the same professional qualification requirements set forth above, and the Appraisers will then notify Landlord and Tenant of such Appraiser's name, address and selection within ten (10) days following the failure of the Appraisers to agree upon the FMRR. The third Appraiser will select one or the other of the two calculations of FMRR submitted by the other two Appraisers and will notify the parties and the Appraisers within ten (10) days of being selected to make the FMRR determination. The determination of the third Appraiser shall be final and binding on Landlord and Tenant.

2.4    Intentionally Deleted.

2.5    Tenant's Early Termination Option.

(i)      Tenant shall have the one (1) time right to terminate this Lease effective as the last day of the 120th month of the Lease Term (the "Termination Right"). Tenant may only exercise the Termination Right by delivering to Landlord on or before the date that is three hundred sixty-five (365) days prior to the last day of the 120th month of the Lease Term (the "Termination Notice Date"): (i) written notice of Tenant's election to terminate this Lease (the "Termination Notice"); and (ii) the "Termination Fee" equal to Four Hundred Sixty-Three Thousand Two Hundred Forty and 85/100 Dollars ($463,240.85). In no event shall Tenant's exercise of the Termination Right be effective or this Lease be terminated until such date as Tenant has delivered to Landlord both the Termination Notice and Termination Fee (as hereinafter defined).

(ii)     In the event that Tenant does not deliver the Termination Notice to Landlord on or before the Termination Notice Date, Tenant shall be deemed to have irrevocably waived the Termination Right and the same shall be of no further force or effect.

(iii)     Provided that Tenant timely and properly exercises its Termination Right, timely delivers the Termination Notice and pays to Landlord the Termination Fee, then this Lease Term shall terminate effective as of the last day of the 120th month of the Lease Term (the "Effective Termination Date") and Base Rent and other charges hereunder shall be apportioned as of the Effective Termination Date.

### ARTICLE 3
### BASE RENT AND ADDITIONAL RENT

3.1     Base Rent. Tenant covenants and agrees to pay, during the Lease Term, to Landlord, or to such other person as Landlord by written notice instructs Tenant to make such payments for Landlord's benefit and account, without demand (except as otherwise herein specifically provided), at the Address of Landlord set forth in Section 1.1 or at such other place as Landlord may by written notice to Tenant direct, commencing with the Rent Commencement Date, the Base Rent in equal monthly installments, in advance, subject to Section 3.9 of this Lease. The Base Rent shall be paid on the first day of each full calendar month of the Lease Term commencing on the Rent Commencement Date, and pro rata for any portion of a calendar month included at the beginning or end of the Lease Term, 1/30 of a monthly payment being due for each day of a partial month, payable on the first day of such month or partial month. The Base Rent has been calculated to include the Operating Expenses for 2019, and Tenant has no obligation to pay for Operating Expenses other than to pay Tenant's Proportionate Share of the OPEX Increase (as defined below), as provided in Section 3.2 below.

3.2     Additional Rent.

(i)     Commencing on the Rent Commencement Date (but in no event earlier than January 1, 2020), and in addition to Base Rent, Tenant also agrees and covenants to pay to Landlord, or to such other person as Landlord by written notice instructs Tenant to make such payments for Landlord's benefit and account, without demand (except as otherwise herein specifically provided), at the Address of Landlord set forth in Section 1.1 or at such other place as Landlord may by written notice to Tenant direct, Tenant's Proportionate Share of any annual increase in Operating Expenses commencing after December 31, 2019 (the "OPEX Increase"). Calendar year 2019 shall be defined as and herein referred to as the "Base Year" for the purpose of calculating the OPEX Increase. The Operating Expenses for the Base Year (calculated as described in Section 1.1 hereof) shall be used to determine the OPEX Increase. In the event occupancy in the Building during the Base Year is less than 95%, then Operating Expenses for said year which vary with occupancy shall be "grossed up" to the amount of Operating Expenses that, using reasonable projections, would normally be expected to be incurred during the Base Year if the Building were 95% occupied during said year; provided, however, in no event will Landlord gross up any Operating Expense to an amount which would permit Landlord to collect more than the actual amount of the Operating Expense incurred by Landlord. In the event

Impositions during the Base Year are not based on the Building Complex being fully assessed (i.e., an abatement, credit or similar exemption applies), then Impositions for said year shall be grossed up to the amount of Impositions that would have been imposed if the Building Complex were fully assessed during said year (i.e., without giving effect to the abatement, credit or similar exemption).

(ii)     Promptly following the end of the Base Year, Landlord shall provide Tenant with a reasonably detailed, itemized statement of Operating Expenses for the Base Year. Within one hundred twenty days (120) following the end of each calendar year, Landlord shall furnish to Tenant a statement showing: (i) a comparison of the Operating Expenses for the Base Year (itemized by category) and the Operating Expenses anticipated for the coming calendar year (itemized by category); and (ii) Tenant's Proportionate Share of any OPEX Increase, if any (the "Annual Statement").

(iii)     The payment of any additional charges pursuant to this Section shall be made as follows:

(a)     Within the first one hundred twenty (120) days of each calendar year, Landlord shall estimate Tenant's Proportionate Share of any OPEX Increase anticipated for that year. The estimated amount of Tenant's Proportionate Share shall be paid in equal monthly installments on the first day of each month of that year. Following the end of each calendar year, the estimated payments made by Tenant pursuant to this Section shall be reconciled against the actual amount of Tenant's Proportionate Share of any OPEX Increase for that year set forth in Landlord's statement rendered in accordance with this Section.

(b)     On the date for payment of the next monthly installment of Rent under this Lease following the delivery of the Annual Statement to Tenant, Tenant shall pay to Landlord Tenant's Proportionate Share of the OPEX Increase for the year covered by the Annual Statement, less a credit for the amounts paid in advance. Tenant's Proportionate Share of the OPEX Increase shall be prorated with respect to any partial calendar year in which the Lease Term expires or is terminated in accordance with Sections 2.5, or by the mutual agreement of Landlord and Tenant. If Tenant's estimated payments during any Lease Year of the Lease Term are greater or less than the actual amounts determined to be owed as shown in Landlord's Annual Statement, Tenant shall pay the difference to Landlord or Landlord shall refund the difference to Tenant, as the case may be. The parties' obligation for the payment or refund of Additional Rent shall survive the expiration or earlier termination of this Lease.

(i)     Provided that Tenant shall have first paid all amounts due and payable by Tenant pursuant to this Section 3.2, within ninety (90) days after receiving Landlord's statement of actual Operating Expenses for a particular calendar year, Tenant shall have the right to provide Landlord with written notice (the "Review Notice") of its intent to review Landlord's books and records relating to the Operating Expenses for such calendar year. Within a reasonable time after receipt of a timely Review Notice, Landlord shall make such books and records available to Tenant or Tenant's agent for its review at either Landlord's office or at the Building Complex, provided that if Tenant retains an agent to review Landlord's books and records for any calendar year, such agent must be a certified public accountant licensed to do business in the state in

which the Building Complex is located and must not be compensated on a contingent fee basis. Landlord shall be solely responsible for any and all costs, expenses and fees incurred by Tenant or Tenant's agent in connection with such review only if the total amount of Operating Expenses used for the calculation of Tenant's Proportionate Share of the OPEX Increase for the year in question exceeded five percent (5%) or more of the total amount of Operating Expenses that should have been charged to Tenant; otherwise, Tenant shall pay the costs of such audit. If Tenant elects to review Landlord's books and records, within thirty (30) days after such books and records are made available to Tenant, Tenant shall have the right to give Landlord written notice stating in reasonable detail any objection to Landlord's statement of actual Operating Expenses for such calendar year. If Tenant fails to give Landlord written notice of objection within such thirty (30) day period or fails to provide Landlord with a Review Notice within the ninety (90) day period provided above, Tenant shall be deemed to have approved Landlord's statement of Operating Expenses in all respects and shall thereafter be barred from raising any claims with respect thereto. Upon Landlord's receipt of a timely objection notice from Tenant, Landlord and Tenant shall work together in good faith to resolve the discrepancy between Landlord's statement and Tenant's review. If Landlord and Tenant determine that Operating Expenses for the calendar year in question are less than reported, Landlord shall forthwith provide Tenant with a credit against future Additional Rent in the amount of any overpayment by Tenant. Likewise, if Landlord and Tenant determine that Operating Expenses for the calendar year in question are greater than reported, Tenant shall pay to Landlord within thirty (30) days the amount of underpayment by Tenant. Any information obtained by Tenant pursuant to the provisions of this Section shall be treated as confidential. Tenant shall have the right to perform such review or audit of Landlord's books, records and documents as provided for herein not more than once during each calendar year.

(iv)    Notwithstanding anything to the contrary in this Lease, the portion of the OPEX Increase that consists of "controllable" Operating Expenses shall not increase from Lease Year to Lease Year by more than five percent (5%) cumulatively (the "Annual OPEX Increase Cap"). As used herein, the term "controllable" Operating Expenses shall include all items of Operating Expenses except for: Impositions, utilities, security, snow removal, and insurance costs, and those single-time occurring, non-budgeted, and non-annually regularly occurring items in any Lease Year.

3.3    Rent. References in this Lease to "Rent" or "rent" shall be deemed to include both Base Rent and Additional Rent when the context so allows. All monetary obligations of Tenant under this Lease, except for the obligation to pay Base Rent, shall be deemed obligations to pay Additional Rent, unless such presumption is repugnant to the context.

3.4    Landlord's Right to Seek Abatement . Landlord shall have the right to seek a reduction in the valuation of the Premises assessed for tax purposes. To the extent any tax refund payable as a result of any proceeding which Landlord may institute, or payable by reason of compromise or settlement of any such proceeding, is based upon a payment made by Tenant, then Tenant shall be authorized to collect the same (or the appropriate portion thereof), subject, however, to Tenant's obligation, if any sums are recovered, to reimburse Landlord forthwith for any actual reasonable expense incurred by Landlord in connection therewith out of such sums paid to Tenant.

3.5    Intentionally Deleted.

3.6    Independent Covenants. Each covenant, agreement, obligation and/or other provision in this Lease to be performed on Tenant's part shall be deemed and construed to be a separate and independent covenant of Tenant and not dependent on any other provision of this Lease.

3.7    Late Charge. Tenant agrees that if any monthly installment of Base Rent or Additional Rent or any other sum is not paid within five (5) days after written notice from Landlord that the same is past due, a late charge shall be imposed in an amount equal to five percent (5%) of the unpaid monthly installment(s) of Rent and Additional Rent or other payment; provided, however, Landlord shall not be obligated to provide written notice of the same more than two (2) times in any calendar year. The amount of the late charge to be paid by Tenant shall be reassessed and added to Tenant's obligation for each successive monthly period until paid. The provisions of this Section 3.7 shall in no way relieve Tenant of the obligation to pay the monthly installment(s) of Base Rent or Additional Rent or other payments on or before the date on which they are due, nor do the terms of this Section 3.7 in any way affect Landlord's remedies pursuant to Article 10 in the event said monthly installment(s) of Base Rent, Additional Rent or other payment is unpaid after date due.

3.8    Rent Commencement Date Agreement. The Parties shall, within fifteen (15) days after the Rent Commencement Date, execute a Commencement Date Agreement in the form attached hereto as Exhibit C, accurately setting forth the Lease Commencement Date, the Rent Commencement Date and the expiration date of this Lease.

3.9    Rent Abatement.

        (i)    Tenant's obligation to pay Base Rent shall abate hereunder as of the Rent Commencement Date and recommence on the first (1st) day of the seventh (7th) month of the Lease Term (for a total of six months of abated Rent); provided that if any Event of Default by Tenant has occurred and is continuing beyond any applicable notice, grace or cure periods, then such Rent abatement (prorated on a per diem basis) applicable to any days during which such default continues, uncured, beyond all applicable notice, grace and cure periods shall be forfeited by Tenant until the same is cured, whereupon Tenant's entitlement to the Rent abatement hereunder shall resume from and thereafter but only during the then remaining balance of any periods to which the Rent abatement applies pursuant to the terms hereof.

        (iii)   Notwithstanding the foregoing, nothing contained in this Section 3.9 shall be deemed to abate Tenant's obligation to pay utilities for the Premises and Tenant shall pay all utilities to the Premises in accordance with Section 5.1 hereof.

**ARTICLE 4**
**SECURITY DEPOSIT**

None.

## ARTICLE 5
## BUILDING SERVICES, ACCESS AND MAINTENANCE

5.1     Utilities.  On or before the Rent Commencement Date, Tenant shall make arrangements with appropriate utility or service companies for its own service for any utilities and/or services which are to serve the Premises exclusively or directly and which can be billed to Tenant directly and Tenant shall promptly pay all costs with respect to same, such payments to be made, to the extent possible, directly to the utility or service provider or to the appropriate party charged with collecting the same, the foregoing to include all charges for such utilities or services; except that electricity used by Tenant in the Premises shall be sub-metered by Landlord and paid by Tenant to Landlord as Additional Rent based on actual usage.  Any installation of non-standard office equipment, special equipment, or intermittent operating equipment must have the prior approval of Landlord (which approval shall not be unreasonably withheld, conditioned or delayed) and shall be subject to commercially reasonable special charges and regulations.  Any new or additional electric facilities required to service equipment installed by Tenant and all changes in existing electrical facilities in or serving the Premises required by Tenant (if permitted) shall be installed, furnished or made by Landlord at Tenant's expense.  Tenant shall be responsible for all expenses related to the maintenance and cleaning of fluorescent lighting equipment located in the Premises.  Landlord shall not be liable for any interruption or failure in the supply of any such utilities or services to the Premises, except as otherwise expressly provided herein.

5.2     Tenant's Access.  Tenant shall have access to the Premises and the use of utilities in the Premises (subject to after-hours charges for HVAC) twenty-four (24) hours a day, seven (7) days a week.  Tenant shall be solely responsible, at Tenant's sole cost and expense, for security for the Premises.  Landlord shall supply Tenant, at Tenant's expense, with key fobs to the Building exterior doors.

5.3     Building Services.  Landlord, as part of the Operating Expenses (subject to the limitations and exclusions set forth in Sections 1.1 and 3.2, and except as provided in (i) below), shall furnish the following services to the Premises:

> (i) electricity service to the Premises of not less than 6.0 watts of current power available per usable square foot of the Premises, exclusive of HVAC (other than Tenant-installed supplemental air-conditioning) and base building ceiling lighting, the cost of which will be paid as provided in Section 5.1);

> (ii) Standard office janitorial service for the Premises.  Landlord's standard janitorial service shall be provided five (5) nights per week for the Premises.

> (iii)Heating, ventilation and seasonal air conditioning for the use and comfortable occupancy of the Premises for general office purposes sufficient to maintain a temperature range of at least 68°F to 76°F with relative humidity substantially within guidelines established by the American Society of Heating and Air Conditioning Engineers (ASHRAE), on business days during business days from 6:00 a.m. to 7:00 p.m. and on

Saturdays from 8:00 a.m. to 12:00 p.m., standard for the Building. Tenant shall pay for heating and air conditioning requested and furnished prior to or following such hours at rates to be established from time to time by Landlord, based on Landlord's actual cost, with at least thirty (30) days' prior notice. All requests for heating or air conditioning prior to or following such hours must be submitted in writing no later than 2:00 pm. on the last prior business day.

(iv)Passenger elevator services on business days from 6:00 a.m. to 7:00 p.m. and on Saturdays from 8:00 a.m. to 1:00 p.m.; elevator service via at least one (1) car per elevator bank all other times.

(v) Disposal of ordinary office trash. In the event Tenant disposes of bulk items, such as desks or chairs, Tenant shall be charged the corresponding disposal fees charged by the trash removal company.

(vi)Hot and cold water to the Premises.

(vii) Standard services as may from time to time be needed for pest control in the Premises.

5.4 Maintenance.

(i) Landlord Maintenance.

(a)    Non-Reimbursable Expenses:    Landlord, at its sole cost, shall make structural repairs and replacements necessary for the Building including to the roof (replacement only), exterior walls and exterior windows, interior load-bearing columns and foundation of the Premises, except to the extent of damage caused by Tenant and/or Tenants employees, contractors, agents or invitees, and the Building. In performing its obligations under this Article or elsewhere under this Lease, Landlord shall not unreasonably interfere with Tenant's normal business operations.

(b)    Reimbursable Expenses: Landlord shall, as part of Operating Expenses, which Operating Expenses shall be reimbursable by Tenant to the extent provided in (and subject to the limitations and exclusions set forth in) Sections 1.1 and 3.2, perform maintenance and repairs to the non-structural components of the Building, including but not limited to the roof, exterior walls and windows, heating and air conditioning system ("HVAC"), plumbing and electrical systems (including all lines and conduits), fire and life safety systems and other building systems (except those exclusively serving the Premises, which shall be Tenant's obligation under Section 5.4(ii) hereunder), Common Area lobbies, hallways, elevators, curbs and walks; make all other repairs and perform all other maintenance required or needed at the Building or Common Areas including, but not limited to, performing or engaging services for maintenance of all landscaping, and service areas, Common Area door locks, window washing, and keeping the sidewalks, and driveways free of snow, ice and debris. In connection with the maintenance of the HVAC system servicing the Premises, Landlord shall, during the Lease Term, as part of Operating Expenses to be reimbursed by Tenant hereunder, maintain a service

contract for the semi-annual performance of standard HVAC system maintenance, including but not limited to, periodic replacement of filters, oiling of mechanical components and inspection for wear and tear. In addition, Landlord shall make all repairs or replacements becoming necessary by reason of any structural or latent defects in the Building existing as of the date hereof (or hereinafter existing with respect to any improvements made by or under the direction of Landlord hereafter).

(ii) <u>Tenant Maintenance</u>: Except as otherwise expressly provided for in this Lease to the contrary, Tenant shall be responsible for the maintenance and repair of the non-structural interior elements of the Premises, and all other maintenance and repair of the Premises, including, without limitation, (a) all interior windows and glass, (b) the mechanical, electrical and plumbing systems that exclusively serve the Premises, except to the extent the need for the same arises from the negligence or willful misconduct of Landlord (or Landlord's agents, employees or other tenants), (c) all utilities, pipes, conduits and drains exclusively serving the Premises and contained within the Premises, except to the extent the need for the same arises from the negligence or willful misconduct of Landlord (or Landlord's agents, employees or other tenants), in which case Landlord shall be responsible for the cost of the same, and (d) telecommunications equipment installed within the Premises. Tenant shall, in all events, promptly make all repairs for which it is responsible hereunder. Tenant's maintenance and repair of the foregoing shall be performed in a good and workmanlike manner with quality materials and in compliance with all Legal Requirements. Should Tenant fail to perform its obligations set forth in this Section and such failure shall continue beyond any notice, grace or cure period specified in this Lease, such failure shall be deemed an Event of Default by Tenant and Landlord, in addition to any rights contained in this Lease, at law, or in equity, shall have the right, but not the obligation, to cure any deficiencies in the maintenance and repair of the Premises pursuant to <u>Section 10.7</u> herein. Landlord, its contractors, subcontractors, employees and agents, shall have the right to enter the Premises, with reasonable prior notice (except in the event of an emergency in which no notice will be required) to inspect same to ensure that all parts of the Premises are maintained in accordance with the requirements of this Lease.

## ARTICLE 6
## INSURANCE

**6.1**  <u>Required Coverage</u>. Tenant covenants and agrees with Landlord that during the Lease Term the following insurance shall be obtained by Tenant and carried at Tenant's sole expense.

(i)  Tenant agrees to carry general liability insurance covering the Premises and Tenant's use thereof, including contractual liability coverage per the ISO CG 00 01 04-13 edition, or its equivalent, covering Tenant's obligations set forth in this Lease, with a minimum limit of Two Million Dollars ($2,000,000.00) on account of bodily injuries to or death or property damage for each occurrence, and a minimum limit of Five Million Dollars ($5,000,000.00) general aggregate.

(ii)  Should Tenant carry a liquor license and sell alcohol at the Premises, Tenant shall obtain Liquor Liability coverage in the amount of One Million Dollars ($1,000,000.00) per occurrence.

(iii)    Workmen's Compensation covering all Tenant's employees working at the Premises.

6.2    Writing and Disposition of Insurance Policies.    Tenant shall furnish Landlord with certificates evidencing the insurance required to be maintained by Tenant under Section 6.1. Tenant's liability coverage shall (i) name Landlord and Landlord's Mortgagee (so long as Landlord shall have provided Tenant with written notice of the name and address of such party) as additional insureds, as their respective interests may appear. Tenant's insurers will endeavor to provide Landlord with thirty (30) days (ten (10) days for cancellations resulting from non-payment of premium) prior written notice of any cancellation or nonrenewal of any policy of insurance required to be maintained by Tenant hereunder.

6.3    Mutual Waiver of Subrogation.    Notwithstanding anything in this Lease to the contrary, Landlord and Tenant each hereby releases the other, its officers, directors, employees and agents, from any and all liability or responsibility (to the other or anyone claiming through or under them) by way of subrogation or otherwise) for any loss or damage covered by insurance actually carried or covered by the insurance required by this Lease (i.e., which would have been covered by the insurance required by this Lease, had such required insurance been carried in compliance with the terms of this Lease), even if such loss or damage shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible. Each party shall cause the insurance company that issues property insurance to such party to waive any rights of subrogation with respect to such property insurance and shall cause the insurance company to issue an endorsement to evidence compliance with such waiver of subrogation. Each of Landlord and Tenant shall bear the costs associated with obtaining such waiver of subrogation from its insurance company. This Section shall survive termination of this Lease.

6.4    Blanket Policies.    Nothing contained herein shall prevent Tenant from taking out insurance of the kind and in the amounts provided for herein under a blanket insurance policy or policies covering properties other than the Premises, provided however, that any such policy or policies of blanket insurance (a) shall specify therein, or Tenant shall furnish Landlord with the written statement from the insurers under such policy or policies specifying the amount of the total insurance allocated to the Premises, which amounts shall not be less than the amounts required herein, and (b) amounts so specified shall be sufficient to prevent any of the insureds from being a co-insurer within the terms of the applicable policy or policies, and provided further, however, that any such policy or policies of blanket insurance shall, as to the Premises, otherwise comply as to endorsements and coverage with the provisions herein.

6.5    Landlord's Insurance Covenant.    Landlord covenants and agrees that, during the Lease Term, it shall obtain all risk insurance against damage by fire or other casualty in an amount at least equal to the replacement cost of the Building as determined from time to time by Landlord (at Landlord's election) or upon Tenant's request by appraisal made at the expense of Tenant by an accredited insurance appraiser approved by Landlord. During the Lease Term, Landlord shall maintain commercial general liability insurance covering any and all claims for injuries to, or death of persons and damage to, or loss of, property, occurring in, on, or about the Common Areas, in amounts reasonably necessary and appropriate. Tenant's Proportionate Share of any

OPEX Increase with respect to such insurance shall be paid by Tenant to the extent provided in (and subject to the limitations and exclusions set forth in) Sections 1.1 and 3.2 hereof.

### ARTICLE 7
### ADDITIONAL COVENANTS

7.1     Performing Obligations.  Tenant shall perform fully, faithfully and punctually all of the obligations of Tenant set forth in this Lease; and shall pay when due Rent and all charges, rates and other sums which by the terms of this Lease are to be paid by Tenant.

7.2     Use.  Tenant shall use the Premises only for the Permitted Use, and for no other purposes without Landlord's prior written consent.  Tenant shall not use or occupy or permit any of the Premises to be used or occupied, nor do or permit anything to be done in or on any of the Premises, in a manner that will or might: (a) violate or be contrary to any Legal Requirement; (b) make void or voidable or cause any insurer to cancel any insurance required by this Lease; (c) adversely affect in any material manner the ability of Landlord or Tenant to obtain any insurance required under Article 6 at commercially reasonable rates; (d) cause structural injury to any portion of the Building; or (e) constitute a public or private nuisance or waste; or (f) violate its certificate of occupancy.  The parties acknowledge and agree that, to the best of each Landlord and Tenant's knowledge, as of the Lease Commencement Date, the Permitted Use does not violate the terms of this Section.

7.3     Compliance with Laws.  Subject to Landlord's obligations under Section 17.2(iii), Tenant shall, at Tenant's sole cost and expense, comply promptly with all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments, departments, commissions, boards and officials, foreseen and unforeseen, ordinary as well as extraordinary, including the Americans with Disabilities Act ("ADA") and all laws with respect to the handling, storage and disposal of hazardous materials (the "Legal Requirements"), to the extent applicable to the operation of Tenant's business and use of the Premises; provided, however, notwithstanding anything to the contrary in the Lease, Tenant shall not be obligated to construct, install and make any improvements which may be required from time to time by such applicable Legal Requirements to any areas outside of the Premises or to any facilities or systems (or the portions thereof) that do not exclusively serve the Premises, unless such improvements are required due to Tenant's (as opposed to other tenants in general) specific use of the Premises or due to Tenant's Alterations (other than Tenant's Initial Improvements).  Landlord shall, as part of the Operating Expenses to the extent permitted by (and subject to the limitations and exclusions set forth in) Sections 1.1 and 3.2 hereof, comply with all present and future Legal Requirements for the Common Areas and structural components of the core and shell and Common Areas of the Building.  Landlord shall also cause to removed or remediated, in accordance with Legal Requirements and at Landlord's sole expense, any regulated Hazardous Substance (as defined in Section 19) or asbestos within the Premises, if any, provided the same are not caused by Tenant or its contractors, during the Lease Term.

7.4     Payment for Tenant's Work.  Tenant shall pay promptly when due the entire cost of any work at or on the Premises undertaken by Tenant so that the Premises shall at all times be free of liens for labor and materials; promptly to clear the record of any notice of any such lien; to procure all necessary permits and before undertaking such work; to do all of such work in a good and workmanlike manner, employing materials of good quality and complying with all applicable governmental requirements; and to save Landlord harmless and indemnified from all injury, loss, claims or damage to any person or property arising out of such work.

7.5     Indemnity.  Subject to the terms of Section 6.3 of this Lease, Tenant shall save Landlord harmless and indemnified from, and defend Landlord against, all injury, loss, claims or damage (including reasonable attorneys' fees) to any person or property while on the Premises, and to defend Landlord against, all injury, loss, claims or damage (including reasonable attorneys' fees) to any person or property within the Building occasioned by any negligence or willful misconduct on the part of Tenant or Tenant's agents, servants, employees, contractors, guests, invitees or licensees, or arising out of any default by Tenant under the terms of this Lease, except in all events to the extent any of the same arises out of any omission, fault, negligence or other misconduct of Landlord, or its agents, servants, employees, or contractors, or any default by Landlord under the terms of this Lease.

7.6     Personal Property at Tenant's Risk.  All personal property, equipment, inventory and the like from time to time upon the Premises shall be at the sole risk of Tenant; and that Landlord shall not be liable for any damage which may be caused to such property or the Premises or to any person for any reason including, without limitation, the bursting or leaking of or condensation from any plumbing, cooling or heating pipe or fixture, unless such damage was due to the negligence or willful misconduct of Landlord or its agents.

7.7     Payment of Cost of Enforcement.  Tenant shall pay on demand Landlord's actual expenses, including reasonable attorneys' fees, incurred in enforcing any obligation of Tenant under this Lease or in curing any Event of Default by Tenant under this Lease, provided that Landlord is successful in enforcing such obligation or has a right under this Lease to cure such default.

7.8     Surrender.  At the termination of the Lease Term, Tenant shall peaceably to surrender the Premises in clean and in good order, repair and condition, and in conformance reasonable wear and tear and damage by fire or casualty or taking excepted and shall deliver to Landlord all keys to the Premises or any part thereof.  Any alteration, addition or improvement in, on, or to the Premises made or installed by Tenant shall become a part of the realty and belong to Landlord without compensation to Tenant upon the expiration or sooner termination of the Lease Term, at which time title shall pass to Landlord under this Lease as if by a bill of sale. Tenant shall not be required to remove the improvements that are part of Tenant's Initial Improvements as described in Exhibit D attached hereto or any other permitted Alterations (as hereinafter defined). Notwithstanding the foregoing, any and all trade equipment (including but not limited to manufacturing and processing equipment), trade fixtures, furniture, data lines, inventory and business equipment ("Personal Property") shall remain Tenant's property and shall be removed by Tenant at the expiration or earlier termination of this Lease.  In the event Tenant fails so to remove any Personal Property or fails to repair any damage to the Premises or the Building

Complex caused by such removal, Landlord may do so and collect from Tenant the cost of such removal and repair in accordance with Section 7.8 hereof.

7.9     Rights of Mortgagees.

(i)     This Lease shall be subordinate to the lien of any mortgage, deed of trust or ground lease or similar encumbrance (collectively, a "Mortgage") from time to time encumbering the Premises, whether executed and delivered prior to or subsequent to the date of this Lease, unless Landlord's Mortgagee shall elect otherwise; provided, however, that such subordination shall be upon the express condition that this Lease shall be recognized by Landlord's Mortgagee and that the rights of Tenant hereunder shall remain in full force and effect during the Lease Term so long as Tenant is not in default under this Lease beyond all applicable notice, grace and cure period. Subject to receipt of a written agreement in form reasonably satisfactory to Tenant evidencing such recognition and agreement not to disturb Tenant, Tenant agrees that this Lease shall remain in full force and effect notwithstanding any default or foreclosure under any such mortgage or deed of trust. Tenant will, upon request by Landlord, execute and deliver to Landlord instrument(s) in recordable form reasonably required to give effect to the provisions of this Section. Landlord represents and warrants that as of the date hereof, no Mortgage or ground or other underlying superior leases affect the Building and/or the Land, except for the Mortgage identified in the subordination, non-disturbance and attornment agreement which Landlord, Tenant and Landlord's Mortgagee have executed of even date herewith.

(ii)     With reference to any assignment by Landlord of Landlord's interest in this Lease, or the rents payable hereunder, conditional in nature or otherwise, which assignment is made to the holder of a Mortgage, Tenant agrees that the execution thereof by Landlord, and the acceptance thereof by the holder of such Mortgage shall not be treated as an assumption by such holder of any of the obligations of Landlord hereunder unless such holder shall, by notice sent to Tenant, specifically otherwise elect and, except as aforesaid, such holder shall be treated as having assumed Landlord's obligations hereunder only upon foreclosure of such holder's mortgage and the taking of possession of the Premises. Except as provided herein, in the event of any transfer of title to the Building Complex by Landlord, and the assumption by the purchaser thereof of the obligations under this Lease, Landlord shall thereafter be entirely freed and relieved from the performance and observance of all covenants and obligations hereunder arising from and after the date of such transfer.

(iii)     Tenant shall not seek to enforce any remedy it may have for any default on the part of Landlord without first giving written notice by certified mail, return receipt requested, specifying the default in reasonable detail to any Mortgage holder whose address has been given to Tenant, and affording such mortgage holder a reasonable opportunity to perform Landlord's obligations hereunder; subject, however, to the terms of any subordination, non-disturbance and attornment agreement then in effect with such Mortgage holder.

7.10     Estoppel Certificates. From time to time, upon not less than thirty (30) days' prior written request by Landlord, Tenant shall execute and acknowledge and deliver to Landlord, for delivery to a prospective purchaser or mortgagee of the Premises or the Building Complex or to any assignee of any mortgage of the Premises or the Building Complex, a statement in writing

certifying: (a) that this Lease is unamended (or, if there have been any amendments, stating the amendments); (b) that it is then in full force and effect, if that be the fact; (c) the dates to which Rent and any other payments to Landlord have been paid; (d) any defenses, offsets and counterclaims which Tenant, at the time of the execution of said statement, believes that Tenant has with respect to Tenant's obligation to pay Rent and to perform any other obligations under this Lease or that there are none, if that be the fact; and (e) such other data as may reasonably be requested that are directly related to the specific terms of and obligations under the Lease. Any such statement may be relied upon by such prospective purchaser or mortgagee of the Premises, or portion thereof, or any assignee of any mortgagee of the Premises, or portion thereof.

7.11   Nuisance. At all times during the Lease Term and such further time as Tenant occupies the Building Complex, Tenant shall not injure, overload, deface or otherwise harm the Building Complex; or commit any nuisance; or do or suffer any waste to the Building Complex; or permit the emission of any objectionable noise or odor; or make any use of the Building Complex which is contrary to any Legal Requirement or which will invalidate any insurance policy covering the Building Complex or any portion thereof, including, without limitation, with respect to the handling, storage and disposal of any Hazardous Material.

7.12   Changes and Alterations. Except as otherwise explicitly set forth herein, Tenant shall have no authority, without the express written consent of Landlord (which consent shall not be unreasonably withheld, conditioned or delayed) to alter, remodel, reconstruct, demolish, add to, improve or otherwise change the Premises, except that Tenant shall have such authority, without the consent of Landlord, to make repairs to the Premises and do such things as are appropriate to comply with the obligations imposed on Tenant under other provisions of this Lease. Tenant shall not construct or permit any alterations, installations, additions or improvements, including any exterior or interior signs ("Alterations") to the Premises or the Building without having first submitted to Landlord plans and specifications therefor for Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed, provided that:

(i)   If the Alteration involves a sign or will otherwise be visible from the exterior then the Alteration must be compatible with the architectural and aesthetic qualities of the Premises and the Land; and

(ii)   The Alteration must be non-structural and have no adverse effect on the plumbing, heating (and cooling), mechanical, electrical or other systems or services in the Building, and the Alteration (except for signs) must be entirely within the Premises; and

(iii)   The Alteration, when completed, will not adversely affect the value of the Premises or the Land in Landlord's reasonable determination; and

(iv)   Tenant demonstrates to Landlord's reasonable satisfaction that the Alteration will be made in accordance with all Legal Requirements using good quality materials and good quality construction practices and will not result in any liens on the Premises; and

(v)   Promptly following completion of the Alteration, Tenant will have prepared and provide Landlord with "as-built" plans showing all such work; and

(vi)     Tenant will comply with any rules or requirements reasonably promulgated by Landlord in connection with the doing of any work, and if requested by Landlord, Tenant will obtain and maintain, or cause to be obtained and maintained, Builder's Risk insurance in connection with such work.

Notwithstanding anything to the contrary, Tenant may make any non-structural Alterations to the Premises up to Fifty Thousand and 00/100 ($50,000.00) per project per calendar year, and otherwise in accordance with this Section, without Landlord's prior consent. Tenant shall not be required to remove all or any portion of Tenant's Initial Improvements or any other permitted Alterations in the Premises upon expiration of the Lease or any extension thereof.

7.13     Financial Statements. Within thirty (30) days after Landlord's written request therefor (but in no event more than two (2) times per any given calendar year), Tenant shall furnish, or caused to be furnished, to Landlord copies of (i) Tenant's most recent audited or certified (but unaudited) annual financial statements (in connection with the delivery of certified unaudited financial statements, the certification shall be made by an authorized representative of Tenant, to that person's actual knowledge), and (ii) during the term of the Guaranty, Guarantor's most recent annual financial statements as soon as the same become available (not later than one hundred eighty (180) days after the expiration of the applicable calendar year); provided, however, that in each instance Landlord and any persons with whom Landlord intends to share the financial statements shall have executed and delivered to Tenant a non-disclosure agreement, reasonably prepared on Tenant's standard form, subject to such modifications as Landlord or such person may request which are reasonably acceptable to Tenant.

7.14     Holding Over. If Tenant remains in the Premises beyond the expiration of the Lease Term, or upon an early termination as provided for herein, such holding over shall not be deemed to create any tenancy, but Tenant shall be a tenant at sufferance only subject to all of Tenant obligations set forth herein, but at a daily rate equal to one hundred fifty percent (150%) of the Rent, the cost of electricity and all other utilities supplied to the Premises, and other charges provided for under this Lease. The acceptance of a purported rent check following termination shall not constitute the creation of a tenancy at will, it being agreed that Tenant's status shall remain that of a tenant at sufferance, at the aforesaid daily rate. Any reference in this Lease to Tenant's obligations continuing during the period of any holdover shall not be deemed to grant Tenant the right to a holdover or imply Landlord's consent to any such holdover. In addition, Tenant shall be liable for all actual damages incurred by Landlord to any subsequent tenant or lost tenant as a result of such holdover.

7.15     Landlord's Ownership. Landlord represents and warrants that Landlord is the fee owner of the Building.

7.16     JO Program Requirements. Tenant acknowledges that Landlord may finance the Building with a JobsOhio financing program, and that such program establishes certain obligations on Landlord, including job creation and retention requirements (the "JO Program"). Upon Landlord's request, Tenant covenants and agrees to provide Landlord with Tenant's annual

payroll reporting information for the Premises, including number of retained and new employees and payroll amount for the Premises. Landlord shall only use Tenant's information for purposes of Landlord's reporting obligations to JobsOhio under the JO Program and Tenant shall not be in default under the Lease for failing to retain or hire a specific number of employees.

## ARTICLE 8
## QUIET ENJOYMENT

Landlord covenants that Tenant on paying the Rent and performing Tenant's obligations under this Lease shall peacefully and quietly have, hold and enjoy the Premises throughout the Lease Term or until it is terminated as in this Lease provided without hindrance by Landlord or by anyone claiming by, through or under Landlord.

## ARTICLE 9
## DAMAGE AND EMINENT DOMAIN

9.1     Fire and Other Casualty.   In the event that at any time during the Lease Term the Premises are totally damaged or destroyed by fire or other casualty or substantially damaged so as to render them or a material portion thereof untenantable, then there shall be a just and proportionate abatement of the Rent payable hereunder, until the Premises are made suitable for Tenant's occupancy.  In the event of any casualty damage to the Premises, Landlord shall proceed at its expense and with reasonable diligence to repair and restore the Premises (not including Tenant's trade fixtures, business equipment and furniture) to substantially the same condition they were in immediately prior to such casualty.  Notwithstanding the foregoing, if Landlord in its sole discretion determines that timely restoration is not possible or practical or that there are or will be insufficient insurance proceeds available to Landlord to accomplish same, then Landlord shall have the right to terminate this Lease by written notice given to Tenant within sixty (60) days after the occurrence of such casualty.  In the event the Premises have not been restored to a condition substantially suitable for their intended purpose within one hundred and eighty (180) days following the issuance of all permits required for such restoration, then either Landlord or Tenant may terminate this Lease by written notice given to the other within five (5) business days following such one hundred and eighty (180) day period.

9.2     Eminent Domain.   Landlord reserves for itself all rights to any damages or awards with respect to the Premises and the leasehold estate created by reason of any exercise of the right of eminent domain, or by reason of anything lawfully done in pursuance of any public or other authority; and by way of confirmation Tenant grants and assigns to Landlord all Tenant's rights to such damages so reserved, except as otherwise provided herein, and Tenant covenants to execute and deliver any instruments confirming such assignment as Landlord may from time to time reasonably request. Tenant reserves all rights to any damages or awards relating to its trade fixtures, equipment, personal property, exterior signs and relocation costs.  If all the Premises are taken by eminent domain, this Lease shall terminate when title to the Building or Premises is transferred to the taking authority.  If a partial taking by eminent domain results in so much of the Premises or access thereto being taken as to render the Premises or a material portion thereof unsuitable for Tenant's continued use and occupancy, as determined by Landlord and Tenant in

their reasonable discretion, Landlord and Tenant may mutually elect to terminate this Lease as of the date when title is transferred to the taking authority. If a partial taking by eminent domain does not result in such portion of the Premises as aforesaid being taken, then this Lease shall not be terminated or otherwise affected by any exercise of the right of eminent domain. Whenever any portion of the Premises shall be taken by any exercise of the right of eminent domain, and if this Lease shall not be terminated in accordance with the provisions of this Section 9.2, Landlord shall, at its expense, proceeding with all reasonable dispatch do such work as may be required to restore the Premises or what remains thereof (not including Tenant's trade fixtures, business equipment and furniture) as nearly as may be to the condition they were in immediately prior to such taking, and Tenant shall at its expense, proceeding with all reasonable dispatch, provided sufficient condemnation proceeds are available therefor (or, if not, provided that Tenant provides additional funds needed above the amount of the condemnation proceeds available, do such work to its trade fixtures, business equipment and furniture, as may be required. A just proportion of the Rent payable hereunder, according to the nature and extent of the taking shall be abated from the time Tenant is required to vacate that portion of the Premises taken. If the Premises and reasonable access thereto have not been restored to a condition substantially suitable for their intended purpose within one hundred eighty (180) days of the issuance of all permits required for such restoration, Tenant may elect to terminate this Lease by written notice to Landlord sent within five (5) business days following such one hundred eighty (180) day period.

## ARTICLE 10
## DEFAULTS BY TENANT AND REMEDIES

10.1    Tenant's Default. Each of the following shall be an event of default ("Event of Default") hereunder:  (A) if Tenant shall fail to pay any installment of Base Rent, Additional Rent or any other payment due under this Lease, and such failure shall continue for a period of five (5) days after written notice from Landlord to Tenant of such failure; provided, however, Landlord shall not be obligated to provide written notice of the same more than two (2) times in any calendar year; (B) if Tenant or any guarantor or surety of Tenant's obligations hereunder shall (i) make a general assignment for the benefit of creditors; (ii) commence any proceeding for relief, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property; (iii) become the subject of any such proceeding which is not dismissed within ninety (90) days after its filing or entry; or (iv) be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity); (C) Tenant shall fail to discharge or bond over any lien placed upon the Premises in violation of this Lease within forty-five (45) days after Tenant receives notice that any such lien or encumbrance is filed against the Premises; (D) an assignment, sublease or other transfer occurs without the prior written consent of Landlord (except to the extent that such consent is not required under this Lease); and (E) if Tenant shall fail to comply with any provision of this Lease, other than those specifically referred to hereinabove and, except as otherwise expressly provided therein, such default shall continue for more than thirty (30) days after Landlord shall have given Tenant written notice of such default, or such longer period if such default cannot be reasonably cured within such thirty (30) day period, provided that Tenant diligently commences the cure within the thirty (30) day period and diligently prosecutes such cure to completion. Upon the occurrence of an Event of Default, defined as aforesaid, then in any

such case, notwithstanding any waiver or other indulgence of any prior default, Landlord may terminate this Lease by written notice to Tenant sent at any time thereafter, but before Tenant has cured or removed the cause for such termination.

10.2.   Landlord's Election.  Upon each occurrence of an Event of Default and so long as such Event of Default shall be continuing, Landlord may at any time thereafter, at its election by written notice to Tenant: (i) terminate this Lease or Tenant's right of possession, but Tenant shall remain liable as hereinafter provided; and/or (ii) pursue any remedies provided for under this Lease or at law or in equity. Upon the termination of this Lease or termination of Tenant's right of possession, it shall be lawful for Landlord, without formal demand or notice of any kind, to re-enter the Premises by summary dispossession proceedings or any other action or proceeding authorized by law and to remove Tenant and all persons and property therefrom. If Landlord re-enters the Premises, Landlord shall have the right to keep in place and use, or remove and store all of the fixtures, equipment and other property of Tenant left at the Premises or elsewhere at the Building Complex.  If Landlord terminates this Lease or terminates Tenant's right of possession, Landlord may recover from Tenant the sum of (i) all Base Rent, Additional Rent and all other amounts accrued hereunder to the date of such termination, (ii) the costs set forth in Section 10.3 below, and (iii) an amount equal to (A) the Base Rent and Additional Rent which would have been payable by Tenant under this Lease had this Lease not been so terminated (or had Tenant's right of possession not been terminated) for the period commencing after said termination and ending on the last day of the Lease Term with such amounts becoming due and payable by Tenant on such dates as Base Rent would otherwise become due and payable hereunder, less (B) the net rents received by Landlord from re-letting the Premises (or any portion(s) thereof) for the period commencing after said termination and ending on the last day of the Lease Term, such net rents to be determined by first deducting from the gross rents received by Landlord from such re-letting the expenses incurred or paid by Landlord in connection with said termination and in re-entering the Premises and in securing possession thereof, as well as the actual expenses of re-letting (including, without limitation, altering and preparing the Premises for new tenants and any broker's commission as determined pursuant to Section 10.3 below). Subject to the provisions of Section 10.4 below, any such re-letting may be for a shorter or longer period than the remaining Lease Term, and in no event shall Tenant be entitled to receive any excess of such net rents over the Base Rent payable by Tenant to Landlord under this Lease.

10.3.   Reimbursement of Landlord's Expenses.  Upon each occurrence of an Event of Default, whether or not such Event of Default results in the termination of this Lease or termination of Tenant's right of possession pursuant to Section 10.2, Tenant shall reimburse Landlord for all actual and reasonable expenses arising out of such Event of Default, including, without limitation, (i) all actual and reasonable costs incurred in collecting such amounts due from Tenant under this Lease (including actual and reasonable attorneys' fees incurred and the costs of litigation and the like but only if Landlord is successful in its litigation) and (ii) all customary and necessary expenses incurred by Landlord in attempting to relet the Premises or parts thereof, such as advertising and brokerage fees but excluding lease inducements and build-out or retrofit of the Premises to accommodate another tenant.

10.4.   Termination of Right of Possession.  Even though Tenant has breached this Lease by not curing such breach following the applicable notice, grace and cure period and abandoned the

Premises, this Lease shall continue in effect for so long as Landlord does not terminate the Lease (even though it has terminated Tenant's right of possession), and Landlord may enforce all its rights and remedies under this Lease, including the right to recover Base Rent and Additional Rent as it becomes due. Any such payments due Landlord shall be made on the dates that Base Rent and Additional Rent would otherwise come due under this Lease, and Tenant agrees that Landlord may file suit to recover any sums falling due from time to time. Notwithstanding any such termination of possession only, Landlord may at any time thereafter elect in writing to terminate this Lease for such previous uncured breach.

10.5. Mitigation. Landlord shall use commercially reasonable efforts to relet the Premises which efforts shall be subject to the reasonable requirements of Landlord to lease to high quality tenants and to develop the Premises in a harmonious manner with an appropriate mix of uses, tenants, and terms of tenancies, and the like and factoring in the location and nature of the Premises. It is agreed that hiring a reputable leasing broker to lease and to list the Premises at then-market rental rates, requiring the broker to use commercially reasonable efforts to market and lease the Premises, and cooperating in good faith with such broker shall satisfy the requirement that Landlord use commercially reasonable efforts to relet.

10.6. Claims in Bankruptcy. Nothing herein shall limit or prejudice the right of Landlord to prove and obtain in a proceeding for bankruptcy, insolvency, arrangement or reorganization, by reason of the termination, an amount equal to the maximum allowed by the statute of law in effect at the time when, and governing the proceedings in which, the damages are to be provided, whether or not the amount is greater to, equal to, or less than the amount of the loss or damage which Landlord has suffered.

10.7. Landlord's Right to Cure Defaults. Landlord may, but shall not be obligated to cure, at any time any default by Tenant under this Lease after the applicable notice, grace and cure period (if any) has expired. In curing such defaults, Landlord may enter upon the Premises and take such reasonable action thereon as may be necessary to effect such cure. In the case of an emergency threatening serious injury to persons or property, Landlord may cure such default without notice. All costs and expenses incurred by Landlord in curing a default, including reasonable attorneys' fees actually incurred, together with interest thereon at a rate equal to the lesser of (a) eight percent (8%) per annum, or (b) the highest lawful rate of interest which Landlord may charge to Tenant without violating any applicable law from the day of payment by Landlord shall be paid by Tenant to Landlord on demand.

10.8. No Waiver. Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises and/or a termination of this Lease by Landlord, whether by agreement or by operation of law, it being understood that such surrender and/or termination can be effected only by the written agreement of Landlord and Tenant. Tenant and Landlord further agree that forbearance or waiver by either party to enforce its rights pursuant to this Lease, or at law or in equity, shall not be a waiver of such party's right to enforce one or more of its rights in connection with any subsequent default. A receipt by Landlord of rent with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord. No payment by Tenant, or acceptance by Landlord, of a lesser amount than shall be due from Tenant to

Landlord shall be treated otherwise than as a payment on account of the earliest installment of any payment due from Tenant under the provisions hereof. The acceptance by Landlord of a check for a lesser amount with an endorsement or statement thereon, or upon any letter accompanying such check, that such lesser amount is payment in full, shall be given no effect, and Landlord may accept such check without prejudice to any other rights or remedies which Landlord may have against Tenant.

10.9   Default Interest. If any payment of Base Rent, Additional Rent or any other payment payable hereunder by Tenant to Landlord shall not be paid when due, then following the applicable notice, grace and cure period for such Event of Default, Landlord may impose, at its election, interest on the overdue amount from the date when the same was payable until the date paid at a rate equal to the lesser of (a) eight percent (8%) per annum, or (b) the highest lawful rate of interest which Landlord may charge to Tenant without violating any applicable law. Such interest shall constitute Additional Rent payable hereunder.

10.10   Landlord Default. Landlord's failure or refusal to perform any provision of this Lease which it is obligated to perform or the breach of any covenant herein, and the continuation of such failure or refusal for thirty (30) days after receipt of written notice from Tenant of such failure or refusal, shall be a default by Landlord (each, a "Landlord Default"); provided, however, that if the failure or refusal to perform cannot reasonably be cured by Landlord within thirty (30) days after receipt by Landlord of the required notice from Tenant, despite reasonably diligent effort by Landlord, then Tenant shall not exercise any of its rights and remedies under this Section 10.10 if Landlord commences a cure within thirty (30) days after receipt of notice thereof and diligently pursues such cure to completion. In the event of a Landlord Default, and without waiving any other remedy or claim for damages or breach of this Lease, but subject to the preceding sentence, Tenant may elect to cure the Landlord Default and Landlord shall promptly reimburse Tenant for the actual and reasonable cost of curing such Landlord Default. Notwithstanding anything in Section 10.10 to the contrary, in the event of an Emergency Situation (defined herein), if the Landlord Default is not cured after reasonable notice to or attempts to notify Landlord, which may be a shorter notice as practicable under the circumstances, Tenant may cure the Landlord Default and Landlord shall reimburse Tenant for the actual and reasonable cost of curing such Landlord Default, provided that such cure is not more extensive than is reasonably necessary under the circumstances. As used in this Section 10.10, "Emergency Situation" means a situation which imminently threatens the physical well-being of persons or property in or on the Premises.

10.11   Tenant Remedies. If Tenant incurs any costs or expenses because of a Landlord Default, the actual and reasonable sums paid by Tenant to cure such Landlord Default shall be due from Landlord to Tenant within thirty (30) days following written notice from Tenant that an expense has been incurred with documentation substantiating such actual and reasonable expenses. If Landlord fails to reimburse Tenant for such actual and reasonable costs incurred by Tenant to cure a Landlord Default within thirty (30) days of invoice therefor, such actual and reasonable costs incurred shall bear interest at the rate of ten percent (10%) per annum from the date due until repaid by Landlord.

10.12   No Consequential Damages. Neither party shall be liable to the other for consequential or other indirect damages of the other (including, without limitation, lost profits or business

interruption), except as expressly set forth herein.

## ARTICLE 11
## ASSIGNMENT AND SUBLETTING

11.1    Prohibition.  Tenant covenants and agrees that neither this Lease nor the term and estate hereby granted, nor any interest herein or therein, will be assigned, mortgaged, pledged, encumbered or otherwise transferred, and that neither the Premises, nor any part thereof will be encumbered in any manner by reason of any act or omission on the part of Tenant, or used or occupied, by anyone other than Tenant, or for any use or purpose other than as stated herein and in Section 11.6 herein, or be sublet, without the prior written consent of Landlord in each and every case, which consent shall not be unreasonably withheld, delayed or conditioned.  Not in limitation of the foregoing, Tenant's request for Landlord's consent to subletting or assignment shall be submitted in writing in advance of the proposed effective date of such proposed assignment or sublease, which request shall be accompanied by the following information (the "Required Information"):  (i) the name, current address and business of the proposed assignee or subtenant; (ii) the precise square footage and location of the portion of the Premises proposed to be so subleased or assigned; (iii) the effective date and term of the proposed assignment or subletting; and (iv) the rent and other consideration to be paid to Tenant by such proposed assignee or subtenant.  Upon Landlord's request, Tenant also shall promptly supply Landlord with such financial statements and other information as Landlord may reasonable request, indicating the net worth, liquidity and credit worthiness of the proposed assignee or subtenant in order to permit Landlord to evaluate the proposed assignment or sublease.  In the event that Tenant intends to assign or sublease fifty percent (50%) or more of the Premises, Tenant agrees to reimburse Landlord for reasonable legal fees and any other reasonable expenses and costs incurred by Landlord in connection with any proposed assignment or subletting.

11.2.    Conditions to Consent.  Notwithstanding anything to the contrary contained herein, it shall not be unreasonable for Landlord to withhold its consent to any proposed assignment or sublease if (i) Tenant proposes to assign this Lease or sublease the Premises or any portion thereof to any person or entity with whom Landlord is then negotiating for the rental of other space in the Building or who is a tenant in the Building or any other building owned by Landlord or any affiliate of Landlord; or (ii) the net worth of any such proposed assignee or subtenant is less than the greater of (A) the net worth of Tenant on the date hereof or (B) the net worth of Tenant at the time of any such assignment or sublease; or (iii)  the proposed use is not limited to the Permitted Uses; or (iv) there are then two (2) or more leases or subleases in effect with respect to the Premises (including this Lease); or (v) any rent payable by Tenant hereunder is so-called "percentage rent" (provided, however, that it is hereby agreed and acknowledged that in no event shall Landlord's right to withhold consent be limited to the basis set forth in clauses (i) through (v) above).  Landlord's consent shall be granted only if the assignee or subtenant shall promptly execute, acknowledge, and deliver to Landlord an agreement in form and substance satisfactory to Landlord whereby the assignee or subtenant shall agree to be bound by and upon the covenants, agreements, terms, provisions and conditions set forth in this Lease other than the payment of Rent hereunder.

11.3    Excess Rents. If Tenant shall sublet the Premises, having first obtained Landlord's consent, at a rental in excess of the rent and additional rent due and payable by Tenant under the provisions of this Lease, such excess Rent and Additional Rent, net of Tenant's commercially reasonable and necessary expenses related to the sublease, shall be paid by Tenant to Landlord, it being agreed, however, that Landlord shall not be responsible for any deficiency if Tenant shall sublet the Premises at a rental less than that provided for herein.

11.4    Assignment or Sublease to an Affiliate. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to assign this Lease or sublet the Premises or any part thereof without the prior consent of Landlord (and the Landlord's rights under Section 11.3 shall not apply) to: (a) any entity into or with which: (i) Tenant or its parent company is merged or consolidated; (ii) acquires ownership interests in Tenant or Tenant's parent company; (iii) acquires all or substantially all of Tenant's or its parent company's assets; and/or (iv) controlled by, controlling or under common control with Tenant; or (b) any sublease or vendor or concession agreement for the operation of, or supplies for, a cafe and/or deli; provided that in the event of (a) in this Section 11.4, (x) the successor to Tenant has a net worth, computed in accordance with generally accepted accounting principles consistently applied, at least equal to the net worth of Tenant herein named on the date of this Lease; (y) proof satisfactory to Landlord of such net worth shall have been delivered to Landlord at least ten (10) days prior to the effective date of any such transaction, and (z) the assignee agrees directly with Landlord, by written instrument in form satisfactory to Landlord in its reasonable discretion, to be bound by all the obligations of Tenant hereunder, including, without limitation, the covenant against further assignment and subletting. Notwithstanding anything to the contrary herein and for the avoidance of doubt, Landlord's approval is not required for, and Landlord's rights under Section 11.3 shall not apply to, direct or indirect changes in the ownership or control of Tenant so long as either (a) Tenant remains under the control of IWG PLC (or its successors), or (b) the business at the Premises continues to operate under the trade name of "Spaces," "Regus," "No. 18" or other future brand developed by IWG PLC.

11.5    No Waiver: Tenant to Remain Liable. If this Lease is assigned, or if the Premises or any part thereof is sublet or occupied by anybody other than Tenant, Landlord may, after default by Tenant, collect Rent and/or Additional Rent from the assignee, subtenant or occupant, and apply the net amount collected to the Rent and/or Additional Rent herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of this covenant, or the acceptance of the assignee, subtenant or occupant as a tenant, or a release of Tenant or Guarantor from the further performance by Tenant or Guarantor of the covenants on the part of Tenant herein contained. The consent by Landlord to an assignment or subletting shall not in any way be construed to relieve Tenant from obtaining the express consent in writing of Landlord to any further assignment or subletting. No assignment, subletting or use of the Premises shall affect the Permitted Use hereunder. Notwithstanding any permitted assignment or subletting, Tenant shall at all times remain directly, primarily and fully responsible and liable for the payment of all sums payable hereunder and for compliance with all the obligations of Tenant hereunder.

11.6    Licensees Permitted. Landlord acknowledges that, as standard operating procedure within the conduct of its business, Tenant shall enter into a license or other written agreements with its clients for their licensing of space within the Premises ("Permitted Licensees"), and such

agreements shall not constitute an assignment or sublease under this Lease and shall not require the consent or approval of Landlord or relieve, in any way, Tenant from its obligations under this Lease.

## ARTICLE 12
## NOTICES

All notices, consents, approvals, or other communication required by the provisions of this Lease to be given to Landlord or Tenant shall be in writing and shall be hand delivered or given by registered or certified mail or by Federal Express or other recognized overnight courier, addressed to the address of the party set forth in Section 1.1 hereof or to such other address as the party shall have last designated by notice. The customary receipt shall be conclusive evidence of compliance with this Article 12. Notice shall be deemed given on the earlier of the date of actual receipt, or the third (3rd) business day following the date when deposited in the U.S. mail or on the first (1st) business day following the date when deposited with such courier, postage paid.

## ARTICLE 13
## MEMORANDUM OF LEASE

Tenant agrees that it will not record this Lease. Landlord and Tenant shall, upon the request of either, execute, acknowledge, and deliver a recordable Memorandum of this Lease. At Landlord's request, promptly upon expiration of or earlier termination of the Lease Term, Tenant shall execute and deliver to Landlord a reasonable release of any document recorded in the real property records for the location of the Premises evidencing this Lease. The obligations of Tenant under this Article 13 shall survive the expiration or any earlier termination of the Lease Term.

## ARTICLE 14
## APPLICABLE LAW, SEVERABILITY, CONSTRUCTION

This Lease shall be governed by and construed in accordance with the laws of the state in which the Building Complex is located and, if any provisions of this Lease shall to any extent be invalid, the remainder of this Lease, and the application of such provisions in other circumstances, shall not be affected thereby. This Lease may be amended only by an instrument in writing executed by Landlord and Tenant. The titles of the several Articles and Sections contained herein are for convenience only and shall not be considered in construing this Lease.

## ARTICLE 15
## SUCCESSORS AND ASSIGNS, ETC.

15.1    Covenants Run With The Land. It is understood and agreed that the covenants and agreements of the parties hereto shall run with the land and that no covenant or agreement of Landlord, expressed or implied, shall be binding upon Landlord except in respect of any breach or breaches thereof committed during Landlord's seizing and ownership of the Premises. Reference in this Lease to "Landlord" or to "Tenant" and all expressions referring thereto, shall

mean the person or persons, natural or corporate, named herein as Landlord or as Tenant, as the case may be, and the heirs, executors, administrators, successors and assigns of such person or persons, and those claiming by, through or under them or any of them, unless repugnant to the context. Each of Landlord and Tenant represents and warrants to the other that any person who signs this Lease for Tenant or for Landlord in a representative capacity is duly authorized to do so.

15.2     Limitation on Landlord's Liability. It is further understood and agreed that Tenant shall look solely to the estate and property of Landlord in the Building Complex (including the rents, income and profits derived therefrom and sale, condemnation, claim and insurance proceeds with respect thereto) for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed or performed by Landlord and any other obligations of Landlord created by or under this Lease, and no other property or assets of Landlord or of its partners, beneficiaries, co-tenants, shareholders or principals (as the case may be) shall be subject to levy, execution or other enforcement procedures for the satisfaction of Tenant's remedies.

### ARTICLE 16
### LANDLORD'S ACCESS

Landlord and its authorized agents, employees, subcontractors and representatives shall have the right to enter the Premises at any time during emergencies (Landlord agrees to use reasonable efforts to notify Tenant of any such emergency) and otherwise at all reasonable times upon not less than 24 hours' prior notice for any of the following purposes: (i) to determine whether the Premises are in good condition and whether Tenant is complying with its obligations under this Lease; (ii) to do any necessary maintenance and to make such repairs, alterations, improvements or additions in or to the Premises or the Building as Landlord has the right or obligation to perform under this Lease, as Landlord may be required to do or make by law, or as Landlord may from time to time deem necessary or desirable; (iii) to exhibit the Premises to prospective tenants during the last twelve (12) months of the Lease Term or during any period while an Event of Default exists hereunder; and (iv) to show the Premises to prospective lenders, brokers, agents, buyers or persons interested in an exchange, at any time during the Lease Term; provided, however. Landlord shall use commercially reasonable efforts to avoid any interference with Tenant's business operations at the Premises.

### ARTICLE 17
### CONDITION OF PREMISES; LANDLORD'S WORK; TENANT'S WORK

17.1     Condition of the Premises. Except as expressly set forth with respect to Landlord's Initial Work (as each such term is defined in Section 17.2) (collectively referred to herein as "Landlord's Work") and except as otherwise stated within this Lease, Tenant shall accept the Premises on the Lease Commencement Date in its "AS-IS" condition, and Landlord shall have no obligation to perform or pay for any repair or other work therein. Subject to the performance of the Landlord's Work and Landlord's other obligations in this Lease, Landlord shall cause the Premises to be in substantially the same condition as existing on the Lease Commencement Date.

Except as otherwise stated within this Lease, Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes. TENANT ACKNOWLEDGES THAT, EXCEPT WITH RESPECT TO LANDLORD'S WORK, UNLESS OTHERWISE EXPRESSLY SET FORTH HEREIN (1) IT HAS INSPECTED AND ACCEPTS THE PREMISES IN AN "AS IS, WHERE IS" CONDITION, (2) THE BUILDING AND IMPROVEMENTS COMPRISING THE SAME ARE SUITABLE FOR THE PURPOSE FOR WHICH THE PREMISES ARE LEASED AND LANDLORD HAS MADE NO WARRANTY, REPRESENTATION, COVENANT, OR AGREEMENT WITH RESPECT TO THE MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE PREMISES, (3) THE PREMISES ARE IN GOOD AND SATISFACTORY CONDITION, (4) NO REPRESENTATIONS AS TO THE REPAIR OF THE PREMISES, NOR PROMISES TO ALTER, REMODEL OR IMPROVE THE PREMISES HAVE BEEN MADE BY LANDLORD AND (5) THERE ARE NO REPRESENTATIONS OR WARRANTIES, EXPRESSED, IMPLIED OR STATUTORY, THAT EXTEND BEYOND THE DESCRIPTION OF THE PREMISES.

17.2    Landlord's Work.

(i) On or before the First Delivery Date and the Second Delivery Date, separately in each case, Landlord shall, at Landlord's sole cost and expense (and not chargeable to the Tenant Improvement Allowance), complete those certain improvements as described in Exhibit E attached hereto and incorporated herein by reference ("Landlord's Initial Work"). Landlord shall diligently perform Landlord's Initial Work in a good and workmanlike manner and in compliance with all applicable Legal Requirements. Upon completion of Landlord's Initial Work, Landlord shall notify Tenant so Tenant may inspect and approve the Landlord's Initial Work, such approval shall not be unreasonably withheld, conditioned or delayed.

(ii) Intentionally omitted.

(iii) In addition, if any lack of compliance with applicable Legal Requirements with regard to the Building or its systems or any part thereof arises during any construction (including by reason of the failure of any grandfathering, temporary reprieve or similar exception or exemption to continue to apply) and will delay or impact the construction of the Tenant's Initial Improvements, Tenant shall notify Landlord in writing and Landlord shall promptly correct the same, at Landlord's expense (not chargeable to Tenant or the Tenant Improvement Allowance) and the Rent Commencement Date shall be extended day-for-day for each day of actual delay that Tenant encounters in the completion of the Tenant's Initial Improvements beyond the Build-Out Period and for Tenant to use the Premises for general office or in the opening of its executive suites office business in the Premises by reason thereof. Notwithstanding the foregoing, Tenant and Landlord acknowledge and agree that with respect to Legal Requirements related to fire suppression systems in the Premises, Tenant accepts such systems, or lack thereof, in As-Is condition in accordance with Section 17.1 herein, and Landlord shall not be responsible for the compliance or the cost of compliance of applicable Legal Requirements related to any such fire suppression system in the Premises.

17.3 <u>Tenant's Initial Improvements</u>.

(i) Landlord and Tenant each acknowledge their approval of the test-fit describing the interior improvements to be made to the Premises attached hereto as <u>Exhibit D</u> and incorporated herein by this reference (the "<u>Test-Fit</u>"). Landlord acknowledges and agrees that Tenant may make such modifications and/or adjustments to the Test-Fit as Tenant deems appropriate. Tenant shall submit for Landlord's approval (which approval shall not be unreasonably withheld, conditioned or delayed) Tenant's plans ("<u>Tenant's Plans</u>") for the construction of improvements to the Premises consistent with the Test-Fit (as the same may be modified or adjusted by Tenant) (the "<u>Tenant's Initial Improvements</u>"), in sufficient detail to obtain a building permit, prepared by Tenant's architect licensed in Ohio. Tenant shall revise Tenant's Plans (and re-revise them) in accordance with Landlord's comments within ten (10) days after receipt of such comments. If Landlord does not approve Tenant's Plans or any revisions thereof, or does not reject and notify Tenant of the specific comments Landlord has to Tenant's Plans within ten (10) days following receipt of same, then Tenant's Plans shall be deemed approved. The iterative process of Tenant's submitting the Tenant's Plans to Landlord, and Landlord reviewing and approving or providing comments with respect thereto, as described in this paragraph shall continue until Tenant's Plans are agreed upon by Tenant and Landlord. The submission to Landlord of Tenant's Plans shall constitute a warranty by Tenant that the work provided for in Tenant's Plans confirms with all Legal Requirements and the terms of the Lease. No approval by Landlord shall constitute in any manner a waiver by Landlord of Landlord's rights under these warranties. Prior to beginning Tenant's Initial Improvements, Tenant shall also deliver or cause to be delivered: (i) to Landlord and Landlord's Mortgagee (which Landlord shall identify to Tenant), at Tenant's cost, a builder's risk insurance policy naming Landlord and Landlord's Mortgagee as additional insureds, as their interests may appear, with the amount and type of coverage reasonably being required by Landlord and Landlord's Mortgagee and otherwise in compliance with the requirements for insurance set forth in Article 6 above and (ii) the names of Tenant's proposed contractor, subcontractors and architect for Landlord's reasonable approval which shall not be unreasonably withheld, conditioned or delayed. Landlord shall not be entitled to any supervisory or construction management fees or fees for general conditions, etc. in connection with the Tenant's Initial Improvements. Tenant agrees to cooperate and reasonably coordinate all construction with Landlord's property manager and to not unreasonably interfere with the rights and business operations of existing tenants in the Building Complex.

(ii) Landlord shall pay Tenant, in accordance with this <u>Section 17.3</u>, for the costs of the Tenant's Initial Improvements including, but not limited to design, construction of improvements, glass, other non-sheetrock wall systems and purchase and installation of furniture, fixtures, telephone equipment, computer wiring, security systems, signage, moving and general communication needs within the Premises, up to the Tenant Improvement Allowance. Any portion of the Tenant Improvement Allowance that is not utilized by Tenant for the completion of Tenant's Initial Improvements, furniture or fixturing shall be applied against the portions of Base Rent next coming due under the Lease.

(iii) During the construction of Tenant's Initial Improvements, upon request from Tenant, Landlord shall pay a portion of the Tenant Improvement Allowance to Tenant (or directly to Tenant's general contractor at Tenant's option) within thirty (30) days after Landlord

receives (1) copies of paid invoices for the most recent disbursement of the Tenant Improvement Allowance paid by Landlord to Tenant's contractor (except for the first draw of the Tenant Improvement Allowance); (2) original, notarized conditional lien waivers in form and substance reasonably satisfactory to Landlord from Tenant's general contractor (or in the case of any work not performed by or under the general contractor, from the applicable vendor, contractor or design service provider) with respect to any work the non-payment for which will give rise to a statutory mechanic's lien under applicable Legal Requirements. After Tenant's Initial Improvements have been completed, Landlord shall pay the balance of the Tenant Improvement Allowance to Tenant's (or directly to Tenant's general contractor, at Tenant's option)within thirty (30) days after Landlord receives (1) copies of paid invoices for the most recent disbursement of the Tenant Improvement Allowance paid by Landlord to Tenant; (2) original, notarized conditional lien waivers in form and substance reasonably satisfactory to Landlord from Tenant's general contractor (or in the case of any work not performed by or under the general contractor, from the applicable vendor, contractor or design service provider) with respect to any work the non-payment for which will give rise to a statutory mechanic's lien under applicable Legal Requirements; (3) an original notarized affidavit of the general contractor in form reasonably satisfactory to Landlord stating that Tenant's Initial Improvements have been completed in accordance with Tenant's Plans approved by Landlord in accordance with the terms of the Lease and all subcontractors, laborers and material suppliers have been paid in full for work completed; and (4) a statement executed by an authorized representative of Tenant (which could be from Tenant's general contractor or architect) which certifies that Tenant has completed all of Tenant's Initial Improvements.

(iv)    Landlord shall reimburse Tenant up to Three Thousand Five Hundred and 00/100 Dollars ($3,500.00) for a fit plan of the Premises within thirty (30) days of Landlord's receipt of written request therefor, accompanied by reasonable documentation substantiating the costs to be reimbursed thereby. Landlord agrees and acknowledges that the cost and expense of such fit plan is not to be included in the Tenant Improvement Allowance.

(v)    In the event Landlord fails to pay the Tenant Improvement Allowance within the thirty (30) day period set forth above, Tenant shall be entitled to offset such amounts from its monthly installments of Base Rent until such offset amounts equal the amount of the Tenant Improvement Allowance that Tenant is entitled to under this Lease.

17.4    Signage. Landlord shall provide Tenant with lobby directory signage that includes Tenant's name and the name of Tenant's clients occupying Tenant's Premises, at Landlord's sole expense. If Landlord is unable to provide Tenant's required directory signage (i.e., directory signage sufficient to accommodate Tenant's trade name and all of Tenant's clients' names), Tenant shall have the right to install and maintain, at Tenant's cost and with Landlord's prior reasonable approval as to the design, layout and location, an electronic directory for Tenant's use in the Building lobby. Tenant shall have the right, at Tenant's sole cost, to locate signage at: (i) any monument that may be installed on the southside exterior of the Building; (ii) eyebrow signage above the main entrance on the southern exterior of the Building; (iii) temporary signage in the lobby of the Building, for a period no longer than six (6) months after the Rent Commencement Date; (iv) signage located in the elevator lobby of the floors where the Premises is located; and (v) rider signage advertising Tenant's executive office suites business attached to

Landlord's Building marketing signage. All signage in this Section is subject to: (a) obtaining all necessary permits and compliance with all applicable Legal Requirements and any applicable covenants and restrictions applicable to the Premises in connection therewith, (b) Section 7.12 of this Lease, and (c) Landlord's prior written consent of such signage (which consent shall not be unreasonably withheld, delayed or conditioned provided that Tenant delivers to Landlord reasonably detailed plans and specifications for the sign). All such signage shall be installed and maintained by Tenant, at its sole cost and expense, and shall be removed by Tenant at the expiration or earlier termination of this Lease in accordance with Section 7.8 hereof.

17.5    Tenant Delay.

(i)      The occurrence of any of the following shall be herein referred to collectively and individually as a "Tenant Delay":

(a)      Any request by Tenant that Landlord delay the commencement or completion of Landlord's Work for any reason;

(b)      Any requested change by Tenant in any of the plans for Landlord's Work; or

(c)      Any other act or omission of Tenant or its officers, agents, employees or contractors that causes a delay in the commencement or completion of Landlord's Work beyond the Second Delivery Date or First Delivery Date (as applicable).

(ii)     None of the foregoing shall be a basis for a "Tenant Delay" unless and until the same continues for two (2) business days after Tenant's receipt of written notice thereof (which details the conduct of Tenant, its officers, agents, employees or contractors causing the alleged delay) from Landlord.

17.6    Landlord Delay.

(i)      The occurrence of any of the following shall be herein referred to collectively and individually as a "Landlord Delay":

(a)      Any request by Landlord that Tenant delay the commencement or completion of Tenant's Initial Improvements for any reason;

(b)      Any requested change by Landlord in any of the plans for Tenant's Initial Improvements after such plans have been approved in accordance with this Lease; or

(c)      Any other act or omission of Landlord or its officers, agents, employees or contractors that causes a delay in the commencement or completion of Tenant's Initial Improvements.

(ii)     None of the foregoing shall be a basis for a "Landlord Delay" unless and until the same continues for two (2) business days after Landlord's receipt of written notice thereof

(which details the conduct of Landlord, its officers, agents, employees or contractors causing the alleged delay) from Tenant.

## ARTICLE 18
## WARRANTY REGARDING BROKER

Tenant warrants and represents that Tenant has dealt with no broker in connection with the consummation of this Lease other than the Broker named in Section 1.1 hereof, and, in the event of any brokerage claims against Landlord predicated upon prior dealings with Tenant by any broker other than the Broker, Tenant agrees to defend the same and indemnify Landlord against any such claim. Landlord warrants and represents that Landlord has dealt with no broker other than the Broker in connection with the consummation of this Lease, and, in the event of any brokerage claims against Tenant predicated upon prior dealings with Landlord by any broker, Landlord agrees to defend the same and indemnify Tenant against any such claim. Landlord agrees to pay any commission due Broker pursuant to the terms of a separate agreement.

## ARTICLE 19
## HAZARDOUS MATERIALS

Tenant shall not bring to the Premises and cause or permit the escape, disposal, release or threat of release of any Hazardous Materials (as said term is hereafter defined) that was not pre-existing on the Premises or Building Complex on, in, upon or under the Premises or the Building Complex. Tenant shall not allow the generation, storage, use or disposal of such Hazardous Materials in any manner not sanctioned by law or by the highest standards prevailing in the industry for the generation, storage, use and disposal of such Hazardous Materials, nor allow to be brought into the Premises or the Building Complex by any person acting under Tenant any such Hazardous Materials except for use in the ordinary course of Tenant's business, and then only after written notice is given to Landlord of the identity of such Hazardous Materials. "Hazardous Materials" shall mean any material or substance which is (i) petroleum, (ii) asbestos, (iii) designated as a "hazardous substance" pursuant to Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321) or listed pursuant to §307 of the Federal Water Pollution Control Act (33 U.S.C. §1317), (iv) defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq. (42 U.S.C. §6903), (v) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §9601 et seq. (42 U.S.C. §9601), as amended, or (vi) defined as "oil" or a "hazardous waste", a "hazardous substance", a "hazardous material" or a "toxic material" under any other law, rule or regulation applicable to the Building Complex or any portion thereof. In addition, Tenant shall execute commercially reasonable affidavits, representations and the like, from time to time, at Landlord's request concerning Tenant's best knowledge and belief regarding the presence of Hazardous Materials in the Premises or at the Building Complex or any portion thereof. In all events, Tenant shall indemnify and save Landlord harmless from any release or threat of release or the presence or existence of any Hazardous Materials brought to the Premises and if such release is caused by Tenant or any person acting under Tenant. Landlord expressly reserves the right to

enter the Premises to perform regular inspections. Landlord agrees to save Tenant harmless and to indemnify Tenant from and against any liability, injury loss, claim, damage, settlement, attorneys' fees, fines, penalties, interest or expense which may be incurred by Tenant (including, without, limitation, any cost which Landlord may incur for testing and remediation) arising from any release, presence or existence of Hazardous Materials which existed at the Building Complex prior to Tenant's occupation of the Premises. The within covenants and indemnities shall survive the expiration or earlier termination of the Lease Term.

**ARTICLE 20**
**FORCE MAJEURE**

In the event that Landlord or Tenant shall be delayed, hindered in or prevented from the performance of any act required hereunder other than the payment of any Base Rent, Additional Rent by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, the act, failure to act or default of the other party, war or other reason beyond their control ("Force Majeure"), then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay (subject to the 165 day limitation imposed on Landlord with respect to Force Majeure delays referenced in the definition of the term "Premises Delivery Date"). Force Majeure shall not be construed to excuse Tenant from making any payments due hereunder in a timely manner as set forth in this Lease or from performing any covenant or obligation imposed under this Lease by reason of the financial inability of Tenant.

**ARTICLE 21**
**GUARANTY**

As an inducement for Landlord to enter into this Lease, Tenant shall cause the Guarantor to execute and deliver to Landlord a Guarantee in the form attached hereto as Exhibit G simultaneously with the execution and delivery of this Lease.

**ARTICLE 22**
**EXCLUSIVE USE**

Subject to the conditions and limitations hereinafter set forth and provided that Tenant is operating as a company with a primary business of executive suites provider to third-party end users with a flexible workplace center, with or without individual offices or ancillary services (the "Exclusive Use"), Landlord shall not lease to, or permit any other space within the Building to be occupied or used by, any person or entity for the Exclusive Use, unless obtaining Tenant's prior written approval (which Tenant may grant or withhold in its sole discretion). Further, subject to the foregoing limitations in the first sentence of this Section, Landlord agrees not to lease any space (except for a retail use in the Building) less than 750 square feet (the "Small Space Rental").

In the event that the Exclusive Use violation occurs, then from the date of Tenant's written notice to Landlord identifying such violation and for so long as the Exclusive Use violation continues, Tenant's Base Rent shall be reduced by fifty percent (50%), or Tenant shall

have the ongoing right to terminate this Lease until the Exclusive Use violation ceases, in addition to any other remedies provided for under this Lease or at law or in equity; (provided, however, prior to exercising any of the foregoing rights or remedies, Tenant shall have given Landlord written notice of the violation and Landlord shall have failed to cure the same within thirty (30) days after Landlord's receipt of such notice).

In the event Landlord violates the Small Space Rental restriction in this Section 22, during the period the Small Space Rental is occurring, Tenant's Base Rent shall be reduced by an amount that equals fifty percent (50%) of the Base Rent for the portion of the Premises that equals the amount of the rentable square footage of the Small Space Rental. By way of example only, if the Small Space Rental is 500 rentable square feet, then 500 rentable square feet of the Premises shall receive a fifty percent (50%) reduction in Base Rent.

Landlord further agrees that, provided Tenant is operating as an Exclusive Use, and subject to any Legal Requirements, Tenant's Permitted Use shall not be subject to any prohibitions on office-related uses by specific companies or lines of business.

Tenant's rights under this Section 22 shall be held in abeyance and shall not be enforceable while any Event of Default by Tenant beyond all applicable notice, grace and cure periods continues and shall resume when such default is cured.

## ARTICLE 23
## GENERAL PROVISIONS

23.1    Merger.  The parties agree that they have not made any commitment, statement, promise or agreement whatsoever, verbally or in writing, which is in conflict with the terms of this Lease, or which in any way modifies, varies, alters, enlarges or invalidates any of its provisions. This Lease, including the exhibits attached hereto, sets forth the entire understanding between the parties and may not be changed or amended except in writing.

23.2    Invalidity of Particular Provision.  If any provision of this Lease or application of it to any persons or circumstances is, to any extent, held to be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected, and that provision of this Lease shall be valid and enforced to the fullest extent permitted by law.

23.3    Waiver.  The failure or delay on the part of either party to enforce or exercise at any time any of the provisions, rights or remedies in this Lease shall in no way be construed to be a waiver thereof, nor in any way to affect the validity of this Lease or any part hereof, or the right of the party to thereafter enforce each and every such provision, right or remedy.

23.4    Obligations that Survive Lease Termination.  The following obligations of the parties shall survive the expiration or termination of this Lease: (i) any obligation herein permitted to be performed after the end of the termination of this Lease; (ii) any obligation not reasonably susceptible of performance prior to the termination of this Lease, including, but not limited to, any obligation or indemnity resulting from either party's default or misrepresentation; (iii) any obligation or indemnity to be performed pursuant to this Lease at or before the end of the Lease

Term which is not so performed; and (iv) any obligation that, pursuant to the terms and conditions of this Lease, expressly survives the expiration or termination of this Lease.

23.5  Waiver of Jury Trial.  LANDLORD AND TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS LEASE OR THE OBLIGATIONS EVIDENCED HEREBY, OR ANY OTHER DOCUMENT OR INSTRUMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT TO EACH OF LANDLORD AND TENANT IN ENTERING INTO THIS LEASE.

23.6  Prevailing Party.  In the event of any litigation or any other dispute arising under this Lease, the non-prevailing party shall, upon demand, reimburse the prevailing party for all costs and expenses arising therefrom, including reasonable attorneys' fees and expenses through the trial and appellate levels.

23.7  Counterparts.  This Lease may be executed in any number of counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, taken together, shall be deemed to be one and the same instrument.

23.8  Originals.  Electronic signatures of this Lease shall be deemed as original.

23.9  Consents and Approvals.  Unless specifically stated otherwise, all consents and approvals required hereunder of Landlord shall not be unreasonably withheld, conditioned or delayed.

23.10  Authorization of Pictures and Name.  Landlord agrees that Tenant may identify the Building and use photographs of the Building in connection with Tenant's advertising for the suites business in the Premises.

**[Signatures appear on the following page]**

Electronically Filed 10/13/2020 11:01 / / CV 20 938826 / Confirmation Nbr. 2093116 / CLAJB

IN TESTIMONY HEREOF, Landlord and Tenant have caused this Lease to be signed in multiples as of the date indicated below.

**LANDLORD:**

WRB Partners, LLC
an Ohio limited liability company

By: _____

Print: _Jason Laver_

Title: _Managing Member_

**TENANT:**

RGN-Cleveland II, LLC
a Delaware limited liability company

By: _____

    Michael J. Osburn
    Authorized Person

STATE OF OHIO        )
                         ) SS.

COUNTY OF CUYAHOGA     )

BEFORE ME, a Notary Public in and for said County and State, personally appeared _Jason Wall_, known to me to be _Managing Member_ of WRB Partners, LLC, an Ohio limited liability company, who executed the foregoing instrument for, and on behalf of, said company, and who acknowledged that the same is his/her free act and deed as such officer and the free act and deed of said company.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Cleveland, Ohio, this _5th_ day of _November_, 2019.

_Belinda J Newrones_
NOTARY PUBLIC

STATE OF _____ )
                   ) SS.
COUNTY OF _____ )

BEFORE ME, a Notary Public in and for said County and State, personally appeared Michael J. Osburn, known to me to be the Authorized Person of RGN-Cleveland II, LLC, a Delaware limited liability company, who executed the foregoing instrument for, and on behalf of, said company, and who acknowledged that the same is his/her free act and deed as such officer and the free act and deed of said company.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____, _____, this ____ day of _____ _____, 2019_.

_____
NOTARY PUBLIC

IN TESTIMONY HEREOF, Landlord and Tenant have caused this Lease to be signed in multiples as of the date indicated below.

**LANDLORD:**

WRB Partners, LLC
an Ohio limited liability company

By: _____

Print: _____

Title: _____

**TENANT:**

RGN-Cleveland II, LLC
a Delaware limited liability company

By: _____
      Michael J. Osburn
      Authorized Person

STATE OF OHIO            )
                              ) SS.

COUNTY OF CUYAHOGA    )

      BEFORE ME, a Notary Public in and for said County and State, personally appeared _____, known to me to be _____ of WRB Partners, LLC, an Ohio limited liability company, who executed the foregoing instrument for, and on behalf of, said company, and who acknowledged that the same is his/her free act and deed as such officer and the free act and deed of said company.

      IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Cleveland, Ohio, this _____ day of _____, 2019.


                              _____

                              NOTARY PUBLIC


STATE OF TEXAS       )
                              ) SS.

COUNTY OF DALLAS    )

      BEFORE ME, a Notary Public in and for said County and State, personally appeared Michael J. Osburn, known to me to be the Authorized Person of RGN-Cleveland II, LLC, a Delaware limited liability company, who executed the foregoing instrument for, and on behalf of, said company, and who acknowledged that the same is his/her free act and deed as such officer and the free act and deed of said company.

      IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Dallas, TX, this 16th day of Nov, 2019_.


                              Donna King Burch
                              NOTARY PUBLIC

DONNA KING BURCH
NOTARY PUBLIC
STATE OF TEXAS
ID# 1446000
EXPIRES 3-31-2021

## EXHIBIT A

### DESCRIPTION OF THE LAND

PARCEL NO. 1 (Permanent Parcel Nos. 101-14-010 and 011)

Situated in the City of Cleveland, County of Cuyahoga and the State of Ohio and known as being part of Original Two Acre Lot Nos. 202, 203, 204 and 204, and bounded and described as follows:

*205*

Beginning on the Southwesterly line of West 9th Street (formerly Water Street), 99 feet wide; said point of beginning being distant 11986 feet Northwesterly, measured along the Southwesterly line of West 9th Street, from its intersection with the Northerly line of Superior Avenue;

Thence North 33° 52' 27" West along the Southwesterly line of West 9th Street, a distance of 85.00 feet to a point;

Thence South 55° 52' 18" West, a distance of 92.50 feet to a point;

Thence South 34° 07' 42" East, a distance of 13.0 feet to a point;

Thence South 55° 52' 18" West, a distance of 47.32 feet to a point;

Thence South 27° 32' 00" West, a distance of 13.40 feet to a point on the Northeasterly line of West 10th Street (formerly Spring Street), 49.5 feet wide;

Thence South 62° 28' 00" East along the Northeasterly line of West 10th Street, a distance of 74.79 feet to a point;

Thence North 55° 46' 40" East, a distance of 115.77 feet to the point of beginning, and containing 0.2505 acres of land, more or less, but subject to all legal highways.

The above described premises are now known as Parcel No. 1 in Subdivision and Consolidation Plat for Reserve Building Associates Limited, as recorded in Volume 245 of Maps, Page 7 of Cuyahoga County Records.

.

PARCEL NO. 2 (Permanent Parcel No. 101-14-012)

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio, and known as being a part of Original Two Acre Lot No. 205 and bounded and described as follows:

Beginning on the northwesterly line of Superior Avenue N.W., at its intersection with the southwesterly line of West 9th Street, 99 feet in width;

Thence South 77°00' 00" West along the northwesterly line of Superior Avenue N.W., 68.63 feet to its intersection with the northeasterly line of West 10th Street, 49.5 feet in width;

Thence North 62° 28' 00" West along the northeasterly line of West 10th Street, 107.86 feet;

Thence North 55° 46' 40" East, 115.77 feet to the aforementioned southwesterly line of West 9th Street;

Thence South 33° 51' 40" East along the southwesterly line of West 9th Street, 119.86 feet to the place of beginning, containing 9,344 square feet of land (0.2145 acres) according to a survey made in January, 1981 by Garrett & Associates, Inc., Registered Engineers and Surveyors, be the same more or less, but subject to all legal highways.

**EXHIBIT B**

<u>DEPICTION OF THE PREMISES</u>

(ATTACHED HERETO)

*Premises shown as cross-hatched and/or shaded





2ND FLOOR

**EXHIBIT C**

**COMMENCEMENT AGREEMENT**

THIS COMMENCEMENT AGREEMENT (the "Agreement") is entered into this _____ day of _____, 201__, by and between WRB Partners, LLC, an Ohio limited liability company ("Landlord"), and RGN-Cleveland II, LLC, a Delaware limited liability company ("Tenant").

WITNESSETH:

WHEREAS, Landlord and Tenant entered into a Lease Agreement dated the _____ day of _____, 2019, for certain real property (the "Premises") located at 1468 West Ninth Street, Cleveland, Ohio  (together with any amendments thereto, the "Lease"); and

WHEREAS, it is the desire and intent of Landlord and Tenant to more clearly define the terms of said Lease.

NOW, THEREFORE, it is agreed by and between Landlord and Tenant that:

1.      The Rent Commencement Date of the Lease is _____.

2.      The Expiration Date of the Lease is _____, unless sooner terminated or extended as provided by said Lease.

3.      The Lease is now in full force and effect and all terms and conditions of the Lease are hereby ratified and confirmed.

Landlord and Tenant agree that this document will not be recorded in any public records including the real estate records of the county where the Premises are located.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Agreement as of the day and year first above written.

LANDLORD:                                                    TENANT:

WRB Partners, LLC                                       RGN-Cleveland II, LLC,
an Ohio limited liability company               a Delaware limited liability company


By:_____               By:_____
Name:                                                             Michael J. Osburn
Title:                                                               Authorized Person

# EXHIBIT D

## APPROVED TEST-FIT





**EXHIBIT E**

<u>LANDLORD'S INITIAL WORK</u>

Landlord shall cause the following to be performed, at Landlord's sole cost and expense:

1)  Electrical service to the Premises no less than 6.0 watts per RSF, exclusive or HVAC (other than Tenant installed supplemental air conditioning).  The ongoing expense for consumption of electric charges shall be paid by Tenant in accordance with Section 5.1 of the Lease.

2)  Base building ceiling lighting in Premises.  The ongoing expense for consumption of electric charges shall be paid by Tenant in accordance with Section 5.1 of the Lease.

3)  Renovation of the elevator lobby, restrooms located on the second floor of the Building (and the hallway connecting the elevator lobby and such restrooms).  Such renovation work shall be done with building standard materials and finishes.

## EXHIBIT G

### Form of Guarantee

## [*IWG Global Investments Sarl HEADED PAPER*]

WRB Partners, LLC
10020 Aurora Hudson Road
Streetsboro, Ohio 44241
For the attention of:  Property Manager

_____, 2019

Dear Sirs,

### Guarantee Agreement

We refer to the lease agreement (the "**Lease Agreement**") dated on or about the date first written above entered into between (1) WRB Partners, LLC (the "**Landlord**"), having an office at the address set forth above; and (2) RGN-Cleveland II, LLC (the "**Tenant**"), having an office at c/o Regus Corporation, 3000 Kellway Dr., Suite 140, Carrollton, Texas 75006, in respect of premises in the building located at 1468 West Ninth Street, Cleveland, Ohio 44113 (the "**Premises**"). In this letter (the "**Agreement**"), definitions used in the Lease Agreement shall apply to this Agreement where the context so permits.

1.     IWG Global Investments Sarl ("**IWG**") is a company incorporated with number B200.985 in Luxembourg at 26 Boulevard Royal, Luxembourg L-2449 Luxembourg.  IWG is ultimately owned by IWG PLC and is an indirect parent company of the Tenant.

2.     IWG hereby unconditionally and irrevocably agrees that it will, within 5 business days of a written demand from the Landlord made in accordance with the terms of this Agreement:

   (a)   pay to the Landlord any Base Rent (as defined in the Lease Agreement) and other charges or amounts required to be paid by the Tenant pursuant to the express terms of the Lease Agreement, including but not limited to any damages resulting from any default beyond all applicable notice and grace periods by the Tenant of any of its obligations, monetary or non-monetary, under the Lease Agreement and any amounts that the Landlord expends to cure any such default of the Tenant under the Lease Agreement (collectively, the "**Lease Liabilities**"), up to a maximum guaranteed amount, in the aggregate, of One Million Three Hundred Forty-Three Thousand and 00/100 U.S. Dollars ($1,343,000.00) (the "**Cap Amount**"); provided, however, that: (i) the Cap Amount shall reduce automatically on the third (3rd) anniversary of the Lease Commencement Date to One Million Seven Thousand Two Hundred Fifty and 00/100 U.S. Dollars ($1,007,250.00), (ii) the Cap Amount shall reduce automatically on the fourth (4th) anniversary of the Lease Commencement Date to Six Hundred Seventy-One Thousand Five Hundred 00/100 U.S. Dollars ($671,500.00), (iii) the Cap Amount shall reduce automatically on the fifth (5th) anniversary of the Lease Commencement Date to Three Hundred Thirty-Five Thousand Seven Hundred Fifty and 00/100 U.S. Dollars ($335,750.00)and (iv) the Cap Amount shall reduce automatically on the sixth (6th) anniversary of the Lease Commencement Date (the "**Final Reduction Date**") to Zero and

00/100 U.S. Dollars ($0.00); and

(b) if any amount or obligation which would otherwise have formed part of the Lease Liabilities is or becomes unenforceable, illegal or invalid, indemnify the Landlord against any cost, loss or liability it incurs as a result of the Tenant not paying any amount which would, but for such unenforceability, illegality or invalidity, have been payable by it. The amount payable under these paragraphs (a) and (b) will not exceed, in the aggregate, the Cap Amount (if and as reduced under paragraph (a)); and

(c) pay to the Landlord any Enforcement Costs (as defined below) that IWG may become obligated to pay pursuant to the terms of Paragraph 14 of this Agreement, which shall be in addition to, and not included as part of nor limited by, the Cap Amount.

3.  IWG will honor all demands with respect to the Lease Liabilities made by the Landlord in accordance with the terms of this Agreement up to, in the aggregate, the Cap Amount from and after the date first written above. IWG's obligations under this Agreement shall expire at 5:00pm (Luxembourg time) on the date (the "**Expiry Date**") which is the earlier of (a) the Final Reduction Date if the Cap Amount reduces to Zero and 00/100 U.S. Dollars ($0.00) under Paragraph 2(a) above, under the terms thereof, on such date or (b) the date that is sixty (60) days after the earlier of (i) the date on which the initial term of the Lease Agreement expires or (ii) the date on which the Lease Agreement earlier terminates, if occurring, in accordance with the express terms of the Lease Agreement; provided, however, (1) this Agreement shall remain in full force and effect in respect of any demand delivered to the address specified in Paragraph 4 below before 5:00 pm (Luxembourg time) on the Expiry Date; and (2) IWG's obligation to pay the amount set forth in such demand; together with any Enforcement Costs that IWG may become obligated to pay pursuant to the terms of Paragraph 14 of this Agreement, shall survive the Expiry Date.

4.  Any demand for payment must (i) be made in writing sent to The Company Secretary, IWG at 26 Boulevard Royal, Luxembourg L-2449 Luxembourg (which address may be updated from time to time hereafter by IWG giving the Landlord written notice of the new address of IWG); (ii) refer to the date of this Agreement and the Landlord and the Tenant, and enclose a copy of this Agreement; (iii) state the amount for which payment is demanded; (iv) state the reason for which payment is demanded; (v) state the name of the bank and account number to which payment is to be made; and (vi) be duly signed by an authorized representative of the Landlord. Notices to IWG shall be in writing and given to the address for payment demands set forth above and in a manner as to method of delivery that conforms with the notice provisions set forth in the Lease Agreement. Any notice or other communication to be given to the Landlord hereunder shall be in writing and sent in accordance with the notice provisions of the Lease Agreement. If any parties' respective notice or payment addresses change, then such party shall give the other written notice thereof to the other party.

5.  This Agreement constitutes an absolute, continuing and irrevocable obligation of IWG and may not be avoided, affected or discharged by reason of (and IWG waives and agrees not to assert any right that it may have to avoid its obligations under this Agreement by reason of) any of the following:

(a) any irregularity, unenforceability, illegality or invalidity of any obligation in the Lease Agreement;

(b) the bankruptcy, insolvency or receivership of the Tenant or other similar proceedings;

(c) the Landlord granting any time, extension of time, release, waiver, discharge, adjustment, indulgence or concession to the Tenant in respect of the Lease Liabilities or any neglect of the Landlord in enforcing the Lease Liabilities (any such granting or neglect by the Landlord may be made without notice to or the consent or knowledge of IWG);

(d) any variation, amendment, or modification to the Lease Agreement by agreement between the Landlord and the Tenant, including, without limitation, any extension or renewal of the term of the Lease Agreement and any change in the Rent (any such change, amendment or modification to the Lease Agreement may be made without notice to or the consent or knowledge of IWG);

(e) any surrender by the Tenant of part of the Premises (any such surrender may be made without notice to or the consent or knowledge of IWG);

(f) any assignment(s) of the Lease Agreement and/or any subletting(s) of the Premises by the Tenant (any such assignment or subletting may be made without notice to or the consent or knowledge of IWG);

(g) the incapacity, lack of authority, death or disability of the Tenant; and/or

(h) the absence, impairment, rejection, disaffirmance, release, discharge, modification, or limitation (in bankruptcy, by election of remedies or otherwise) of the liability of the Tenant under the Lease Agreement or the rejection of the Lease Agreement in bankruptcy or other insolvency proceeding.

6.  The maintenance of any action or proceeding by the Landlord to recover any sum or sums that may be or become due under the Lease Agreement and to secure the performance of any of the other terms, covenants and conditions of the Lease Agreement shall not preclude the Landlord from thereafter instituting and maintaining subsequent actions or proceedings for any subsequent default or defaults of the Tenant under the Lease Agreement. In the event of a default by the Tenant of any of the Lease Liabilities, the Landlord may proceed either against the Tenant or may make demand for payment from IWG hereunder without first prosecuting or exhausting any remedy or claim against the Tenant or may pursue both courses simultaneously and IWG hereby waives and agrees not to assert any right to require the Landlord to proceed against the Tenant, or any other guarantor or person or to pursue any other security, collateral or remedy, before proceeding against IWG. IWG waives and agrees not to assert or take advantage of any right to (a) exoneration if the Landlord's actions shall impair any security or collateral of IWG and (b) any security or collateral held by the Landlord.

7.  IWG waives any right, statutory, or otherwise, for itself to require or for the Tenant to require the Landlord to apply rents received toward the obligations of IWG under this Agreement, or to otherwise prioritize the receipt of rents as against the obligations of the undersigned under this Agreement, or to require the Landlord to pursue any right or remedy for the benefit of IWG.

8.  IWG hereby waives and agrees not to assert any right or defense based on the absence of any or all presentments, demands (Including demands for performance), notices (including notices of any adverse change in the financial status of the Tenant, notices of any other facts which increase

the risk to the undersigned, notices of non-performance and notices of acceptance of this Agreement) and protests of each and every kind, except that the foregoing shall not waive any requirements expressly set forth in this Agreement as to the timing and presentment of a written demand hereunder in accordance with the terms hereof.

9.   This Agreement represents the entire understanding between the parties hereto as to the matters addressed herein and the provisions of this Agreement cannot be modified, waived or cancelled, except by a written instrument signed by IWG and the Landlord. All prior understandings and agreements as to the matters addressed herein, oral or written, express or implied, are hereby merged herein. The provisions of this Agreement shall apply to, bind and inure to the benefit of IWG and the Landlord and their respective heirs, legal representatives, successors and assigns. As used herein, the term "Tenant" means the Tenant specifically named in the Lease Agreement and also its successors and assigns, including, without limitation, any assignee of the Tenant's right, title or interest (in whole or in part) in the Lease Agreement, including, without limitation, any trustee in bankruptcy and any bankruptcy estate of the Tenant or its successors and assigns. All references in this Agreement to "IWG" shall be deemed to include its successors and assigns. All references in this Agreement to "Landlord" shall be deemed to include its successors and assigns. The Landlord may assign the benefit of this Agreement to any subsequent owner of the Building.

10.  Notwithstanding anything contained in this Agreement to the contrary, the maximum liability, in the aggregate, that IWG shall be subject to under this Agreement shall be the Cap Amount (if and as reduced under Paragraph 2(a)), plus Enforcement Costs.

11.  IWG acknowledges that IWG is issuing this Agreement to induce the Landlord to enter into the Lease Agreement with the Tenant. IWG acknowledges that additional consideration for giving this Guarantee to Landlord is the fact that IWG is an affiliate of the Tenant and IWG expects to benefit directly or indirectly from the Lease Agreement.

12.  This Agreement and any non-contractual obligations arising out of or in connection with it are governed by and interpreted in accordance with the laws of the State of Ohio, United States, without regard to conflicts of laws. This Agreement shall be deemed to have been made and performed, and shall be enforceable, in the State of Ohio, United States.

13.  (a) IWG hereby: (i) irrevocably consents and submits to the jurisdiction of any federal, state, county or municipal court sitting in the County of Cuyahoga, State of Ohio for the limited purpose of resolving any dispute under this Agreement and enforcing this Agreement (including, without limitation, any action by the Landlord to collect on any judgment obtained in connection with this Agreement); (ii) expressly waives any rights of IWG pursuant to the laws of the United Kingdom or any other jurisdiction by virtue of which exclusive jurisdiction of the courts of the United Kingdom or any other jurisdiction might be claimed; (iii) irrevocably waives personal service of any summons and complaint; (iv) irrevocably waives all objections as to venue and any and all rights IWG may have to seek a change of venue with respect to any such action or proceeding; (v) agrees that the laws of the State of Ohio shall govern in any such action or proceeding, and waives any defense to any action or proceeding granted or allowed by the laws of the United Kingdom or any other country or jurisdiction unless such defense is also allowed by the laws of the State of Ohio; and (vi) agrees that any final judgment rendered against IWG in any such action or proceeding shall be conclusive and may be enforced in the United Kingdom or any other jurisdiction by suit on the judgment or in any other manner provided by law, and expressly consents to the affirmation

of the validity of any such judgment by the courts of the United Kingdom or any other jurisdiction so as to permit execution thereon.

(b) IWG irrevocably designates and appoints the Tenant as its authorized agent to accept and acknowledge on its behalf service of process with respect to any dispute under, or enforcement of, this Agreement at c/o Regus Corporation, 3000 Kellway Dr., Suite 140, Carrollton, Texas 75006, Attn: Legal Department (which address may be updated from time to time hereafter by the Tenant giving the Landlord written notice of the new address of the Tenant in accordance with the applicable notice provisions set forth in the Lease Agreement); receipt by the Tenant of any legal process may be made in the State of Ohio, in a like manner and with like effect as if the same were served personally upon IWG within the jurisdiction of the State of Ohio.

**(c) FOR THE PURPOSE OF RESOLVING ANY DISPUTE UNDER, OR ENFORCEMENT OF, THIS AGREEMENT, IWG HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY.**

14. If the Landlord should retain counsel and/or institute any suit against IWG to enforce this Agreement or any covenants or obligations of IWG hereunder, then IWG shall pay to the Landlord, upon demand, all reasonable attorneys' fees, costs and expenses, including, without limitation, court costs and filing fees (all of which are referred to herein as **"Enforcement Costs"**), if the Landlord is the prevailing party.

Yours faithfully,

.......................................................
For and on behalf of **IWG Global Investments Sarl**

Name:_____
Title: _____

The undersigned, _____, notary in Luxembourg (Grand-Duchy of Luxembourg)

certifies the authenticity of the signature(s) of _____.

Luxembourg, _____, 20___

Name: _____

SEAL

# EXHIBIT 2



**International Workplace Group**

**IWG Global Investments (SARL)**

26 Boulevard Royal, L-2449 Luxembourg, Grand Duchy of Luxembourg

Phone +352 22 99 99 57 52

Fax +352 22 99 99 54 99

Registered in Luxembourg under RCS Luxembourg No. B200985

WRB Partners, LLC
10020 Aurora Hudson Road
Streetsboro, Ohio 44241
For the attention of:  Property Manager

December 13, 2019

Dear Sirs,

### Guarantee Agreement

We refer to the lease agreement (the "**Lease Agreement**") dated on or about the date first written above entered into between (1) WRB Partners, LLC (the "**Landlord**"), having an office at the address set forth above; and (2) RGN-Cleveland II, LLC (the "**Tenant**"), having an office at c/o Regus Corporation, 3000 Kellway Dr., Suite 140, Carrollton, Texas 75006, in respect of premises in the building located at 1468 West Ninth Street, Cleveland, Ohio 44113 (the "**Premises**"). In this letter (the "**Agreement**"), definitions used in the Lease Agreement shall apply to this Agreement where the context so permits.

1.  IWG Global Investments Sarl ("**IWG**") is a company incorporated with number B200.985 in Luxembourg at 26 Boulevard Royal, Luxembourg L-2449 Luxembourg.  IWG is ultimately owned by IWG PLC and is an indirect parent company of the Tenant.

2.  IWG hereby unconditionally and irrevocably agrees that it will, within 5 business days of a written demand from the Landlord made in accordance with the terms of this Agreement:

    (a)  pay to the Landlord any Base Rent (as defined in the Lease Agreement) and other charges or amounts required to be paid by the Tenant pursuant to the express terms of the Lease Agreement, including but not limited to any damages resulting from any default beyond all applicable notice and grace periods by the Tenant of any of its obligations, monetary or non-monetary, under the Lease Agreement and any amounts that the Landlord expends to cure any such default of the Tenant under the Lease Agreement (collectively, the "**Lease Liabilities**"), up to a maximum guaranteed amount, in the aggregate, of One Million Three Hundred Forty-Three Thousand and 00/100 U.S. Dollars ($1,343,000.00) (the "**Cap Amount**"); provided, however, that: (i) the Cap Amount shall reduce automatically on the third (3rd) anniversary of the Lease Commencement Date to One Million Seven Thousand Two Hundred Fifty and 00/100 U.S. Dollars ($1,007,250.00), (ii) the Cap Amount shall reduce automatically on the fourth (4th) anniversary of the Lease Commencement Date to Six Hundred Seventy-One Thousand Five Hundred 00/100 U.S. Dollars ($671,500.00), (iii) the Cap Amount shall reduce automatically on the fifth (5th) anniversary of the Lease Commencement Date to Three Hundred Thirty-Five Thousand Seven Hundred Fifty and 00/100 U.S. Dollars ($335,750.00)and (iv) the Cap Amount shall reduce automatically on the sixth (6th) anniversary of the Lease Commencement Date (the "**Final Reduction Date**") to Zero and 00/100 U.S. Dollars ($0.00); and

    (b)  if any amount or obligation which would otherwise have formed part of the Lease Liabilities is or becomes unenforceable, illegal or invalid, indemnify the Landlord against any cost, loss or liability it incurs as a result of the Tenant not paying any amount which would, but for such unenforceability, illegality or invalidity, have been payable by it.  The amount payable under these paragraphs (a) and (b) will not exceed, in the aggregate, the Cap Amount (if and as reduced under paragraph (a)); and

    (c)  pay to the Landlord any Enforcement Costs (as defined below) that IWG may become obligated to pay pursuant to the terms of <u>Paragraph 14</u> of this Agreement, which shall be in addition to, and not included as part of nor limited by, the Cap Amount.



**IWG Global Investments (SARL)**

26 Boulevard Royal, L-2449 Luxembourg, Grand Duchy of Luxembourg

Phone +352 22 99 99 57 52

Fax +352 22 99 99 54 99

Registered in Luxembourg under RCS Luxembourg No. B200985

International Workplace Group

3.  IWG will honor all demands with respect to the Lease Liabilities made by the Landlord in accordance with the terms of this Agreement up to, in the aggregate, the Cap Amount from and after the date first written above. IWG's obligations under this Agreement shall expire at 5:00pm (Luxembourg time) on the date (the "**Expiry Date**") which is the earlier of (a) the Final Reduction Date if the Cap Amount reduces to Zero and 00/100 U.S. Dollars ($0.00) under <u>Paragraph 2(a)</u> above, under the terms thereof, on such date or (b) the date that is sixty (60) days after the earlier of (i) the date on which the initial term of the Lease Agreement expires or (ii) the date on which the Lease Agreement earlier terminates, if occurring, in accordance with the express terms of the Lease Agreement; provided, however, (1) this Agreement shall remain in full force and effect in respect of any demand delivered to the address specified in <u>Paragraph 4</u> below before 5:00 pm (Luxembourg time) on the Expiry Date; and (2) IWG's obligation to pay the amount set forth in such demand; together with any Enforcement Costs that IWG may become obligated to pay pursuant to the terms of <u>Paragraph 14</u> of this Agreement, shall survive the Expiry Date.

4.  Any demand for payment must (i) be made in writing sent to The Company Secretary, IWG at 26 Boulevard Royal, Luxembourg L-2449 Luxembourg  (which address may be updated from time to time hereafter by IWG giving the Landlord written notice of the new address of IWG); (ii) refer to the date of this Agreement and the Landlord and the Tenant, and enclose a copy of this Agreement; (iii) state the amount for which payment is demanded; (iv) state the reason for which payment is demanded; (v) state the name of the bank and account number to which payment is to be made; and (vi) be duly signed by an authorized representative of the Landlord.  Notices to IWG shall be in writing and given to the address for payment demands set forth above and in a manner as to method of delivery that conforms with the notice provisions set forth in the Lease Agreement. Any notice or other communication to be given to the Landlord hereunder shall be in writing and sent in accordance with the notice provisions of the Lease Agreement.  If any parties' respective notice or payment addresses change, then such party shall give the other written notice thereof to the other party.

5.  This Agreement constitutes an absolute, continuing and irrevocable obligation of IWG and may not be avoided, affected or discharged by reason of (and IWG waives and agrees not to assert any right that it may have to avoid its obligations under this Agreement by reason of) any of the following:

    (a)  any irregularity, unenforceability, illegality or invalidity of any obligation in the Lease Agreement;

    (b)  the bankruptcy, insolvency or receivership of the Tenant or other similar proceedings;

    (c)  the Landlord granting any time, extension of time, release, waiver, discharge, adjustment, indulgence or concession to the Tenant  in respect of the Lease Liabilities or any neglect of the Landlord in enforcing the Lease Liabilities (any such granting or neglect by the Landlord may be made without notice to or the consent or knowledge of IWG);

    (d)  any variation, amendment, or modification to the Lease Agreement by agreement between the Landlord and the Tenant, including, without limitation, any extension or renewal of the term of the Lease Agreement and any change in the Rent (any such change, amendment or modification to the Lease Agreement may be made without notice to or the consent or knowledge of IWG);

    (e)  any surrender by the Tenant of part of the Premises (any such surrender may be made without notice to or the consent or knowledge of IWG);

    (f)  any assignment(s) of the Lease Agreement and/or any subletting(s) of the Premises by the Tenant (any such assignment or subletting may be made without notice to or the consent or knowledge of IWG);

    (g)  the incapacity, lack of authority, death or disability of the Tenant; and/or



**International Workplace Group**

IWG Global Investments (SARL)

26 Boulevard Royal, L-2449 Luxembourg, Grand Duchy of Luxembourg

Phone +352 22 99 99 57 52

Fax +352 22 99 99 54 99

Registered in Luxembourg under RCS Luxembourg No. B200985

(h) the absence, impairment, rejection, disaffirmance, release, discharge, modification, or limitation (in bankruptcy, by election of remedies or otherwise) of the liability of the Tenant under the Lease Agreement or the rejection of the Lease Agreement in bankruptcy or other insolvency proceeding.

6. The maintenance of any action or proceeding by the Landlord to recover any sum or sums that may be or become due under the Lease Agreement and to secure the performance of any of the other terms, covenants and conditions of the Lease Agreement shall not preclude the Landlord from thereafter instituting and maintaining subsequent actions or proceedings for any subsequent default or defaults of the Tenant under the Lease Agreement. In the event of a default by the Tenant of any of the Lease Liabilities, the Landlord may proceed either against the Tenant or may make demand for payment from IWG hereunder without first prosecuting or exhausting any remedy or claim against the Tenant or may pursue both courses simultaneously and IWG hereby waives and agrees not to assert any right to require the Landlord to proceed against the Tenant, or any other guarantor or person or to pursue any other security, collateral or remedy, before proceeding against IWG. IWG waives and agrees not to assert or take advantage of any right to (a) exoneration if the Landlord's actions shall impair any security or collateral of IWG and (b) any security or collateral held by the Landlord.

7. IWG waives any right, statutory, or otherwise, for itself to require or for the Tenant to require the Landlord to apply rents received toward the obligations of IWG under this Agreement, or to otherwise prioritize the receipt of rents as against the obligations of the undersigned under this Agreement, or to require the Landlord to pursue any right or remedy for the benefit of IWG.

8. IWG hereby waives and agrees not to assert any right or defense  based on the absence of any or all presentments, demands (including demands for performance), notices (including notices of any adverse change in the financial status of the Tenant, notices of any other facts which increase the risk to the undersigned, notices of non-performance and notices of acceptance of this Agreement) and protests of each and every kind, except that the foregoing shall not waive any requirements expressly set forth in this Agreement as to the timing and presentment of a written demand hereunder in accordance with the terms hereof.

9. This Agreement represents the entire understanding between the parties hereto as to the matters addressed herein and the provisions of this Agreement cannot be modified, waived or cancelled, except by a written instrument signed by IWG and the Landlord. All prior understandings and agreements as to the matters addressed herein, oral or written, express or implied, are hereby merged herein. The provisions of this Agreement shall apply to, bind and inure to the benefit of IWG and the Landlord and their respective heirs, legal representatives, successors and assigns. As used herein, the term "Tenant" means the Tenant specifically named in the Lease Agreement and also its successors and assigns, including, without limitation, any assignee of the Tenant's right, title or interest (in whole or in part) in the Lease Agreement, including, without limitation, any trustee in bankruptcy and any bankruptcy estate of the Tenant or its successors and assigns. All references in this Agreement to "IWG" shall be deemed to include its successors and assigns. All references in this Agreement to "Landlord" shall be deemed to include its successors and assigns. The Landlord may assign the benefit of this Agreement to any subsequent owner of the Building.

10. Notwithstanding anything contained in this Agreement to the contrary, the maximum liability, in the aggregate, that IWG shall be subject to under this Agreement shall be the Cap Amount (if and as reduced under <u>Paragraph 2(a)</u>), plus Enforcement Costs.

11. IWG acknowledges that IWG is issuing this Agreement to induce the Landlord to enter into the Lease Agreement with the Tenant. IWG acknowledges that additional consideration for giving this Guarantee to Landlord is the fact that IWG is an affiliate of the Tenant and IWG expects to benefit directly or indirectly from the Lease Agreement.



**International Workplace Group**

**IWG Global Investments (SARL)**

26 Boulevard Royal, L-2449 Luxembourg, Grand Duchy of Luxembourg

Phone +352 22 99 99 57 52

Fax +352 22 99 99 54 99

Registered in Luxembourg under RCS Luxembourg No. B200985

12. This Agreement and any non-contractual obligations arising out of or in connection with it are governed by and interpreted in accordance with the laws of the State of Ohio, United States, without regard to conflicts of laws. This Agreement shall be deemed to have been made and performed, and shall be enforceable, in the State of Ohio, United States.

13. (a) IWG hereby: (i) irrevocably consents and submits to the jurisdiction of any federal, state, county or municipal court sitting in the County of Cuyahoga, State of Ohio for the limited purpose of resolving any dispute under this Agreement and enforcing this Agreement (including, without limitation, any action by the Landlord to collect on any judgment obtained in connection with this Agreement); (ii) expressly waives any rights of IWG pursuant to the laws of the United Kingdom or any other jurisdiction by virtue of which exclusive jurisdiction of the courts of the United Kingdom or any other jurisdiction might be claimed; (iii) irrevocably waives personal service of any summons and complaint; (iv) irrevocably waives all objections as to venue and any and all rights IWG may have to seek a change of venue with respect to any such action or proceeding; (v) agrees that the laws of the State of Ohio shall govern in any such action or proceeding, and waives any defense to any action or proceeding granted or allowed by the laws of the United Kingdom or any other country or jurisdiction unless such defense is also allowed by the laws of the State of Ohio; and (vi) agrees that any final judgment rendered against IWG in any such action or proceeding shall be conclusive and may be enforced in the United Kingdom or any other jurisdiction by suit on the judgment or in any other manner provided by law, and expressly consents to the affirmation of the validity of any such judgment by the courts of the United Kingdom or any other jurisdiction so as to permit execution thereon.

(b) IWG irrevocably designates and appoints the Tenant as its authorized agent to accept and acknowledge on its behalf service of process with respect to any dispute under, or enforcement of, this Agreement at c/o Regus Corporation, 3000 Kellway Dr., Suite 140, Carrollton, Texas 75006, Attn: Legal Department (which address may be updated from time to time hereafter by the Tenant giving the Landlord written notice of the new address of the Tenant in accordance with the applicable notice provisions set forth in the Lease Agreement); receipt by the Tenant of any legal process may be made in the State of Ohio, in a like manner and with like effect as if the same were served personally upon IWG within the jurisdiction of the State of Ohio.

(c) **FOR THE PURPOSE OF RESOLVING ANY DISPUTE UNDER, OR ENFORCEMENT OF, THIS AGREEMENT, IWG HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY.**

14. If the Landlord should retain counsel and/or institute any suit against IWG to enforce this Agreement or any covenants or obligations of IWG hereunder, then IWG shall pay to the Landlord, upon demand, all reasonable attorneys' fees, costs and expenses, including, without limitation, court costs and filing fees (all of which are referred to herein as "**Enforcement Costs**"), if the Landlord is the prevailing party.

Yours faithfully,

For and on behalf of **IWG Global Investments Sarl**

Name: CHRISTOFFR MUR

Title: DIRECTOR



**International Workplace Group**

IWG Global Investments (SARL)

26 Boulevard Royal, L-2449 Luxembourg, Grand Duchy of Luxembourg

Phone +352 22 99 99 57 52

Fax +352 22 99 99 54 99

Registered in Luxembourg under RCS Luxembourg No. B200985

The undersigned, Joelle Baden , notary in Luxembourg (Grand-Duchy of Luxembourg) certifies the authenticity of the signature(s) of Mr. Christoffel Alphonsus Maria Hut

Luxembourg, 15 / 11 , 2019

Name: _____

SEAL

# EXHIBIT 3

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/coworking-companies-expanded-rapidly-now-theyre-retreating-fast-11597138203

PROPERTY REPORT

# Co-Working Companies Expanded Rapidly. Now They're Retreating Fast.

Coronavirus upends their business model, exposing those with pricey leases



A WeWork location in Manhattan in May of last year.

**PHOTO:** DAVID 'DEE' DELGADO/BLOOMBERG NEWS

*By _Konrad Putzier_*

Aug. 11, 2020 5:30 am ET

The world's biggest coworking companies are starting to close money-losing locations across the globe, signaling an end to years of expansion in what had been one of real estate's hottest sectors.

The retreat reflects an effort to slash costs at a time when the coronavirus is reducing demand for office space, and perhaps for years to come. It also shows how bigger

Electronically Filed 10/13/2020 11:01 / / CV 20 938826 / Confirmation Nbr. 2093116 / CLAJB

Case: 1:20-cv-02583-DCN Doc #: 1-33 Filed: 11/20/20 91 of 133. PageID #: 97

coworking firms, in a race to sign as many leases as possible and grab market share, overexpanded and became saddled with debt and expensive leases.

The share of coworking spaces that have closed is still small. In the first half of the year, closures accounted for just 1.5% of the space occupied by flexible-office companies in the 20 biggest U.S. markets, according to <u>CBRE Group</u> Inc

Scott Homa, head of office research at  brokerage JLL, says the impact has been modest partly because some operators have been able to get rent relief and because closing locations takes time. But JLL estimates that of the roughly 4,500 coworking locations in the U.S. a fifth, or about 25 million square feet, will likely close or change operators.

<u>IWG</u> PLC, the world's biggest flexible-office firm by number of locations, said recently it had closed 32 locations in the first half of this year because of the coronavirus pandemic. The company plans to close around 100 locations in the second half of the year, or 4% of its total spaces, according to its chief executive, Mark Dixon.

At Knotel, which sublets furnished offices to companies, revenue fell by around 20% in the second quarter, Chief Executive Amol Sarva said. The company plans to ditch 20% of its portfolio and has bought its way out of some leases.

WeWork has continued efforts that predated Covid-19 to end a number of leases, including a 226,000-square-foot lease in Düsseldorf, Germany, that it signed last year.

The closings mark a dramatic reversal for an industry that had emerged as one of the fastest-growing commercial property sectors. For years, flexible-office operators accounted for a rising share of new leases in some of the world's biggest cities, driving up demand for commercial properties and boosting landlords' profits.

Coworking lured masses of young professionals by offering shared, densely packed offices where they could mingle over a beer keg after work. But as many companies continue to work remotely and as social distancing governs those who do return to offices, the appeal of coworking has diminished considerably. Widespread layoffs and business closures are also damping demand for offices overall.

Still, flexible-office companies have had some success renegotiating their leases and lowering monthly rent bills, with landlords worried about replacing a tenant during the
Electronically Filed 10/13/2020 11:01 / / CV 20 938826 / Confirmation Nbr. 2093116 / CLASB
pandemic. Coworking executives also say the industry will ultimately benefit from the

Case: 1:20-cv-02583-DCN Doc #: 11-4 Filed: 11/20/20 92 of 133. PageID #: 98

shift to more remote work and flexible work schedules, as more companies eschew big, long-term office leases and seek smaller spaces closer to where their employees live.

"Everybody's pretty bullish on the concept of shared workspace when we come out of this," said Shlomo Silber, CEO of New York-based coworking company Bond Collective. "But getting out of this is the struggle."

### SHARE YOUR THOUGHTS

*Do you think the coronavirus is the death knell for coworking spaces? Join the conversation below.*

The recent announcement by Alphabet Inc.'s Google that it would extend remote work until at least next summer was another warning sign. Many companies sign coworking memberships for up to a year, and if they don't expect to return to the office soon they are less likely to renew their deals.

For coworking companies, ditching leases can be difficult and expensive. We Co.'s WeWork, for example, signs leases through special-purpose entities, but usually provides corporate guarantees or letters of credit for a portion of the lease obligation. That means the parent company is on the hook for payments even if it shutters a location.

In some cases, WeWork's lease deals include a commitment from landlords to spend heavily on the space, and the company was able to get out of leases in part by waiving that obligation.

Columbia Property Trust, for example, said during a recent earnings call that the company got out of paying $18.7 million for building out a WeWork space in Manhattan by agreeing to cancel the lease, which it signed in late 2018. The landlord also got a $6.4 million payout, Chief Executive Nelson Mills said during the call.

But efforts to close locations have led to tensions between coworking firms and landlords in a number of cases. Property owners have sued Knotel, WeWork and others over unpaid rent.

IWG has used bankruptcy for exiting lease obligations. Four single-purpose entities created to rent and manage particular locations in Columbus, Ohio, Chicago, Fort

Electronically Filed 10/13/2020 11:01 / / CV 20 938826 / Confirmation Nbr. 2093116 / CLAJB

Lauderdale, Fla., and Chapel Hill, N.C., recently filed for bankruptcy in Delaware, according to court records.

The coworking company is using a type of bankruptcy protection designed for small businesses and expanded under the Cares Act, records show. Although IWG is a major public company, its single-purpose entities that sign leases are much smaller. Filing for chapter 5 bankruptcy is often faster and cheaper than the better-known chapter 11, said Adam Stein-Sapir, a managing member of Pioneer Funding Group, LLC, which invests in claims against bankrupt companies.

IWG's Mr. Dixon said filing for bankruptcy could allow the single-purpose entities to get out of long-term lease obligations in return for a one-time penalty.

Mr. Dixon said that many of the leases IWG is jettisoning were signed with high rents at the peak of the market and those located in urban centers where workers depend on public transit, now out of favor because of the coronavirus. The company's suburban spaces, he said, are performing better.

**Write to** Konrad Putzier at konrad.putzier@wsj.com

Copyright © 2020 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# EXHIBIT 4

# WRB PARTNERS, LLC

August 21, 2020

**VIA FEDERAL EXPRESS**

RGN-Cleveland II, LLC
c/o Regus Corporation
3000 Kellway Drive, Suite 140
Carrollton, TX 75006
Attn: Lease Administrator

RGN-Cleveland II, LLC
c/o Regus Corporation
One Alliance Center, Suite1500
3500 Lenox Road
Atlanta, GA 30346
Attn: Michael Berretta

Re:  **Lease Agreement by and between WRB Partners, LLC and RGN-Cleveland II, LLC for Premises at 1468 West Ninth Street, Cleveland, Ohio 44113 Request for Adequate Assurances**

To Whom It May Concern:

Reference is made to that certain Lease Agreement by and between WRB Partners, LLC (as Landlord) and RGN-Cleveland II, LLC (as Tenant) dated as of December 13, 2019 (the "Lease"), and the related Guarantee Agreement executed by WRG Global Investments SARL ("Guarantor") dated as of December 13, 2019 (the "Guarantee").[1] We are troubled by Tenant's apparent inaction with respect to several of its material obligations under the Lease. Therefore, this Request for Adequate Assurances seeks Tenant's confirmation that it still intends to perform—and is able to perform—its obligations under the Lease.

Obligations imposed on the Tenant by the Lease as to which Tenant disconcertingly appears to be taking no action include, without limitation, the following:

1. Landlord is not aware that Tenant has procured insurance coverage as required by Section 6.1 of the Lease, and Tenant has not provided Landlord with certificates of insurance evidencing that it has obtained the necessary coverage, as required by Section 6.2 of the Lease.

---

[1] All capitalized terms in this letter not otherwise defined herein shall have the meanings ascribed to them in the Lease and Guarantee.

2.  Tenant has not, as required by Section 17.3(i), delivered to Landlord and Landlord's Mortgagee a builder's risk insurance policy naming Landlord and Landlord's Mortgagee[2] as additional insureds and complying with the insurance requirements set forth in Section 6 of the Lease.

3.  Tenant has not provided Landlord with the names of its proposed contractor, subcontractors and architect, for Landlord's reasonable approval, as required by Section 17.3(i) of the Lease.

4.  Tenant has not provided Landlord with a W-9 Form and Contact Information Form, as previously requested by Landlord and as required to allow Landlord to prepare for billing on the Rent Commencement Date.

Tenant has also refused to execute the Rent Commencement Agreement proposed by Landlord on August 17, 2020, leaving Landlord in substantial doubt as to whether Tenant intends to commence the payment of rent—as required by the Lease—on September 24, 2020.[3] It has not begun the demolition work on leased premises or the construction of Tenant's Initial Improvements to the leased premises, nor has it even procured its permits for doing this work from the city. And, Tenant's pattern of delay in reviewing and approving Landlord's improvements to the Premises casts further doubt Tenant's willingness and/or ability to perform the Lease.

Tenant's failure to comply with any of its above-referenced obligations would constitute an Event of Default under the Lease. *See* Lease § 10.1. Unfortunately, Tenant's conduct has caused Landlord to reasonably anticipate that such an Event of Default is substantially likely to occur. Despite the availability of remedies under the Lease and Guarantee,[4] Landlord wishes to avoid that outcome if

---

[2] As Tenant was informed by email of August 17, 2020, for the purposes of this insurance policy, the Landlord should be listed as WRB Partners, LLC, Attn: Geis Property Management, 10020 Aurora Hudson Road, Streetsboro, Ohio 44241, and the Landlord's Mortgagee should be listed as First National Bank of Pennsylvania, 55 Public Square, Suite 1460, Mail Code: PUBLIC SQ, Cleveland, Ohio 44113.

[3] Tenant signaled that it was be unwilling to execute the Commencement Agreement because it may claim to be entitled to an extension of time to perform its obligations under the Lease, apparently referring to the Lease's force majeure provision (Article 20). *See* 8/17/20 email from S. L. Moore to A. Krist, *et al.* However, Landlord is unaware that Tenant has incurred any delay that might entitle it to an extension under Article 20. In particular, Landlord is aware of no reason why Tenant's performance might be delayed by impacts from COVID-19. Tenant's obligations at present primarily relate to the build-out of the leased premises. Construction activities like those relating to this build-out have been deemed "essential" under Ohio Department of Health guidelines, and therefore, were never required to cease as a result of any public health order relating to COVID-19. *See* Director's Stay at Home Order, Ohio Dep't of Health ¶ 9 (Mar. 22, 2020). In any event, Article 20 expressly does *not* excuse Tenant from making timely payments under the Lease, or from performing any covenant or obligation imposed under the Lease by reason of Tenant's financial inability.

[4] An Event of Default by Tenant would entitle Landlord to all the remedies set forth in the Lease and otherwise provided by law, including, but not exclusive to, the termination of the Lease and/or of Tenant's right of possession. *See* Lease §§ 10.1, 10.2. Should Landlord be required to incur expenses, including attorneys' fees, in its efforts to enforce the terms of the Lease against Tenant, Tenant will be required to reimburse Landlord for those expenses. *See id.* §§ 7.7, 10.3. In addition, any failure by Tenant to timely transmit payments of any kind owed to Landlord will entitle Landlord to the collection of Default Interest. *Id.* § 10.9. And, Guarantor's guarantee obligations will be triggered if Landlord is not timely paid amounts owing under the Lease or is otherwise obligated to expend money to cure Tenant's defaults under the Lease. *See* Guarantee § 2(a). Guarantor, too, will be obligated to pay Landlord's

RGN-Cleveland II, LLC
August 21, 2020
Page 3

possible. Therefore, Landlord demands that Tenant provide it with adequate assurances that it can and will perform the Lease Agreement by furnishing Landlord with the following:

1. Certificates of insurance evidencing that Tenant has obtained the insurance coverage required by Section 6.1 of the Lease.
2. Tenant's Plans for the construction of improvements on the Premises, as required by Section 17.3(i) of the Lease.
3. A copy of a builder's risk insurance policy naming Landlord and Landlord's Mortgagee[5] as additional insureds, as required by Section 17.3(i) of the Lease.
4. The names of Tenant's proposed contractor, subcontractors and architect, as required by Section 17.3(i) of the Lease.
5. Tenant's W-9 form and completed Contact Information Form.

Please provide us with these materials by no later than **Friday, August 28, 2020.** If you fail to do so, we will consider that failure to constitute a repudiation of Tenant's obligations under the Lease and reserve all rights to exercise any available remedies. *See supra* at n.4.

In addition, Landlord hereby requests, pursuant to Section 7.13 of the Lease, that Tenant furnish it with (i) Tenant's most recent audited or certified annual financial statements, and (ii) Guarantor's most recent annual financial statements. Pursuant to Section 7.13, please provide us with Tenant's standard-form non-disclosure agreement at your earliest convenience.

Please do not hesitate to contact me if you would like to discuss any of the matters raised by this letter. We look forward to hearing from you.

Sincerely,

*Jason Laver*

Manager, WRB Partners, LLC

cc (via email):

        Ericka Irby (Ericka.Irby@iwgplc.com)
        TeAndre Sistrunk (TeAndre.Sistrunk@iwgplc.com)
        Leigh Moore (Leigh.Moore@iwgplc.com)
        Apryl Cahill (Apryl.Cahill@iwgplc.com)
        Aaron S. Evenchik (aevenchik@hahnlaw.com)
        Maura Maresh (Maura@geisco.net)
        Al Krist (Al@geisco.net)

---

attorneys' fees and other costs should Landlord be obligated to incur such fees and costs to enforce the Lease Agreement. *See id.* § 14.

[5] As Tenant was informed by email of August 17, 2020, for the purposes of this insurance policy, the Landlord should be listed as WRB Partners, LLC, Attn: Geis Property Management, 10020 Aurora Hudson Road, Streetsboro, Ohio 44241, and the Landlord's Mortgagee should be listed as First National Bank of Pennsylvania, 55 Public Square, Suite 1460, Mail Code: PUBLIC SQ, Cleveland, Ohio 44113.

# EXHIBIT 5

# Regus Affiliates to Tap Bankruptcy Loan to Pay Rent on Co-Working Spaces

## Parent company is extending a $50 million loan for bankrupt affiliates to pay landlords while seeking rent concessions



**The bankruptcy filings by Regus affiliates are designed to pry concessions from landlords as white-collar employees largely continue working from home due to the coronavirus pandemic. Here, a Regus workspace in the Netherlands.**

Photo: michael kooren/Reuters

By
Jonathan Randles

Jonathan Randles
The Wall Street Journal

- Biography
- Jonathan.Randles@wsj.com

Sept. 29, 2020 2:28 pm ET

Affiliates of co-working company Regus Corp. have been authorized to start drawing from a $50 million bankruptcy loan made by their parent to cover rent payments to dozens of landlords as the business works to restructure office leases.

Regus has placed under chapter 11 protection more than 100 corporate affiliates that hold office leases in New York, Los Angeles, Chicago, Philadelphia, Atlanta and other cities where the coronavirus pandemic has depressed commercial-real-estate markets.

The company, which provides furnished workspaces under short-term deals, hasn't filed for bankruptcy itself. The chapter 11 filings represent a small share of Regus's portfolio of on-demand workspace in more than 1,000 locations in the U.S. and Canada.

The filings are designed to pry concessions from landlords as white-collar workers largely continue avoiding offices in major metropolitan areas. By placing the companies—created to rent and manage workspaces in particular cities—into bankruptcy protection, Regus can get out of long-term lease obligations in return for a one-time penalty.

Regus might put more affiliates into chapter 11 depending on the continued impact of Covid-19 and negotiations with landlords, bankruptcy lawyer Chad Husnick said during a Tuesday hearing in the U.S. Bankruptcy Court in Wilmington, Del.

At the hearing, the judge overseeing the bankruptcy cases authorized the affiliates to draw $17.5 million from a chapter 11 loan advanced by Regus. The affiliates can come back to the bankruptcy judge later to seek permission to draw the remainder of the loan, a common move in chapter 11.

The money is earmarked primarily for October and September rent payments, lawyers said. Parallel bankruptcy and insolvency proceedings are under way for affiliates Canada and Europe.

Regus is a subsidiary of IWG PLC, which is listed on the London Stock Exchange.

The bankruptcy filings show how the response to coronavirus has squeezed U.S. office markets as businesses large and small have ordered their employees to work from home. Demand for temporary office space in large urban centers, which have been hit particularly hard by the pandemic, has fallen since businesses around the country have adopted telecommuting policies.

Mr. Husnick told the judge Tuesday that the Regus affiliates in chapter 11 intend to reorganize their affairs as quickly as possible. "I promise your honor, one way or another, there's going to be a reorganized debtor on the other end," Mr. Husnick said.

**Write to** Jonathan Randles at Jonathan.Randles@wsj.com

# EXHIBIT 6

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RGN-GROUP HOLDINGS, LLC, a Delaware limited liability company, *et al.*[1] | Case No. 20-11961 (BLS) (Joint Administration Requested) |
| Debtors. | |

## DECLARATION OF JAMES S. FELTMAN IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST-DAY RELIEF

I, James S. Feltman, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.     I am a managing director of Duff & Phelps, LLC, an advisory firm providing governance, risk and transparency solutions for clients across diverse sectors, including publicly traded and privately held companies, law firms, government entities and investment organizations such as private equity firms and hedge funds.  My practice at Duff & Phelps is focused on providing fiduciary, advisory consulting, and expert witness testimony in areas including insolvency, restructuring, accounting, and financial statement reporting.  I have served as an appointed fiduciary with a branch of the United States Department of Justice spanning nearly 30 years, have been appointed as an advisor by both federal (district and bankruptcy) and state courts, have served as an arbitrator and mediator, and have been appointed as a Monitor by

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's Federal Employer Identification Number ("FEIN"), where applicable, are as follows: RGN-Group Holdings, LLC, RGN-National Business Centers, LLC (7723), H Work, LLC (4516), RGN-Columbus IV, LLC, RGN-Chapel Hill II, LLC, RGN-Chicago XVI, LLC, and RGN-Fort Lauderdale III, LLC.  The aforementioned Debtors that do not include a FEIN are disregarded entities for tax purposes and do not have FEINs.  The mailing address for the Debtors is 3000 Kellway Drive, Suite 140, Carrollton, Texas 75006 (Attn: James S. Feltman, Responsible Officer).

the U.S. Federal Trade Commission.  Prior to joining Duff & Phelps, I had over two decades of experience with "Big 4" accounting firms, and was previously a partner at Mesirow Financial, Arthur Andersen LLP, and KPMG LLP.  I earned an M.P.S. from Cornell University and a B.A. from the University of Wisconsin, Madison.  I am a Certified Public Accountant.

2.     Duff & Phelps was retained by each of the above-captioned debtors and debtors in possession (the "Debtors") prepetition to provide interim management services.  I am the Responsible Officer for each of the Debtors, effective as of the dates of their respective bankruptcy filings.  In this capacity, I am responsible for assisting in the management of the Debtors' operations, overseeing their liquidity management, and assisting with their restructuring process.  In the course of this engagement, and working with the Debtors' management and outside counsel (Faegre Drinker Biddle & Reath LLP) and financial advisors (AlixPartners, LLP), I have become familiar with the operations and financial affairs of the Debtors and their non-debtor affiliates.

3.     On July 30, 2020, RGN-Columbus IV, LLC ("Columbus IV") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code. 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), with this Court.  On August 2, 2020, RGN-Chapel Hill II, LLC ("Chapel Hill II") filed its voluntary chapter 11 petition with this Court.  On August 3, 2020, RGN-Chicago XVI, LLC ("Chicago XVI") filed its voluntary chapter 11 petition with this Court. On August 8, 2020, RGN-Fort Lauderdale III, LLC ("Fort Lauderdale III" and, together with Columbus IV, Chapel Hill II, and Chicago XVI, the "SPE Debtors") filed its voluntary chapter 11 petition with this Court.  On August 17, 2020, RGN-Group Holdings, LLC ("Holdings"), RGN-National Business Centers, LLC ("RGN-NBC"), and H Work, LLC (f/k/a HQ Global Workplaces LLC) ("H Work" and, together with Holdings and RGN-NBC, the "Guarantor

Debtors") filed their voluntary chapter 11 petitions with this Court.[2] I understand that each of the Debtors is a "small business debtor" as defined by section 101(51D) of the Bankruptcy Code. The Debtors have elected for subchapter V of chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1181-1195, to apply to their chapter 11 cases (the "Chapter 11 Cases").

4.      The Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1182(2) and 1184 of the Bankruptcy Code.  No request for the appointment of a creditor's committee, chapter 11 trustee, or examiner has been made in these Chapter 11 Cases, and none have been appointed.  On July 31, 2020, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed Natasha Songonuga to serve as the trustee under section 1183(a) of the Bankruptcy Code (the "Subchapter V Trustee") for Columbus IV.  The U.S. Trustee subsequently appointed Ms. Songonuga as the Subchapter V Trustee for Chapel Hill II and Chicago XVI on August 10, 2020, and for Fort Lauderdale III on August 13, 2020.[3]

5.      As set forth in Part IV, the Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

6.      I submit this Declaration pursuant to Bankruptcy Rule 1007 to provide an overview of the Debtors' business and these Chapter 11 Cases and to support the Debtors' applications and motions for "first-day" relief described in paragraph 32 below (collectively, the "First-Day Motions").  Except as otherwise indicated herein, all facts set forth in this Declaration

---

[2] As used herein, the term "Petition Date" refers to the date of commencement of the applicable Debtor's (or Debtors') chapter 11 proceedings.

[3] Although Ms. Songonuga has not yet been officially designated as Subchapter V Trustee in the Guarantor Debtors' chapter 11 cases, I anticipate that she will be so designated.

are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management, consultation with the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I believe all information herein to be true to the best of my knowledge. I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

7.    To familiarize the Court with the Debtors, the Chapter 11 Cases, and the relief sought in the First-Day Motions, this Declaration provides a summary overview of the Debtors and the Chapter 11 Cases, and is organized as follows. Part I describes the Debtors' business operations, corporate structure, key liabilities, and estate assets. Part II describes the events leading up to the commencement of the Chapter 11 Cases. Part III summarizes the Debtors' goals in commencing these Chapter 11 Cases. Part IV sets forth my basis for testifying to the facts underlying and described in the First-Day Motions.

## I.    BACKGROUND REGARDING THE DEBTORS

### A.    Overview of the Debtors' Business

8.    The Debtors are direct or indirect subsidiaries of Regus Corporation, a Delaware corporation, that, together with its affiliates (collectively, "IWG" or the "Company"), offers a network of on-demand office and co-working spaces, and ancillary services and support, to a variety of clients across a host of industries in over 1,000 locations in the United States and Canada.

9.    IWG's business model begins with entry into long-term non-residential real property leases (each, a "Lease") with property owners (each, a "Landlord") that provide the

Company unoccupied office space (the "Centers"). Based on significant market research on potential client needs in local markets and the unique requirements of their existing clients, IWG engineers each of the Centers to meet the architectural style, service, space, and amenity needs of those individuals, companies, and organizations who will contract for use of subportions of the Centers. IWG markets its Centers under an umbrella of different brand names, each tailored to appeal to different types of clients and those clients' specialized needs. These clients (the "Occupants") enter into short-term licenses (each, an "Occupancy Agreement") to use portions of the Centers, which are customizable as to duration, configuration, services, and amenities. When operating successfully, a Center's Occupants' license payments ("Occupancy Fees") will exceed the combined cost of the underlying long-term lease, management cost, and operating expenses of the Center.

10.      The lessee on each Lease (each, a "Lease Holder") is typically a special-purpose entity (SPE) formed for this specific purpose—including, for example, the SPE Debtors. However, certain IWG entities act as Lease Holder for multiple Leases—including, for example, Debtors RGN-NBC and H Work. Certain Lease Holders' obligations under their respective Leases are partially or fully guaranteed by another IWG entity, including in some cases Debtors RGN-Group Holdings, LLC ("Holdings"), H Work, and RGN-NBC (collectively, the "Guarantor Debtors").[4]

11.      Debtor Holdings differs from the other Debtors in that it is not a Lease Holder, but rather owns all of the furniture, fixtures, equipment, and other personal property

---

[4] Non-debtor Regus Plc S.A., a Bailiwick of Jersey entity headquartered in Luxembourg, is also guarantor of certain of the Leases.

(collectively, the "FF&E") located in the respective Centers in United States.[5]  Holdings leases this FF&E to the applicable Lease Holder—including the SPE Debtors, RGN-NBC, and H Work, as well as hundreds of non-debtor entities—pursuant to the Equipment Lease Agreements described below.

## B.     Corporate Structure

12.     The Debtors are single-member, member-managed Delaware limited liability companies that are indirect (in the case of RGN-NBC) or direct (in the case of all other Debtors), wholly-owned subsidiaries of Regus Corporation.

13.     Regus Corporation, in turn, is a wholly-owned subsidiary of Regus Group Limited, a company organized under the laws of the United Kingdom.  Regus Group Limited, in turn, is a wholly-owned subsidiary of IWG Group Holdings Sarl, a company organized under the laws of Luxembourg.  IWG Group Holdings Sarl, in turn, is a wholly-owned subsidiary of IWG Enterprise Sarl, a company also organized under the laws of Luxembourg.  IWG Group Holdings Sarl, in turn, is a wholly-owned subsidiary of IWC Plc, a company organized under the laws of the Bailiwick of Jersey with a head office in Switzerland.

14.     A simplified organizational chart of IWG including Regus Corporation, the Debtors, and certain of their affiliates who are or may potentially become relevant in these Chapter 11 Cases, is attached as Exhibit 1 hereto.

---

[5] FF&E located at the Centers in Canada is owned by the applicable Lease Holder entities, which are non-debtor affiliates of the Debtors (represented by the "Tenant LPs" group on the organizational chart attached as Exhibit 1 hereto).

### C.    Debtors' Principal Indebtedness

15.    As discussed below, the Debtors' principal prepetition indebtedness is to certain affiliates (including Regus Corporation, the Debtors' parent and prepetition secured lender) and to Landlords.

### (i)    *Secured Indebtedness to Regus Corporation*

16.    The Debtors, certain other borrowers thereunder, and Regus Corporation are parties to that certain Senior Loan and Security Agreement, dated as of August 1, 2013 (as amended, restated, or modified at any time, the "Loan Agreement" and, together with the other documents, instruments, and agreements executed in connection therewith or related thereto, collectively, the "Loan Documents"), whereby Regus Corporation provides working capital loans, on a senior-secured basis, for the operation of the Debtors' respective businesses. Pursuant to the Loan Documents, the Debtors' obligations to Regus Corporation are secured by a first-priority security interest in all of the Debtors' assets.  The table below illustrates the approximate balances, if any, owed by the Debtors for principal, interest, fees, and charges payable pursuant to the Loan Documents, as of the dates of the best available data, namely: (i) June 30, 2020, for the SPE Debtors, and (ii) December 31, 2019, for the Guarantor Debtors:[6]

---

[6] Determination of balances as of the Debtors' respective Petition Dates requires reconciliation of intercompany accounts between the Debtors, RGM, and Regus Corporation, which is in process.

| Debtor | Approximate Debt to Regus Corporation |
|---|---|
| Columbus IV | $1,200,367 |
| Chapel Hill II | $1,623,085 |
| Chicago XVI- | $1,834,811 |
| Fort Lauderdale III | $476,419 |
| Holdings | $427,845,000 |
| RGN-NBC | - |
| H Work | - |
| **TOTAL** | **$432,979,681** |

17.     On August 7, 2020, Columbus IV and Regus Corporation entered into a *Stipulation (I) Authorizing Use of Cash Collateral and Providing Adequate Protection and (II) Confirming Administrative Expense Status for Further Advances* [Case No. 20-11894, D.I. 12] (the "Cash Collateral Stipulation"), which provided for the payment of August rent to Columbus IV's Landlord from any cash collateral of Regus Corporation or, to the extent such cash collateral was insufficient, as an extension of unsecured credit by Regus Corporation pursuant to section 364(a) of the Bankruptcy Code pending the negotiation and entry into a more comprehensive debtor-in-possession financing arrangement to be brought before the Court for approval in the coming weeks.  In accordance with the Cash Collateral Stipulation, August rent in the amount of approximately $117,000 was paid to Columbus IV's Landlord on or about August 7, 2020.

### (ii)     *Prepetition Lease Arrearages*

18.     As of the Petition Date, the Lease Holder Debtors were in arrears to Landlords under certain of their respective Leases in the prepetition amounts set forth in the table below:

| Debtor | Prepetition Lease Arrearages |
|---|---|
| Columbus IV | $372,384 |
| Chapel Hill II | $117,759 |
| Chicago XVI- | $82,277 |
| Fort Lauderdale III | $318,205 |
| RGN-NBC | $262,741 |
| H Work | - |
| **TOTAL** | **$1,153,366** |

### (iii)  *Contingent, Unliquidated Liabilities Under Guaranteed or Assigned Leases*

19.     As of the Petition Date, the Guarantor Debtors were guarantors of, or co-liable as original tenant-assignor,[7] approximately 656 Leases in total—83 for Holdings, 381 for RGN-NBC, and 192 for H Work.  I am advised, and therefore believe, that the Guarantor Debtors' liabilities associated with guaranteed and assigned Leases were all contingent and unliquidated as of the Petition Date.

### (iv)  *Other Amounts Due to Affiliates*

20.     <u>Management Agreements</u>.  Each of the Lease Holder Debtors is party to a Global Full Service Management Agreement (each, a "<u>Management Agreement</u>") with non-debtor affiliate Regus Management Group, LLC ("<u>RMG</u>"),[8] pursuant to which RMG provides certain Management Services (as defined in the Management Agreement) to the Lease Holder Debtors

---

[7] For example, where a Guarantor Debtor had been the original Lease Holder but then assigned its rights under the Lease to an SPE without receiving a novation from the Landlord.

[8] RMG is a wholly-owned subsidiary of Regus Corporation, the Debtors' secured lender and parent.

9

in connection with the operation of their respective Centers, which include, among other things, the entry into Occupancy Agreements with the Occupants of the Centers. The Lease Holder Debtors are obligated under their Management Agreements to fully reimburse RMG for its Gross Expenses (as defined in each Management Agreement as the aggregate of cost directly incurred by RMG in performing the Management Services for the specific Center), and to pay RMG a monthly management fee equal to five and one-half percent (5.5%) of the Gross Revenues (as defined in the Management Agreement) received directly or indirectly by RMG from the Occupants or anyone else using a Center.[9]

21. In the ordinary course of business under the Management Agreement, prepetition, among other duties, RMG would bill and collect all Occupancy Fees from Occupants of a Lease Holder Debtor's Center(s), which would be booked to the intercompany account for the applicable period along with other intercompany transactions between RMG and the Lease Holder Debtor for services and other costs incurred for the period. The resulting net balance between the Lease Holder Debtor and RMG would then be transferred to Regus Corporation at each month-end closing of the books. Additionally, as lease payments came due for the Lease Holder Debtor each month, RMG would initiate the lease payment to the Landlord on behalf of the Lease Holder Debtor, and as the payment clears, RMG would fund an account maintained by RMG for the benefit of the Lease Holder Debtor, bringing the bank balance back to zero. In periods where Occupancy Fees for the Lease Holder Debtor's Center(s) exceeded Lease payments and other costs funded by RMG in the period, it would result in a receivable due from

---

[9] To be clear, following their respective Petition Dates, the Lease Holder Debtors have not paid any management fees or expense reimbursements to RMG, and they do not presently intend to do so absent further order of the Court. The Debtors intend to seek relief with respect to payment of post-petition fees and expenses to RMG in connection with their debtor-in-possession financing.

Regus Corporation to the Lease Holder Debtor (or be netted against any pre-existing balance between those parties) (such excess amount, the "Surplus Fees"). In periods where Occupancy Fees were less than the lease payments and other costs funded by RMG, it would result in a payable due from the Lease Holder Debtor to Regus Corporation (or be netted against any pre-existing balance between those parties).

22.     In the ordinary course of business, the Debtors, RMG, and Regus Corporation close their books for a given month approximately twenty days after the end of the month. Thus, given the timing of these Chapter 11 Cases, the Debtors, RMG, and Regus Corporation have not yet closed their respective books for July and August 2020, which will be necessary to determine the definitive amounts of any balances due to RMG and Regus Corporation as of the respective Petition Dates. However, as of their respective Petition Dates, the Lease Holder Debtors were indebted to RMG in the *approximate* amounts set forth in the table below for prepetition expenses and management fees:

| Debtor | Approximate Prepetition Debt to RMG |
|---|---|
| Columbus IV | $28,054 |
| Chapel Hill II | $55,087 |
| Chicago XVI- | $38,321 |
| Fort Lauderdale III | $52,473 |
| RGN-NBC | $593,385 |
| H Work | $638,129 |
| **TOTAL** | **$1,405,447** |

23.     Equipment Lease Agreements.  Each of the Lease Holder Debtors is party to an Equipment Lease Agreement (each, an "Equipment Lease Agreement") with Debtor Holdings,

pursuant to which Holdings leases to the Lease Holder Debtor the FF&E that is used in the applicable Center(s). For its part, the Lease Holder Debtor is obligated for the original cost of the FF&E plus a finance fee and any direct costs incurred by Holdings to provide the FF&E to the Lease Holder Debtor (such as insurance, maintenance, etc.), plus a margin fee.[10] As of their respective Petition Dates, the Lease Holder Debtors were indebted to Holdings in the approximate amounts set forth in the table below for amounts due under the Equipment Lease Agreements:

| Debtor | Approximate Prepetition Debt to Holdings |
|---|---|
| Columbus IV | $61,864 |
| Chapel Hill II | $66,800 |
| Chicago XVI- | $47,260 |
| Fort Lauderdale III | $96,072 |
| RGN-NBC | $304,572 |
| H Work | $370,505 |
| TOTAL | $947,072 |

24. **Franchise Agreements.** Each of the Lease Holder Debtors is party to a Franchise Agreement for Operation of Regus Business Centre (each, a "Franchise Agreement") with non-debtor affiliate Franchise International GmbH ("Franchisor"), whereby Franchisor grants the

---

[10] To be clear, following their respective Petition Dates, the SPE Debtors have not made any payments to Holdings under their respective Equipment Lease Agreements. Any payments by the SPE Debtors, H Work, or RGN-NBC under their respective Equipment Lease Agreements going forward will be in accordance with applicable provisions of the Bankruptcy Code (*e.g.*, section 365(b)(5) (providing 60-day period before a debtor must resume performance on a personal property lease post-petition), and applicable orders of this Court (*e.g.*, with respect to debtor-in-possession financing or use of cash collateral).

Lease Holder Debtor the right to operate an IWG business format in their respective locations and provides certain business support services, advices, and information technology to the Lease Holder Debtors. For its part, the Lease Holder Debtor agrees to pay Franchisor of a monthly fee equal to twelve percent (12%) of the Gross Revenue (as defined in the Franchise Agreement).[11] As of their respective Petition Dates, the Lease Holder Debtors were indebted to Franchisor in the approximate amounts set forth in the table below for amounts due under the Franchise Agreements:

| Debtor | Approximate Prepetition Debt to Franchisor |
|---|---|
| Columbus IV | $5,827 |
| Chapel Hill II | $13,200 |
| Chicago XVI- | $6,710 |
| Fort Lauderdale III | $27,253 |
| RGN-NBC | $306,359 |
| H Work | $215,151 |
| **TOTAL** | **$671,681** |

### D.  Debtors' Principal Assets

25. Holdings' principal assets consist of its FF&E and its rights under the Equipment Lease Agreements. As of December 31, 2019, the FF&E had a book value of approximately $999 million.

---

[11] To be clear, following their respective Petition Dates, the SPE Debtors have not paid any fees to Franchisor, and they do not presently intend to do so absent further order of this Court. I am aware that Columbus IV's accounting records, which are maintained by RMG, show a payment to Franchisor or about the Petition Date. However, I understand that this payment was an accounting journal entry reflecting the accrual of an intercompany balance, and was not accompanied by any transfer of funds from Columbus IV to Franchisor.

13

26.     The remaining Debtors' principal assets consist of their rights under their

respective Leases, Equipment Lease Agreements, Management Agreements, and Franchise

Agreements, as well as their right to receive the net Occupancy Fees from the operation of their

respective Centers.

## II.     <u>EVENTS LEADING TO THE CHAPTER 11 CASES</u>

27.     I understand that, following a strong first quarter in 2020, the Company

experienced significant challenges during the second and third quarters as a direct result of the

COVID-19 pandemic, which has severely disrupted business plans and operations for certain

locations within the Company's U.S. portfolio.  With the near universal adoption of work-from-

home policies (either voluntary, or government-mandated) by U.S. businesses during the early

months of the pandemic, demand for temporary office space has been depressed, which I

understand resulted in lower occupancy rates than were anticipated when the Company decided

to make certain investments in the Centers, *e.g.*, in acquiring and building out additional space in

cities in which it already had a footprint.  To attract and retain Occupants in this environment,

the Company has had to cut pricing for new sales and renewals, resulting in a reduction of

revenue from the space that is occupied.  And with the dramatic contraction of the overall

economy during the second and third quarters of 2020, certain Occupants' inability to timely pay

their Occupancy Fees—or unwillingness to do so, as part of their emergency cash-conservation

measures—has impacted the Company's liquidity at the level of the U.S. portfolio.  Like so

many other companies navigating these troubled times, the Company instituted a variety of

comprehensive actions to reduce costs and improve cash flow and liquidity, including the

deferral of rent payments and engagement with Landlords to negotiate forbearances, temporary

accommodations, and, where possible, permanent modifications to the various Leases to bring

14

them in line with the COVID-19-adjusted market realities so as to permit the Company to continue operating Centers at those respective locations despite the uncertainty when the pandemic will subside and when (and indeed, *whether*) the U.S. will return to something resembling the pre-pandemic "business as usual."

28.     I understand that the Company has had some success in negotiations with Landlords to date, and that each success puts the Company's U.S. portfolio on an overall better financial and operational footing going forward—i.e., by reducing the amount of near- and/or long-term working capital funding that Regus Corporation would need to provide to a given Lease Holder entity for it to continue operating its Center, thus freeing up that capital to be deployed elsewhere in the portfolio.  But I understand that the inverse is also true—i.e., the breakdown of negotiations can put the entire portfolio on a less-sure footing, by requiring the immediate deployment of a disproportionate amount of liquidity (*e.g.*, to cure an accumulated Lease arrearage) in order to avoid the potential closure of a Center and potential loss of business from Occupants at that location, thus tying up capital that could otherwise have been deployed elsewhere.

29.     I understand that the Company was in discussions with the Debtors' respective Landlords concerning the arrearages under the Debtors' Leases and the potential modification of those Leases going forward, but those discussions reached an impasse with the SPE Debtors' Landlords.  I understand that Columbus IV and Chapel Hill II commenced their Chapter 11 Cases in response to notices from their respective Landlords that they would be locked out of their Centers as of a date certain, and that Chicago XVI and Fort Lauderdale III commenced their Chapter 11 Cases because they were at peril of immediate termination of their Leases and subsequent eviction from their Centers.  The Guarantor Debtors commenced their Chapter 11

Cases shortly thereafter, which I understand was to preempt both a potential "run on the bank" by Landlords exercising their rights under the various guarantee agreements, and the inevitable "race to the courthouse" that would follow.

### III.    GOALS OF THE CHAPTER 11 CASES

30.    I understand that the Debtors commenced their Chapter 11 Cases to prevent the forfeiture of the Lease Holder Debtors' Leases, and to preserve all Debtors' ability to operate their respective businesses—thereby, importantly, protecting the Occupants of the Lease Holder Debtors' Centers from any disruption to their businesses.  I expect that the "breathing spell" from Landlords' collection efforts that will be afforded by the chapter 11 process will allow the Debtors, and the Company more broadly, to more fully explore the possibility of restructuring their various contractual obligations in order to put the Company's North American portfolio on a surer footing going forward, so as to allow the Debtors to emerge from this process stronger and more viable than when they went in.  If these restructuring efforts prove unsuccessful, the Lease Holder Debtors intend to utilize the procedures available to them under the Bankruptcy Code to (i) orderly wind down the operation of the applicable Centers (including, to the extent necessary, the removal of the FF&E from the leased premises, and to the extent possible, transition of the Occupants to other locations), (ii) liquidate the amounts due to the Landlords under their respective Leases and guarantees, as well as amounts due to the Debtors' affiliates under their respective agreements, and (iii) to make distributions to creditors in accordance with their respective priorities under the Bankruptcy Code and applicable law.

### IV.    FIRST-DAY MOTIONS

31.    To enable the Debtors to operate effectively and minimize potential adverse effects from the commencement of the Chapter 11 Cases, the Debtors have requested certain

Electronically Filed 10/13/2020 11:01 / / CV 20 938826 / Confirmation Nbr. 2093116 / CLAJB

relief through the First-Day Motions filed with the Court concurrently herewith. The Debtors respectfully request that this Court enter the proposed orders granting the relief requested in such First-Day Motions. I believe that the relief sought in each of the First-Day Motions (a) is vital to the Debtors' transition to, and operation in, chapter 11 with minimal interruption or disruption to their businesses or loss of productivity or value, and (b) is necessary to avoid immediate and irreparable harm to the Debtors' businesses.

32.     The First-Day Motions that are sought to be heard at the "first-day" hearing in these Chapter 11 Cases are as follows:

- *Debtor's Motion for Order Authorizing (I) Joint Administration of Chapter 11 Cases and (II) Filing of a Consolidated Creditor Matrix*

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Payment to Utility Companies and (II) Granting Related Relief*

- *Guarantor Debtors' Joinder to Certain First-Day Motions Filed in Chapter 11 Cases*

- *Application of the Debtors for Entry of an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of the Petition Date*

- *Debtors' Motion for an Order Authorizing RGN-National Business Centers, LLC to Serve as Foreign Representative on Behalf of the Debtors' Estates*

- *Debtors' Motion for Interim and Final Orders Establishing Notification Procedures for Lease Termination*

33.     I have reviewed each of the First-Day Motions (including the exhibits and schedules attached thereto) listed above, and, to the best of my knowledge, I believe that the facts set forth in the First-Day Motions are true and correct. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First-Day Motions.

34.     Furthermore, as a result of my personal knowledge, information supplied to me by other members of Debtors' management, from my review of relevant documents, or upon my opinion based upon my experience, discussions with the Debtors' professional advisors, and knowledge of the Debtors' operations and financial condition, I believe the relief sought in the First-Day Motions is necessary for the Debtors to effectuate a smooth transition into chapter 11 bankruptcy and to avoid immediate and irreparable harm to their businesses and estates, and is in the best interests of the Debtors' creditors, estates, and other stakeholders.

For the reasons stated herein and in each First-Day Motion, I respectfully request that each First-Day Motion be granted in its entirety, together with such other and further relief as the Court deems just and proper. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 17, 2020

/s/ James S. Feltman

James S. Feltman
Responsible Officer

Exhibit 1

Simplified Organizational Chart for the Debtors and Certain Affiliates



*all ownership is 100% unless otherwise noted

# EXHIBIT 7

**WRB PARTNERS, LLC**
**10200 Aurora Hudson Road**
**Streetsboro, Ohio 44241**

October 3, 2020

<u>**VIA FEDERAL EXPRESS**</u>

RGN-Cleveland II, LLC
c/o Regus Corporation
3000 Kellway Drive, Suite 140
Carrollton, TX 75006
Attn: Lease Administrator

RGN-Cleveland II, LLC
c/o Regus Corporation
One Alliance Center, Suite1500
3500 Lenox Road
Atlanta, GA 30346
Attn: Michael Berretta

    **Re:    Lease Agreement by and between WRB Partners, LLC and RGN-Cleveland II,**
              **LLC for Premises at 1468 West Ninth Street, Cleveland, Ohio 44113**
              **Second Request for Adequate Assurances**

To Whom It May Concern:

Reference is made to that certain Lease Agreement by and between WRB Partners, LLC (as Landlord) and RGN-Cleveland II, LLC (as Tenant) dated as of December 13, 2019 (the "Lease"), and the related Guarantee Agreement executed by WRG Global Investments SARL ("Guarantor") dated as of December 13, 2019 (the "Guarantee").[1] We write once again to express our concern regarding Tenant's ability to perform under the Lease and we hereby submit this second Request for Adequate Assurances seeking, among other things, financial information and plans from Tenant in an effort to ensure it will be able to perform the Lease.

This letter follows our letter of August 21, 2020, which contained Landlord's first Request for Adequate Assurances. Although Tenant provided some of the materials requested in that letter (i.e., a certificate of insurance, 2019 annual financials), it failed to provide other requested materials, to which Landlord is entitled under the Lease, including: a detailed construction plan for the Tenant Improvements, as required by Lease Section 17.3(i)[2]; a builder's risk insurance

---

[1] All capitalized terms in this letter not otherwise defined herein shall have the meanings ascribed to them in the Lease and Guarantee.

[2] The PCI One Source Contracting estimate and schedule Tenant provided are not nearly detailed or comprehensive enough to constitute "Tenant's Plans," let alone provide Landlord with adequate assurances. In addition to other deficiencies, we are troubled that these materials appear to omit important parts of the work to be performed. For instance, the PCI estimate does not price sprinklers for the west half of the building. This is unacceptable. As PCI

policy, as required by Section 17.3(i); the identity of any subcontractors who will work on the Tenant Improvements, for Landlord's approval, as required by Section 17.3(i); Tenant's W-9; and Tenant's Contact Information Form. In addition, Tenant has not furnished Landlord with its contract with the contractor it has apparently selected, PCI One Source Contracting ("PCI"). This contract is obviously material to the construction plans for the Tenant Improvements and must be provided to Landlord as a part of Tenant's construction plans. We repeat our demand that you provide all of the above items immediately.

Also, we note with concern that Tenant has yet to provide Landlord with proof that PCI is licensed in Ohio. It should go without saying that Landlord will reasonably decline to accept any unlicensed contractor to perform the Tenant Improvements. Please immediately provide proof that PCI is licensed in Ohio.

Further, events transpiring with respect to Tenant require that additional information be provided to Landlord to ensure that Tenant will be able to perform the Lease despite the formidable challenges it currently faces. It is no secret that the market for the corporate workspace services Tenant provides faces steep challenges. Beginning July 31, 2020 and continuing to date, more than 100 of Tenant's corporate affiliates have already declared bankruptcy. *See* Jonathan Randles, *Regus Affiliates to Tap Bankruptcy Loan to Pay Rent on Co-Working Spaces*, Wall Street Journal, Sept. 29, 2020.[3] These market conditions, and the rash of bankruptcy filings by Tenant's affiliate companies raise well-grounded concerns that Tenant is on the brink of insolvency and will soon follow its corporate affiliates into bankruptcy. Tenant's affiliates and their professionals have made clear in the bankruptcies already filed that these affiliates are highly-integrated (legally, financially and operationally), function under a business model involving a myriad of intercompany transfers, transactions and obligations, and that through the bankruptcies and otherwise they intend to seek "forbearances, temporary accommodations and where possible, permanent modifications" from their landlords.[4] Landlord has no intention of expending nearly two million dollars to fund Tenant Improvements only to have Tenant declare bankruptcy. Tenant's past lack of transparency and breaches of the Lease, including as detailed more fully in the August 21, 2020 letter, only exacerbate the sense of uncertainty and instability surrounding Tenant's ability to perform.

Accordingly, in order to give Landlord the assurances it requires to continue performing the Lease by, for example, funding the Tenant Improvements, Landlord hereby demands that Tenant also provide it with:
- Its most recent monthly financial statements;
- Its most recent financial projections;
- Its most recent capital expenditure budgets;
- The most recent monthly financial statements for IWG Global Investments sarl;
- The most recent financial projections for IWG Global Investments sarl;

---

should know, sprinklers are a code requirement that must be included in any adequate construction plan. We are surprised that an Ohio-licensed contractor would omit these from its estimate.

[3] Available at: https://www.wsj.com/articles/regus-affiliates-to-tap-bankruptcy-loan-to-pay-rent-on-co-working-spaces-11601404109?st=jjjpgoz0tz6kclt.

[4] Declaration of James S. Feltman in Support of Chapter 11 Petitions and First Day Relief (Dkt. No. 3, p. 14), available at: https://dm.epiq11.com/case/rgn/dockets.

- The most recent monthly financial statements for any of Tenant's corporate affiliates that could have a material impact on its ability to perform, including without limitation, Regus Corporation and Regus Management Group, LLC;
- The most recent financial projections for any of Tenant's corporate affiliates that could have a material impact on its ability to perform, including without limitation, Regus Corporation and Regus Management Group, LLC;
- All financial and other disclosures made and to be made by any of Tenant's corporate affiliates to any Official Committee of Unsecured Creditors appointed in the bankruptcy cases of any of Tenants' corporate affiliates;
- A clear, definite, transparent business plan sufficient to demonstrate Tenant's ability to continue performing the Lease.

We understand that Tenant has already had discussions with a contractor concerning the build-out of the Leased Premises and we are as eager as Tenant to go forward with the build-out—assuming Tenant can provide adequate assurances. Therefore, we demand that the above items be provided to Landlord no later than **October 12, 2020**.

Please do not hesitate to contact me if you would like to discuss any of the matters raised by this letter. We look forward to hearing from you.

Sincerely,

**WRB Partners, LLC**

Rico Pietro

cc (via email):      Ericka Irby (Ericka.Irby@iwgplc.com)
                           TeAndre Sistrunk (TeAndre.Sistrunk@iwgplc.com)
                           Leigh Moore (Leigh.Moore@iwgplc.com)
                           Apryl Cahill (Apryl.Cahill@iwgplc.com)
                           Maura Maresh (Maura@geisco.net)
                           Al Krist (Al@geisco.net)

# EXHIBIT 8

# WRB PARTNERS, LLC
## 10020 Aurora Hudson Road
## Streetsboro, Ohio 44241

October 13, 2020

**VIA FEDERAL EXPRESS**

RGN-Cleveland II, LLC
c/o Regus Corporation
3000 Kellway Drive, Suite 140
Carrollton, TX 75006
Attn: Lease Administrator
Attn: Legal Department
Attn: Chief Financial Officer

RGN-Cleveland II, LLC
c/o Regus Corporation
One Alliance Center, Suite1500
3500 Lenox Road
Atlanta, GA 30346
Attn: Michael Berretta

IWG Global Investments SARL
26 Boulevard Royal
Luxembourg L-2449
Luxembourg

Re:    **Lease Agreement by and between WRB Partners, LLC and RGN-Cleveland II,
       LLC for Premises at 1468 West Ninth Street, Cleveland, Ohio 44113
       Notice of Termination**

To Whom It May Concern:

Reference is made to that certain Lease Agreement by and between WRB Partners, LLC (as Landlord) and RGN-Cleveland II, LLC (as Tenant) dated as of December 13, 2019 (the "Lease").[1] As Tenant has not furnished Landlord with the adequate assurances requested and demanded from it in Landlord's First Request for Adequate Assurances, dated August 21, 2020, or its Second Request for Adequate Assurances, dated October 3, 2020, Landlord hereby states that it deems Tenant to have breached and repudiated the Lease, and Landlord therefore terminates the Lease, effective immediately. Accordingly, Landlord demands that Tenant, its contractors and subcontractors, and anyone else acting for or on Tenant's behalf, cease and desist from performing any additional construction or demolition work on the Premises. Landlord reserves all rights under the Lease and otherwise available under the law.

---

[1] All capitalized terms in this letter not otherwise defined herein shall have the meanings ascribed to them in the Lease.

Sincerely,

**WRB PARTNERS, LLC**

cc (via email):      Ericka Irby (Ericka.Irby@iwgplc.com)
                          TeAndre Sistrunk (TeAndre.Sistrunk@iwgplc.com)
                          Leigh Moore (Leigh.Moore@iwgplc.com)
                          Apryl Cahill (Apryl.Cahill@iwgplc.com)
                          Maura Maresh (Maura@geisco.net)
                          Al Krist (Al@geisco.net)
                          Aaron Evenchik, Esq. (AEvenchik@hahnlaw.com)
                          Daniel A. DeMarco, Esq. (DADemarco@hahnlaw.com)
                          Eugene Endress, Esq. (EEndress@hahnlaw.com)

# EXHIBIT 9



REDACTED

**From:** Rico Pietro
**Sent:** Friday, October 9, 2020 3:01 PM
**To:** Joshua Nicosia <Joshua.Nicosia@iwgplc.com>
**Subject:** RE: 1468 W 9th Street-Cleveland IWGPLC Lease

Mr. Nicosia:

It is come to our attention that there is no valid building permit for the Tenant's space at 1468 W. 9th St. (the "Premises"). The performance of work on the Premises without necessary permits is a breach of, *inter alia*, Section 7.4 of the Lease. Therefore, we must require you, and any contractor, subcontractor, agent, servant, employee or anyone acting in concert or participation with any of them, to **cease and desist** immediately from any activity related to any building at the Premises unless and until you have provided Landlord with a building permit from the City of Cleveland that is reasonably satisfactory in form and substance to Landlord in its discretion.


Best,

RAP


**Rico Pietro, SIOR**
Principal
Cushman & Wakefield | CRESCO Real Estate

Direct:   +1 216 525 1473
Mobile: +1 216 235 1559
Office:  +1 216 520 1200
Fax:      +1 216 520 1828
rpietro@crescorealestate.com



3 Summit Park Drive, Suite 200
Cleveland, OH  44131 | USA
crescorealestate.com


LinkedIn | Facebook | Twitter |

View my personal LinkedIn profile

*Independently Owned and Operated / A Member of the Cushman & Wakefield Alliance*


**\*\*\*NOTICE\*\*\* This came from an external source. Use caution when replying, clicking links, or opening attachments.**



114854690

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

WRB PARTNERS, LLC
    Plaintiff

RGN-CLEVELAND II, LLC
    Defendant

Case No: CV-20-938826

Judge: CASSANDRA COLLIER-WILLIAMS

## JOURNAL ENTRY

CASE MGMNT CONFERENCE SET FOR 11/19/2020 AT 02:30 PM.
ALL PARTIES ARE TO CALL CONFERENCE CALL NUMBER 978-990-5000 AND ENTER ACCESS CODE 701774# AT THE SCHEDULED DATE AND TIME.

FAILURE OF THE PLAINTIFF TO APPEAR FOR THIS CMC WILL RESULT IN A DISMISSAL WITHOUT PREJUDICE.

COUNSEL FOR PLAINTIFF(S) SHALL INFORM ALL OPPOSING COUNSEL AND UNREPRESENTED PARTIES OF THE DATE, TIME, AND CONFERENCE CALL INSTRUCTIONS OF THE CASE MANAGEMENT CONFERENCE.

ANY ATTORNEY OR UNREPRESENTED PARTY WHO IS NOT AVAILABLE WILL BE DEEMED TO HAVE WAIVED HIS/HER PARTICIPATION AND TO HAVE ACCEPTED THE CASE SCHEDULING ORDER ESTABLISHED BY THE COURT.

PARTIES SHOULD NOT WAIT FOR THE CMC BEFORE BEGINNING TO CONDUCT DISCOVERY.

FAILURE TO APPEAR AT ANY COURT SCHEDULED EVENT IN THE FUTURE MAY RESULT IN DISMISSAL OF PLAINTIFF'S CLAIMS FOR WANT OF PROSECUTION OR JUDGMENT RENDERED AGAINST DEFENDANT.

SO ORDERED

_____
Judge Signature          10/21/2020

10/21/2020